ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                     :

      - v. -                               :        **INDICTMENT**

LAMONT EVANS,                                :        17 Cr.
EMANUEL RICHARDSON,
   a/k/a "Book,"
ANTHONY BLAND,                               :
   a/k/a "Tony,"                                
CHRISTIAN DAWKINS, and                       :
MERL CODE,

          Defendants.             :

- - - - - - - - - - - - - - - - - - x

**17 CRIM 684**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: NOV 0 7 2017

## Overview

    1.    The charges in this Indictment relate to the criminal influence of money on coaches and student-athletes who participate in intercollegiate basketball governed by the National Collegiate Athletic Association (the "NCAA"). As described herein, athlete advisors — including financial advisors and business managers such as CHRISTIAN DAWKINS, the defendant, as well as a co-conspirator not named herein ("CC-1") — participated in a scheme whereby they paid bribes to men's basketball coaches employed by NCAA Division I universities — including LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," and ANTHONY BLAND, a/k/a "Tony," the defendants. In exchange for the bribes, those coaches agreed to and did exert their influence over student-athletes under their control to retain the services of the bribe-payors once the athletes

eventually entered the National Basketball Association ("NBA").

2.    At all times relevant to this Indictment, LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," and ANTHONY BLAND, a/k/a "Tony," the defendants, by virtue of their official positions as NCAA Division I men's basketball coaches, had the ability to provide sports agents, financial advisors, business managers and others with access to the student-athletes whom they coach.  Moreover, EVANS, RICHARDSON, and BLAND had enormous influence over the student-athletes who played for them, including with respect to guiding those student-athletes through the process of selecting agents and other advisors when they prepared to leave college and enter the NBA.    EVANS, RICHARDSON, and BLAND exercised that influence by agreeing to steer and/or steering athletes and their families to retain particular advisors, not because of the merits of those advisors, but because these coaches were being bribed by the advisors to do so.

3.    The corrupt arrangements described in this Indictment were valuable both to LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," and ANTHONY BLAND, a/k/a "Tony," the defendants, who received cash bribes to deliver players to an agent or advisor, and to the bribor agents or advisors, including CHRISTIAN DAWKINS, the defendant, and CC-1, for whom securing a future NBA player as a client could prove extremely profitable.    As the scheme

2

participants knew, NBA draft picks can make tens of millions of dollars over the course of their NBA career, a portion of which they typically pay to their agents, and a portion of which they invest and have managed typically through financial advisors and business managers, resulting in lucrative fees for those agents and advisors.

4.      In addition, LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," and ANTHONY BLAND, a/k/a "Tony," the defendants, directed payments to certain student-athletes and/or their family members, which payments they knew would be concealed on certifications submitted by these student-athletes to their universities, as well as in the certifications submitted by EVANS, RICHARDSON, and BLAND to their respective universities.  These payments defrauded the universities by depriving them of the financial aid the universities continued to award to the relevant student-athletes under false pretenses.  The illicit payments to players' families also defrauded the universities by interfering with the universities' ability to control their assets, and creating a risk of tangible economic harm, including, among other things, decision-making about the distribution of their limited athletic scholarships; the possible disgorgement of certain profit-sharing by the NCAA; monetary fines; restrictions on athlete recruitment and the distribution of athletic scholarships; and the potential

3

ineligibility of the universities' basketball teams to compete in NCAA programs generally, and the ineligibility of certain student-athletes in particular.

## Relevant Entities

5.   At all relevant times, the University of South Carolina was a public research university located in South Carolina that, in each year relevant to this Indictment, received funds from the federal government in excess of $10,000 per year.  At all relevant times, the University of South Carolina fielded multiple varsity sports teams in NCAA Division I competition, including men's basketball.

6.   At all relevant times, Oklahoma State University was a public research university located in Oklahoma that, in each year relevant to this Indictment, received funds from the federal government in excess of $10,000 per year.  At all relevant times, Oklahoma State University fielded multiple varsity sports teams in NCAA Division I competition, including men's basketball.

7.   At all relevant times, the University of Arizona was a public research university located in Arizona that, in each year relevant to this Indictment, received funds from the federal government in excess of $10,000 per year.  At all relevant times, the University of Arizona fielded multiple varsity sports teams in NCAA Division I competition, including men's basketball.

8.   At all relevant times, the University of Southern California was a private research university located in California that, in each year relevant to this Indictment, received funds from the federal government in excess of $10,000 per year.  At all relevant times, the University of Southern California fielded multiple varsity sports teams in NCAA Division I competition, including men's basketball.

9.   At all relevant times, Sports Management Company-1 ("SMC-1") was a sports agency firm with headquarters based in New Jersey that specialized in the representation of professional basketball players.

## The Defendants and Relevant Individuals

10.   From in or about 2012 through in or about April 2016, LAMONT EVANS, the defendant, served as an assistant coach for the NCAA Division I men's basketball program at the University of South Carolina.   In or about April 2016, EVANS was hired by Oklahoma State University as the associate head coach for its Division I men's basketball program.

11.   At all relevant times, EMANUEL RICHARDSON, a/k/a "Book," the defendant, served as an assistant coach for the NCAA Division I men's basketball program at the University of Arizona.

12.   At all relevant times, ANTHONY BLAND, a/k/a "Tony," the defendant, served as an assistant coach for the NCAA Division I

men's basketball program at the University of Southern California.

13.   From in or about 2015 until in or about May 2017, CHRISTIAN DAWKINS, the defendant, worked for SMC-1.  DAWKINS was not a registered sports agent, and his work at SMC-1 primarily consisted of recruiting athletes as clients and maintaining client relationships for SMC-1.  In or about May 2017, SMC-1 terminated DAWKINS in connection with DAWKINS's alleged use of an athlete's credit card to pay for expenses from a ride services company without the athlete's authorization.  Beginning in May 2017, DAWKINS endeavored to start his own sports management business with CC-1, among others.

14.   At all relevant times, MERL CODE, the defendant, was a consultant for an athletic apparel company ("Company-1") and its high school and college basketball programs.  In that capacity, CODE worked directly with amateur and college basketball coaches and players.

15.   At all relevant times, CC-1 was a registered investment advisor and the founder of an investment services company in New Jersey.

16.   "CW-1," as referred to herein, is an individual who ran a business management firm that primarily serviced professional athletes, as well as a registered investment advisory firm that provided investment related services to CW-1's clients, including

athletes.   CW-1's activities described in this Indictment were undertaken during the course of his cooperation and at the instruction of law enforcement.

## Background on the NCAA and Relevant NCAA Rules

17.   The NCAA is a non-profit organization headquartered in Indianapolis, Indiana, which regulates athletics for over 1,000 colleges and universities, conferences, and other associations. NCAA member schools are organized into three separate Divisions: Division I, Division II, and Division III.   The University of South Carolina, Oklahoma State University, the University of Arizona, and the University of Southern California all are in NCAA's Division I, which is the highest level of intercollegiate athletics sanctioned by the NCAA.

18.   Division I schools typically have the biggest student bodies, manage the largest athletics budgets and offer the most athletic scholarships.   Among other things, Division I schools must offer a minimum amount of financial assistance (in the form of scholarships) to their athletes; however, at all times relevant to this Indictment, the NCAA set a maximum number of scholarships available for each sport that a Division I school could not exceed. Teams could offer no more than 13 athletic scholarships for the 2017-2018 men's basketball season.

19.   At all times relevant to this Indictment, the official

rulebook governing Division I schools was the NCAA Division I Manual (the "Manual"), which is published annually and which contains the NCAA Constitution and its operating bylaws (the "Bylaws"). Among the NCAA's core principles for the conduct of intercollegiate athletics was a directive that "[s]tudent-athletes shall be amateurs in an intercollegiate sport;" and that "student-athletes should be protected from exploitation by professional and commercial enterprises." The Constitution further stated that "an institution found to have violated the [NCAA]'s rules shall be subject to disciplinary and corrective actions as may be determined by the [NCAA]."

20. Consistent with the NCAA's core principles, any financial assistance to student-athletes other than from the university itself or the athletes' legal guardians was prohibited without express authorization from the NCAA. In addition, neither student-athletes, prospective student-athletes, nor their relatives could accept benefits, including money, travel, clothing or other merchandise directly or indirectly from outside sources such as agents or financial advisors.

21. At all relevant times, the NCAA Division I Bylaws defined an "agent" broadly as "any individual who, directly or indirectly, . . . seeks to obtain any type of financial gain or benefit . . . from a student-athlete's potential earnings as a professional

athlete." Specifically included in the definition of "agent" was, among others, "a certified contract advisor, financial advisor, marketing representative, brand manager or anyone who is employed or associated with such persons."

22. At all relevant times, a student-athlete was rendered "ineligible" to participate in Division I sports if the athlete was recruited by a university or any "representative of its athletics interests" in violation of NCAA rules.

23. At all relevant times, coaches and other team staff at NCAA Division I schools also were subject to various prohibitions, including on (i) facilitating contact between student-athletes and agents or financial advisors; and (ii) receiving compensation directly or indirectly from outside sources with respect to any actions involving the student-athletes.

24. At all relevant times, student-athletes, coaches, and staff members of university athletics departments were required to complete annual certifications regarding their knowledge of NCAA rules violations, and, in the case of student-athletes, their continued eligibility to participate in NCAA-sponsored sports.

25. At all relevant times, a student-athlete was required to, on an annual basis, "sign a statement . . . in which the student-athlete submits information related to eligibility, recruitment, financial aid, [and] amateur status," which is known

as the "Student-Athlete Statement." In the Student-Athlete Statement, the student-athlete represented, among other things, that "[a]ll information provided to the NCAA . . . and the institution's admissions office is accurate and valid, including . . . [his] amateur status" and that the student-athlete had "reported to [his] director of athletics . . . any violations of NCAA regulations involving [him] and [his] institution." Furthermore, in signing the Student-Athlete Statement, the student-athlete certified that "to the best of [his] knowledge, [he] ha[d] not violated any amateurism rules," and had "not provided false or misleading information concerning [his] amateur status to the NCAA . . . or the institution's athletics department."

26. At all relevant times, coaches and staff members were required to certify annually that they had reported to their university any knowledge of violations of NCAA rules involving their institution.

27. In addition, at all relevant times, the Bylaws prohibited student-athletes, coaches and staff members of athletics departments from "knowingly furnishing or knowingly influencing others to furnish the NCAA or the individual's institution false or misleading information concerning an individual's involvement in or knowledge of matters relevant to a

possible violation of an NCAA regulation."

28.   As set forth in the Bylaws, violations of NCAA rules by a university or any individual may lead to penalties including, but not limited to, limitations on a university's "participation in postseason play in the involved sport"; financial penalties including "requirements that an institution pay a fine, return revenue received from a specific athletics event or series of events, or . . . reduction[s] in or elimination of monetary distribution by" the NCAA; "limitations on the number of financial aid awards that may be provided" by the university to student-athletes; and recruiting restrictions including on the ability to conduct off-campus recruiting activities or to communicate by telephone or letter with prospective student-athletes.

## Allegations Relating to LAMONT EVANS

29.   Beginning in 2016, and continuing into 2017, LAMONT EVANS, the defendant, solicited and accepted at least $22,000 in bribes from, among others, CW-1, and in exchange agreed to and did exert his official influence over certain student-athletes that EVANS coached, first at the University of South Carolina, and then at Oklahoma State University, so that they would retain CW-1's business management services.

30.   CHRISTIAN DAWKINS, the defendant, first introduced CW-1 and CC-1 to LAMONT EVANS, the defendant, in order for CW-1 and CC-

11

1 to make bribe payments to EVANS in exchange for EVANS using his official position with the University of South Carolina to provide access to and influence over student-athletes that he coached to retain the services of CW-1 and CC-1. DAWKINS subsequently explained to CW-1 and CC-1 that coaches such as EVANS exerted significant control over student-athletes, and could direct the athletes to retain certain athlete advisors while keeping other advisors from gaining access to the athletes.[1]

31. In or about December 2015, CHRISTIAN DAWKINS, the defendant, spoke to CW-1 by telephone and informed him that, based on his discussions with LAMONT EVANS, the defendant, CW-1 would be expected to pay EVANS $25,000 in exchange for EVANS's agreement to steer multiple specific student-athletes to retain CW-1. From in or about April 2016 to in or about July 2017, EVANS received bribes from CW-1 and CC-1, both in cash and via wire transfers by CW-1 to an account controlled by EVANS.

32. As a result of the bribe payments, in or around February 2017, LAMONT EVANS, the defendant, arranged for CW-1 to meet with a student-athlete on the NCAA Division I men's basketball team at Oklahoma State University in connection with EVANS's attempt to

_____

[1] EVANS previously had solicited and accepted bribes from DAWKINS in connection with EVANS's role as a Division I men's basketball coach.

12

influence the student-athlete to retain CW-1.  During the meeting, EVANS repeatedly touted CW-1's ability to help the student-athlete, and pressured the student-athlete to use CW-1's services. EVANS did not disclose to the student-athlete that he had received bribes from CW-1 in exchange for directing the athlete to retain CW-1.  After the student-athlete left the meeting, CW-1 made a $2,000 bribe payment to EVANS.

33.  Moreover, LAMONT EVANS, the defendant, arranged to introduce CC-1, who previously had made bribe payments to EVANS, to the mother of a different student-athlete that EVANS had previously coached at the University of South Carolina for the purpose of pressuring the mother to retain CC-1.  EVANS also informed CW-1 in a subsequent meeting that EVANS would direct to CW-1 a particular high-caliber student-athlete whom EVANS anticipated would be joining the Oklahoma State University basketball team for the 2017-2018 season, and further promised CW-1 that he would use his influence over student-athletes under his control for the benefit of CW-1.

34.  In addition to accepting bribe payments in exchange for using his official position to steer and influence the student-athletes that he coached to retain the financial advisory and business management services of the bribe-payors, LAMONT EVANS, the defendant, solicited additional funds from CW-1 that EVANS

13

stated he would funnel to a high school basketball recruit so that this recruit would commit to attending Oklahoma State University.

## Allegations Relating to EMANUEL RICHARDSON

35. Beginning in or about February 2017, and continuing through September 2017, EMANUEL RICHARDSON, a/k/a "Book," the defendant, solicited and accepted at least $20,000 in bribes from, among others, CHRISTIAN DAWKINS, the defendant, CC-1, and an undercover FBI agent posing as CW-1's business partner ("UC-1"), and in exchange agreed to exert his official influence over certain student-athletes that RICHARDSON coached at the University of Arizona so that they would retain the business management and financial advisory services of DAWKINS and CC-1, respectively. Furthermore, RICHARDSON solicited a portion of the payments from DAWKINS, CC-1, and UC-1 for the stated purpose of making direct payments to a high school basketball recruit and/or his family so that this recruit would commit to attending the University of Arizona.

36. CC-1, CW-1, and UC-1 were first introduced to EMANUEL RICHARDSON, a/k/a "Book," the defendant, by CHRISTIAN DAWKINS, the defendant. During meetings and telephone conversations in or about May 2017 and June 2017, DAWKINS, CC-1, CW-1 and UC-1 discussed making bribe payments to RICHARDSON in exchange for RICHARDSON using his official position with the University of

Arizona to steer and influence the student-athletes that RICHARDSON coached to retain the services of a new sports management company being formed by DAWKINS, CC-1, and UC-1. UC-1 had been interposed into the investigation as an individual who could provide financial backing to DAWKINS's new company.

37.  On or about June 20, 2017, EMANUEL RICHARDSON, a/k/a "Book," the defendant, CC-1, CW-1, UC-1, and another undercover FBI agent posing as CW-1's business partner ("UC-2"), among others, met in Manhattan, New York, as arranged by CHRISTIAN DAWKINS, the defendant. During the meeting, RICHARDSON agreed that he would steer the student-athletes that he coached at the University of Arizona to retain the services of the new sports management company controlled by DAWKINS, CC-1, and UC-1. At the end of the meeting, RICHARDSON accepted a $5,000 cash bribe payment from UC-1.

38.  In or about July 2017, EMANUEL RICHARDSON, a/k/a "Book," the defendant, solicited an additional $15,000 bribe from CHRISTIAN DAWKINS, the defendant, CC-1, and UC-1. RICHARDSON represented that he intended to provide these funds to a high school basketball prospect and/or his family so that this recruit would commit to attending the University of Arizona. On or about July 20, 2017, RICHARDSON met with CC-1 and UC-1 at CC-1's office in New Jersey and during the meeting received the $15,000 payment in cash from UC-1.

39.  On or about August 30, 2017, EMANUEL RICHARDSON, a/k/a "Book," and CHRISTIAN DAWKINS, the defendants, as well as CC-1 and UC-2 met in Arizona.  During the meeting, RICHARDSON stated that a relative of one of the student-athletes that RICHARDSON coached would be the primary decision-maker with respect to which athlete advisors that student-athlete would ultimately retain.  RICHARDSON assured DAWKINS, CC-1, and UC-2 that RICHARDSON would steer this student-athlete to retain the services of DAWKINS and CC-1.  Later that day, DAWKINS, CC-1, and UC-2 met with the relative of the aforementioned student-athlete and discussed, among other things, that RICHARDSON had sought to steer the student-athlete to retain DAWKINS and CC-1, and that the student-athlete was inclined to retain the services of DAWKINS and CC-1.

## Allegations Relating to ANTHONY BLAND

40.  As set forth in more detail herein, beginning in or around July 2017, and continuing into September 2017, CHRISTIAN DAWKINS, the defendant, CC-1 and UC-1 paid at least $13,000 in bribes to ANTHONY BLAND, a/k/a "Tony," the defendant, in exchange for BLAND's agreement to exert his official influence over certain student-athletes that BLAND coached to retain DAWKINS and CC-1's business management and/or financial advisory services once those athletes entered the NBA.  In addition, and as part of the scheme, DAWKINS, CC-1, and UC-2 paid and/or facilitated the payment of an

16

additional $9,000 directly to the families and/or close confidantes of student-athletes at the University of Southern California at BLAND's direction.

41. On or about June 20, 2017, CHRISTIAN DAWKINS and MERL CODE, the defendants, CC-1, CW-1, and UC-1 met in Manhattan, New York. The purpose of the meeting was for DAWKINS to introduce CODE to CC-1, CW-1, and UC-1. During this meeting, DAWKINS, CODE, CC-1, CW-1, and UC-1 discussed, among other things, CODE's utility to the scheme to make bribe payments to college basketball coaches, and how CODE could use his affiliation with Company-1 in order to assist DAWKINS, CC-1, CW-1, and UC-1 in developing relationships with college basketball coaches. CODE stated, among other things, that, due to his involvement in an amateur high school basketball league sponsored by Company-1, he frequently interacted with college basketball coaches. CODE agreed to identify coaches that would be willing to accept bribe payments in exchange for steering their student-athletes to retain the services of the company DAWKINS, CC-1, and UC-1 were forming. At the end of the meeting, UC-1 provided CODE with a $5,000 payment.

42. On or about July 7, 2017, CHRISTIAN DAWKINS and MERL CODE, the defendants, discussed by telephone, among other things, specific men's college basketball coaches that CODE could introduce to UC-1, including, among others, ANTHONY BLAND, a/k/a

"Tony," the defendant.   During the call, CODE stated that he expected to be paid $5,000 for each men's college basketball coach that he introduced to UC-1.   CODE and DAWKINS further discussed an upcoming trip to Las Vegas, Nevada, during which CODE would facilitate introductions to multiple men's basketball coaches who would be willing to accept bribes in order to steer student-athletes under their control to retain the services of DAWKINS, CC-1 and UC-1.   During a subsequent call on or about July 8, 2017, DAWKINS and CODE discussed a list of coaches with whom CODE would arrange meetings in Las Vegas, including, among others, BLAND.

43.   On or about July 29, 2017, ANTHONY BLAND, a/k/a "Tony," and CHRISTIAN DAWKINS, the defendants, as well as UC-1 and CW-1, met in a hotel room in Las Vegas, Nevada, which meeting had been arranged by MERL CODE, the defendant.   During the meeting, BLAND confirmed that he would use his influence to steer student-athletes at the University of Southern California to retain the new sports management company being formed by DAWKINS, CC-1, and UC-1.   BLAND also confirmed that, by virtue of his position as a coach for the University of Southern California's basketball team, he exerted significant influence over his athletes in deciding which agents and advisors to retain.   At the end of the meeting, in the presence of BLAND, DAWKINS confirmed with UC-1 that UC-1 brought $13,000 in bribe money for BLAND that BLAND had solicited from DAWKINS.

18

DAWKINS then provided the $13,000 bribe to BLAND outside the hotel room.

44.   Following the payment of the $13,000 bribe, ANTHONY BLAND, a/k/a "Tony," the defendant, orchestrated a meeting among CHRISTIAN DAWKINS, the defendant, CC-1, UC-2, and a family member and/or close family friend of a current student-athlete on the University of Southern California's men's basketball team, as well as a family member of a rising freshman that would be joining the University of Southern California's men's basketball team.   During the meetings, DAWKINS, CC-1, and UC-2 provided payments directly to the family members and/or close family friends of the aforementioned student-athletes, as directed by BLAND.

45.   During an in-person meeting on or about August 31, 2017, in California, ANTHONY BLAND, a/k/a "Tony," the defendant, informed CHRISTIAN DAWKINS, the defendant, CC-1, and UC-2 that if they continued to fund payments to the family members of University of Southern California men's basketball players and recruits, then BLAND would ensure that those student-athletes retained DAWKINS's and CC-1's services once the athletes entered the NBA.

## COUNT ONE
### (Conspiracy To Commit Bribery)

The Grand Jury charges:

46.   The allegations set forth in paragraphs 1 through 45 of this Indictment are repeated and realleged as if fully set forth herein.

47.   From at least in or about 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," ANTHONY BLAND, a/k/a "Tony," CHRISTIAN DAWKINS, and MERL CODE, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, violations of Title 18, United States Code, Sections 666(a)(1)(B) and 666(a)(2).

48.   It was a part and object of the conspiracy that LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," and ANTHONY BLAND, a/k/a "Tony," the defendants, being agents of organizations that received, in a one-year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, the University of South Carolina, Oklahoma State University, the University of Arizona, and the University of Southern

20

California, corruptly would and did solicit and demand for the benefit of a person, and accept and agree to accept, something of value from, among others, CHRISTIAN DAWKINS, the defendant, as well as CC-1, CW-1 and undercover law enforcement officers, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such organizations, involving something of value of $5,000 and more, in violation of Title 18, United States Code, Section 666(a)(1)(B).

49.   It was further a part and an object of the conspiracy that CHRISTIAN DAWKINS and MERL CODE, the defendants, and others known and unknown, corruptly would and did give, offer, and agree to give something of value to a person, with intent to influence and reward an agent of an organization, in connection with business, transactions, and series of transactions of such organization involving a thing of value of $5,000 and more, while such organization was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, in violation of Title 18, United States Code, Section 666(a)(2).

## Overt Acts

50.   In furtherance of this conspiracy, and to effect the illegal objects thereof, the following overt acts, among others,

21

were committed in the Southern District of New York and elsewhere:

a. On or about March 3, 2016, in South Carolina, LAMONT EVANS, CHRISTIAN DAWKINS, the defendants, CC-1, and CW-1 met, during which meeting EVANS, DAWKINS, CC-1 and CW-1 discussed, in sum and substance, that EVANS could direct and influence certain student-athletes that EVANS coached at the University of South Carolina to retain the services of DAWKINS, CC-1 and CW-1.

b. On or about April 19, 2016, EVANS met with CW-1 and CC-1 in Manhattan, New York, during which meeting CC-1 provided EVANS with a cash bribe of $500.

c. On or about February 3, 2017, EVANS met with CW-1 in West Virginia, during which meeting CW-1 provided EVANS with a cash bribe of $2,000 and EVANS introduced CW-1 to a basketball player at Oklahoma State University.

d. On or about June 20, 2017, EMANUEL RICHARDSON, a/k/a "Book," the defendant, CC-1, CW-1, and UC-1, among others, met in Manhattan, New York, during which meeting RICHARDSON received a cash bribe of $5,000.

e. On or about June 20, 2017, MERL CODE, the defendant, DAWKINS, CC-1, CW-1 and UC-1, among others, met in Manhattan, New York, during which meeting CODE received a cash payment of $5,000 and agreed to identify and make introductions to men's college basketball coaches that would be willing to accept bribe payments

22

in exchange for steering their student-athletes to retain the services of the company being formed by DAWKINS, CC-1, and UC-1.

f.   On or about July 20, 2017, RICHARDSON, CC-1, and UC-1 met in New Jersey, during which meeting RICHARDSON received a cash bribe of $15,000.

g.   On or about July 29, 2017, DAWKINS, ANTHONY BLAND, a/k/a "Tony," the defendant, CW-1, and UC-1, among others, met in a hotel room in Las Vegas, Nevada to discuss BLAND's steering of student-athletes under his control to retain the services of the company being formed by DAWKINS, CC-1, and UC-1.   After the meeting, DAWKINS paid BLAND a $13,000 cash bribe.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Solicitation Of Bribes And Gratuities By An Agent Of A Federally Funded Organization – LAMONT EVANS)

The Grand Jury further charges:

51.   The allegations set forth in paragraphs 1 through 45 of this Indictment are repeated and realleged as if fully set forth herein.

52.   From at least in or about 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, LAMONT EVANS, the defendant, being an agent of organizations that received, in a one-year period, benefits in excess of $10,000 under a Federal program involving a grant,

contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, the University of South Carolina and Oklahoma State University, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such organizations involving a thing of value of $5,000 and more, to wit, EVANS, in his capacity as a coach for the men's basketball team at the University of South Carolina and then Oklahoma State University, solicited and accepted cash and things of value from CHRISTIAN DAWKINS, the defendant, CC-1, and CW-1, among others, which were intended to influence and reward EVANS in connection with the business of the University of South Carolina and Oklahoma State University.

(Title 18, United States Code, Section 666(a)(1)(B) and 2.)

### COUNT THREE
**(Solicitation Of Bribes And Gratuities By An Agent Of A Federally Funded Organization – EMANUEL RICHARDSON)**

The Grand Jury further charges:

53.    The allegations set forth in paragraphs 1 through 45 of this Indictment are repeated and realleged as if fully set forth herein.

54.    From at least in or about March 2017, up to and including in or about September 2017, in the Southern District of

24

New York and elsewhere, EMANUEL RICHARDSON, a/k/a "Book," the defendant, being an agent of an organization that received, in a one-year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, the University of Arizona, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such organization involving a thing of value of $5,000 and more, to wit, RICHARDSON, in his capacity as a coach for the University of Arizona's men's basketball team, solicited and accepted cash and things of value from CHRISTIAN DAWKINS, the defendant, CC-1, and UC-1, among others, which were intended to influence and reward RICHARDSON in connection with the business of the University of Arizona.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

## COUNT FOUR
**(Payments Of Bribes And Gratuities To An Agent Of A Federally Funded Organization – CHRISTIAN DAWKINS and MERL CODE)**

The Grand Jury further charges:

55.   The allegations set forth in paragraphs 1 through 45 of this Indictment are repeated and realleged as if fully set forth herein.

56.   From at least in or about 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHRISTIAN DAWKINS, the defendant, aided and abetted by MERL CODE, the defendant, corruptly did give, offer, and agree to give a thing of value to a person, with intent to influence and reward an agent of an organization, in connection with business, transactions, and series of transactions of such organization involving a thing of value of $5,000 and more, while such organization was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, DAWKINS offered and paid bribes to multiple NCAA men's college basketball coaches, including as facilitated by CODE, intending to influence and reward those coaches in connection with the business of their universities.

(Title 18, United States Code, Section 666(a)(2) and 2.)

## COUNT FIVE
### (Conspiracy To Commit Honest Services Wire Fraud)

The Grand Jury further charges:

57.   The allegations set forth in paragraphs 1 through 45 of this Indictment are repeated and realleged as if fully set forth herein.

58.   From at least in or about 2016, up to and including in

26

or about September 2017, in the Southern District of New York and elsewhere, LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," ANTHONY BLAND, a/k/a "Tony," CHRISTIAN DAWKINS, and MERL CODE, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit honest services wire fraud in violation of Title 18, United States Code, Sections 1343 and 1346.

59. It was a part and an object of the conspiracy that LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," ANTHONY BLAND, a/k/a "Tony," CHRISTIAN DAWKINS, and MERL CODE, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive EVANS's, RICHARDSON's, and BLAND's respective employers of their intangible right to their employees' honest services, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, EVANS, RICHARDSON, and BLAND, through telephone and email communications, and wire transfers of funds, among other means and methods, agreed to and did deprive their respective employers of their honest services by soliciting and receiving bribes from DAWKINS and CC-1, among others, some of

which were facilitated by MERL CODE, in exchange for which EVANS, RICHARDSON and BLAND agreed to and did exercise their influence as coaches at the University of South Carolina, Oklahoma State University, the University of Arizona, and the University of Southern California to persuade and pressure student-athletes to retain the services of DAWKINS and CC-1, among others.

(Title 18, United States Code, Section 1349.)

## COUNT SIX
### (Honest Services Wire Fraud – The University of South Carolina and Oklahoma State University)

The Grand Jury further charges:

60.  The allegations set forth in paragraphs 1 through 45 of this Indictment are repeated and realleged as if fully set forth herein.

61.  From at least in or about 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, LAMONT EVANS, the defendant, aided and abetted by CHRISTIAN DAWKINS, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the University of South Carolina and Oklahoma State University of their respective intangible rights to EVANS's honest services, and attempting to do so, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds

28

for the purpose of executing such scheme and artifice, to wit, EVANS and DAWKINS, among others, through telephone and email communications, and wire transfers of funds, among other means, agreed to and did deprive EVANS's employers of his honest services by soliciting and receiving bribes, in exchange for which EVANS agreed to and did exercise his influence as a coach at the University of South Carolina and Oklahoma State University to persuade and pressure student-athletes to retain the services of DAWKINS, CC-1, and CW-1, among others.

(Title 18, United States Code, Section 1343, 1346, 1349, and 2.)

## COUNT SEVEN
### (Honest Services Wire Fraud – The University of Arizona)

The Grand Jury further charges:

62.   The allegations set forth in paragraphs 1 through 45 of this Indictment are repeated and realleged as if fully set forth herein.

63.   From at least in or about March 2017, up to and including in or about September 2017, in the Southern District of New York and elsewhere, EMANUEL RICHARDSON, a/k/a "Book," the defendant, aided and abetted by CHRISTIAN DAWKINS, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the University of Arizona of its intangible right to RICHARDSON's honest services, and

attempting to do so, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, RICHARDSON and DAWKINS, among others, through telephone and email communications, and wire transfers of funds, among other means, agreed to and did deprive RICHARDSON's employer of his honest services by soliciting and receiving bribes, in exchange for which RICHARDSON agreed to and did exercise his influence as a coach at the University of Arizona to persuade and pressure student-athletes to retain the services of DAWKINS and CC-1, among others. (Title 18, United States Code, Section 1343, 1346, 1349, and 2.)

## COUNT EIGHT
### (Wire Fraud Conspiracy)

The Grand Jury further charges:

64.   The allegations set forth in paragraphs 1 through 45 of this Indictment are repeated and realleged as if fully set forth herein.

65.   From at least in or about 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," ANTHONY BLAND, a/k/a "Tony," and CHRISTIAN DAWKINS, the defendants, and others known and unknown, willfully and knowingly did combine,

conspire, confederate, and agree together and with each other to commit wire fraud in violation of Title 18, United States Code, Section 1343.

66. It was a part and object of the conspiracy that LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," ANTHONY BLAND, a/k/a "Tony," and CHRISTIAN DAWKINS, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, EVANS, RICHARDSON, BLAND, and DAWKINS, and others known and unknown, participated in a scheme to defraud the University of South Carolina, Oklahoma State University, the University of Arizona, and the University of Southern California by facilitating and concealing bribe payments to prospective and current student-athletes at those universities, and/or their families, including by telephone, email, and wire transfers of funds, among other means, thereby causing the University of South Carolina, Oklahoma State University, the University of Arizona,

31

and the University of Southern California to provide or agree to provide athletic scholarships to student-athletes who, in truth and in fact, were ineligible to compete as a result of the bribe payments.

67.   It was a further part and object of the conspiracy that LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," ANTHONY BLAND, a/k/a "Tony," and CHRISTIAN DAWKINS, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, EVANS, RICHARDSON, BLAND, and DAWKINS, and others known and unknown, participated in a scheme to defraud the University of South Carolina, Oklahoma State University, the University of Arizona, and the University of Southern California by making and concealing bribe payments to prospective and current student-athletes at those universities, and/or their families, including by telephone, email, and wire transfers of funds, among other means, which deprived the University of South Carolina,

32

Oklahoma State University, the University of Arizona, and the University of Southern California of the right to control the use of their assets, including the decision of how to allocate a limited number of athletic scholarships, and which, if revealed, would have further exposed the University of South Carolina, Oklahoma State University, the University of Arizona, and the University of Southern California to tangible economic harm, including monetary and other penalties imposed by the NCAA.

(Title 18, United States Code, Section 1349.)

## COUNT NINE
### (Travel Act Conspiracy)

The Grand Jury further charges:

68.   The allegations set forth in paragraphs 1 through 45 of this Indictment are repeated and realleged as if fully set forth herein.

69.   From at least in or about 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," ANTHONY BLAND, a/k/a "Tony," CHRISTIAN DAWKINS, and MERL CODE, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, a violation of Title 18, United States Code, Section 1952.

70.   It was a part and object of the conspiracy that LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," ANTHONY BLAND, a/k/a "Tony," CHRISTIAN DAWKINS, and MERL CODE, the defendants, and others known and unknown, willfully and knowingly would and did travel in interstate commerce, and use and cause to be used the mail and facilities in interstate and foreign commerce, with the intent to distribute the proceeds of an unlawful activity, and to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, to wit, the offering by DAWKINS, CC-1, and CW-1, and others known and unknown, and the acceptance by EVANS of commercial bribes, in violation of S.C. Code Ann. § 16-17-540 and 21 Okl. St. Ann. § 380, the acceptance by RICHARDSON of commercial bribes, in violation of A.R.S. § 13-2605, and the acceptance by BLAND, as facilitated by CODE, of commercial bribes, in violation of Cal. Penal Code § 641.3, thereafter would and did perform and attempt to perform an act to distribute the proceeds of said unlawful activity, and to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(1) and (a)(3).

34

## Overt Acts

71. In furtherance of this conspiracy, and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about March 3, 2016, in South Carolina, LAMONT EVANS, CHRISTIAN DAWKINS, the defendants, CC-1, and CW-1 met, during which meeting EVANS, DAWKINS, CC-1 and CW-1 discussed, among other things, that EVANS could direct and influence certain student-athletes that EVANS coached at the University of South Carolina to retain the services of DAWKINS, CC-1 and CW-1.

b. On or about April 19, 2016, EVANS met with CW-1 and CC-1 in Manhattan, New York, during which meeting CW-1 provided EVANS with a cash bribe of $500.

c. On or about February 3, 2017, EVANS met with CW-1 in West Virginia, during which meeting CW-1 provided EVANS with a cash bribe of $2,000 and EVANS introduced CW-1 to a basketball player at Oklahoma State University.

d. On or about June 20, 2017, EMANUEL RICHARDSON, a/k/a "Book," the defendant, CC-1, CW-1, and UC-1, among others, met in Manhattan, New York, during which meeting RICHARDSON received a cash bribe of $5,000.

e. On or about June 20, 2017, MERL CODE, the defendant, DAWKINS, CC-1, CW-1 and UC-1, among others, met in Manhattan, New

York, during which meeting CODE received a cash payment of $5,000 and agreed to identify and make introductions to men's college basketball coaches that would be willing to accept bribe payments in exchange for steering their student-athletes to retain the services of the company being formed by DAWKINS, CC-1, and UC-1.

       f.   On or about July 20, 2017, RICHARDSON, CC-1, and UC-1 met in New Jersey, during which meeting RICHARDSON received a cash bribe of $15,000.

       g.   On or about July 29, 2017, ANTHONY BLAND, a/k/a "Tony," the defendant, DAWKINS, CW-1, and UC-1, among others, met in a hotel room in Las Vegas, Nevada to discuss BLAND's steering of student-athletes under his control to retain the services of the company being formed by DAWKINS, CC-1, and UC-1. After the meeting, DAWKINS paid BLAND a $13,000 cash bribe.

       (Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATIONS

    72.  As a result of committing the offenses charged in Counts One, Five, and Nine of this Indictment, LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," ANTHONY BLAND, a/k/a "Tony," CHRISTIAN DAWKINS, and MERL CODE, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is

derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

73. As a result of committing the offense charged in Count Eight of this Indictment, LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," ANTHONY BLAND, a/k/a "Tony," and CHRISTIAN DAWKINS, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

74. As a result of committing the offense charged in Count Two of this Indictment, LAMONT EVANS, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

37

75.   As a result of committing the offense charged in Count Three of this Indictment, EMANUEL RICHARDSON, a/k/a "Book," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

76.   As a result of committing the offense charged in Count Four of this Indictment, CHRISTIAN DAWKINS and MERL CODE, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

77.   As a result of committing the offense charged in Count Six of this Indictment, LAMONT EVANS and CHRISTIAN DAWKINS, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and

personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

78.   As a result of committing the offense charged in Count Seven of this Indictment, EMANUEL RICHARDSON, a/k/a "Book," and CHRISTIAN DAWKINS, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

<u>Substitute Asset Provision</u>

79.   If any of the above described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981,
Title 21, United States Code, Section 853, and
Title 28, United States Code, Section 2461.)


_____
FOREPERSON

November 23, 2017

_____
JOON H. KIM
Acting United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

LAMONT EVANS,
EMANUEL RICHARDSON, a/k/a "Book,"
ANTHONY BLAND, a/k/a "Tony,"
CHRISTIAN DAWKINS, and
MERL CODE

Defendants.

INDICTMENT

17 Cr.

(18 U.S.C. §§ 371, 666, 1343, 1346,
1349, and 2.)

JOON H. KIM
Acting United States Attorney.

A TRUE BILL

*Bibi Trislan-Bermuder*
Foreperson.

*November 7, 2017*

*11/7/17 - Filed Indictment*
*bc   Case assigned to J Ramos*
*J Pitman*
*USMJ*