UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

UNITED STATES OF AMERICA                          :

   -v.-                                                      :          17 Cr. 684 (ER)

LAMONT EVANS,                                             :
EMANUEL RICHARDSON,
  a/k/a "Book,"                                             :
ANTHONY BLAND,
  a/k/a "Tony,"                                            :
CHRISTIAN DAWKINS, and
MERL CODE                                                    :

                   Defendants.          :

------------------------------------------------------------------x

# GOVERNMENT OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS (1) TO DISMISS THE INDICTMENT, (2) TO SUPPRESS WIRETAP EVIDENCE, (3) TO SUPPRESS CELLPHONE EVIDENCE, AND (4) A BILL OF PARTICULARS, AND ADDITIONAL DISCOVERY, INCLUDING, EARLY DISCLOSURE OF ANY *BRADY* AND *GIGLIO* EVIDENCE

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Robert L. Boone
Noah Solowiejczyk
Eli J. Mark
Assistant United States Attorneys

- Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................................1

BACKGROUND ...............................................................................................................................2

    A.    The Defendants' Bribery Scheme ...............................................................................2

    B.    The Indictment .............................................................................................................3

THE MOTION TO DISMISS THE INDICTMENT .........................................................................4

    I.    APPLICABLE LAW ..................................................................................................5

    II.    THE MOTION TO DISMISS SHOULD BE DENIED ...........................................6

    A.    The Indictment Properly Alleges a Federal Funds Bribery Scheme ....................7

    1.    Applicable Law ..............................................................................................7

    2.    Argument .....................................................................................................10

    B.    The Federal Funds Bribery Statute and the Honest Services Fraud Statute are Not Unconstitutionally Vague As Applied .....................................................15

    C.    The Indictment Properly Alleges a Scheme to Defraud the Universities of the Honest Services of Their Employees .....................................................................17

    D.    The Indictment Properly Alleges A Travel Act Conspiracy ...............................21

THE WIRETAP SUPPRESSION MOTION ...................................................................................22

    I.    BACKGROUND .....................................................................................................24

    A.    The April 7 Order and the Sood Phone .................................................................24

    B.    The Subsequent Wiretaps .......................................................................................25

    II.    THE MOTION TO SUPPRESS COMMUNICATIONS INTERCEPTED PURSUANT TO THE APRIL 7 ORDER BASED ON A TECHNICAL ERROR IN THAT ORDER SHOULD BE DENIED ........................................................................28

    A.    Applicable Law .........................................................................................................29

    B.    Argument ...................................................................................................................31

    1.    The Error in the April 7 Order Does not Render the Order "Insufficient on its Face" or Require Suppression Pursuant to Section 2518(10)(a)(ii) ...............................................................................32

    III.    THE MOTION TO SUPPRESS THE COMMUNICATIONS INTERCEPTED PURSUANT TO THE APRIL 7 ORDER ON PROBABLE CAUSE GROUNDS SHOULD BE DENIED ...............................................................................................42

    A.    Applicable Law .........................................................................................................42

    B.    Argument ...................................................................................................................44

    IV.    THE MOTION TO SUPPRESS THE COMMUNICATIONS INTERCEPTED PURSUANT TO THE APRIL 7 ORDER ON NECESSITY GROUNDS SHOULD BE DENIED .......49

    A.    Relevant Background ...............................................................................................50

B.    Applicable Law.................................................................................................... 51

C.    Argument .............................................................................................................. 52

V.    THE GOVERNMENT WAS ENTITLED TO RELY IN GOOD FAITH ON THE APRIL 7 ORDER .................................................................................................................. 56

VI.   EVEN IF THE APRIL 7 ORDER IS SUPPRESSED, THE COMMUNICATIONS INTERCEPTED PURSUANT TO THE ENSUING ORDERS SHOULD NOT BE SUPPRESSED BECAUSE THOSE ORDERS ARE BASED ON INDEPENDENT SOURCES ............................................................................................................... 58

A.    Applicable Law.................................................................................................... 59

B.    Argument .............................................................................................................. 60

VII. THE DEFENDANTS' REQUEST FOR THE GRAND JURY MINUTES SHOULD BE DENIED .................................................................................................................. 67

THE MOTION TO SUPPRESS THE CELLPHONE EVIDENCE ....................................... 68

I.    FACTS RELEVANT TO THE SEARCHES OF THE CELL PHONES ............................... 69

A.    Defendants' Arrests ............................................................................................ 69

B.    The Search Warrant Applications..................................................................... 70

C.    The Search Warrants........................................................................................... 72

D.    Execution of the Searches................................................................................... 73

II.   THE SEARCH WARRANTS WERE PROPERLY ISSUED AND RELIED UPON IN GOOD FAITH ........................................................................................................... 74

A.    Applicable Law.................................................................................................... 74

B.    The Search Warrants Were Supported by Probable Cause ............................. 76

C.    The Search Warrants Were Not Overbroad ..................................................... 77

D.    Law Enforcement Agents Relied in Good Faith on the Warrant..................... 82

THE MOTION FOR A BILL OF PARTICULARS, ADDITIONAL DISCOVERY, AND EARLY BRADY AND GIGLIO DISCLOSURES ...................................................................... 84

I.    THE DEFENDANTS' MOTION FOR A BILL OF A PARTICULARS SHOULD BE DENIED .................................................................................................................. 85

A.    The Defendants' Requests .................................................................................. 85

B.    Applicable Law.................................................................................................... 86

C.    Argument .............................................................................................................. 90

II.   THE DEFENDANTS' MOTION FOR EARLY BRADY AND GIGLIO DISCLOSURES SHOULD BE DENIED.............................................................................................. 94

CONCLUSION ......................................................................................................... 97

## TABLE OF AUTHORITIES

**Cases**

*Boyce Motor Lines, Inc.* v. *United States*, 342 U.S. 337 (1952) ................................................... 6

*Costello* v. *United States*, 350 U.S. 359 (1956) ....................................................... 5

*Franks* v. *Delaware*, 438 U.S. 154 (1978)......................................................................... 57

*Hamling* v. *United States*, 418 U.S. 87 (1974) ...................................................... 5

*Herring* v. *United States*, 555 U.S. 135 (2009)........................................................ 83

*Illinois* v. *Gates*, 462 U.S. 213 (1983) ........................................................ 43, 75, 76, 79

*In Re Nextel Cellular Telephone*, 2014 WL 2898262 (D. Kan. June 26, 2014) ........................................ 82

*Maryland* v. *Garrison*, 480 U.S. 79 (1987) ......................................................... 75

*McDonnell* v. *United States*, 136 S. Ct. 2355 (2016).................................................. 16

*Murray* v. *United States*, 487 U.S. 522 (1988) ...................................................... 60

*Nardone* v. *United States*, 303 U.S. 338 (1939) ..................................................... 60

*Russell* v. *United States*, 369 U.S. 749 (1962) ...................................................... 5

*Sabri* v. *United States*, 541 U.S. 600 (2004)........................................................ 8

*Salinas* v. *United States*, 522 U.S. 52 (1997)....................................................... 8, 9

*Segura* v. *United States*, 468 U.S. 796 (1984) ...................................................... 60

*Spinelli* v. *United States*, 393 U.S. 410 (1969) ..................................................... 43

*Texas* v. *Brown*, 460 U.S. 730 (1983)............................................................. 75

*Walczyk* v. *Rio*, 496 F.3d 139 (2d Cir. 2007).......................................................... 75

*Wong Sun* v. *United States*, 371 U.S. 471 (1963) .................................................. 59, 60

*United States* v. *Ambrosio*, 898 F. Supp. 177 (S.D.N.Y. 1995) ............................................. 43

*United States* v. *Amendolara*, 2002 WL 31368279 (S.D.N.Y. Oct. 21, 2002) ........................................ 92

*United States* v. *Bellomo*, 954 F. Supp. 630 (S.D.N.Y. 1997) ............................................. passim

*United States* v. *Berganza*, 2005 WL 372045 (S.D.N.Y. Feb. 16, 2005) ................................................. 87

*United States* v. *Bianco*, 998 F.2d 1112 (2d Cir. 1993) ............................................. 57

*United States* v. *Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ............................................. 85, 86, 87

*United States* v. *Boyland*, 862 F.3d 279 (2d Cir. 2017) ............................................. 16

*United States* v. *Brann*, 990 F.2d 98 (3d Cir. 1993) ............................................. 8, 10

*United States* v. *Brunshtein*, 344 F.3d 91 (2d Cir. 2003) ............................................. 17

*United States* v. *Byrnum*, 386 F. Supp. 449 (S.D.N.Y. 1974) ............................................. 40

*United States* v. *Callum*, 410 F.3d 571 (9th Cir. 2005) ............................................. 34, 38, 39, 41, 43

*United States* v. *Canter*, 338 F. Supp. 2d 460 (S.D.N.Y. 2004) ............................................. 96

*United States* v. *Caruso,* 415 F. Supp. 847 (S.D.N.Y. 1976) ............................................. 66

*United States* v. *Cephas*, 937 F.2d 816 (2d Cir. 1991) ............................................. 88

*United States* v. *Chavez,* 416 U.S. 562 (1972) ............................................. passim

*United States* v. *Cimino*, 31 F.R.D. 277 (S.D.N.Y. 1962) ......................................................... 89

*United States* v. *Concepcion*, 579 F.3d 214 (2d Cir. 2009) .................................................. 43, 52

*United States* v. *Coppa*, 267 F.3d 132 (2d Cir. 2001) ............................................................. 96

*United States* v. *Crozier*, 987 F.2d 893 (2d Cir. 1993) ........................................................... 17

*United States* v. *De La Pava*, 268 F.3d 157 (2d Cir. 2001) ....................................................... 5

*United States* v. *Diaz*, 176 F.3d 52 (2d Cir. 1999) .................................................... 42, 43, 51, 54

*United States* v. *Donovan*, 429 U.S. 413 (1977) ...................................................................... 30

*United States* v. *Elie*, 2012 WL 383403 (S.D.N.Y. Feb. 7, 2012) ............................................. 6

*United States* v. *Elson*, 968 F. Supp. 900 (S.D.N.Y. 1997) ...................................................... 6

*United States* v. *Facciolo*, 753 F. Supp. 449 (S.D.N.Y. 1990) ................................................ 87

*United States* v. *Farhane*, 634 F.3d 127 (2d Cir. 2011) ........................................................... 16

*United States* v. *Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987) ............................................... 55, 89

*United States* v. *Fernandez*, 722 F.3d 1 (1st Cir. 2013) ........................................................ 8, 11

*United States* v. *Ferrara*, 990 F. Supp. 146 (E.D.N.Y. 1998) ................................................... 9

*United States* v. *Finazzo*, 850 F.3d 94 (2d Cir. 2017) .............................................................. 47

*United States* v. *Forde*, 740 F. Supp. 2d 406 (S.D.N.Y. 2010) ................................................ 67

*United States* v. *Foy*, 641 F.3d 455 (10th Cir. 2011) ............................................................... 34

*United States* v. *Friend*, 2017 WL 6947861 (W.D. Mo. Dec. 8, 2017) .................................... 37

*United States* v. *Fudge*, 325 F.3d 910 (7th Cir. 2003) .................................................. 33, 34, 37, 41

*United States* v. *Fury*, 554 F. Supp. 522 (2d Cir. 1977) ...................................................... 22, 44

*United States* v. *Gallo,* 1999 WL 9848 (S.D.N.Y. Jan. 11, 1999) ....................................... 95, 96

*United States* v. *Galpin,* 720 F.3d 436 (2d Cir. 2013) .............................................................. 82

*United States* v. *Gangi,* 33 F. Supp. 2d 202 (S.D.N.Y. 1999) ............................................. 43, 44

*United States* v. *Ganim,* 510 F.3d 134 (2d Cir. 2007) ................................................................. 8

*United States* v. *Ganias,* 824 F.3d 199 (2d Cir. 2016) .............................................................. 78

*United States* v. *Gatto,* 2018 WL 1801313 (S.D.N.Y. Mar. 26, 2018) ............................... passim

*United States* v. *Geibel,* 369 F.3d 682 (2d Cir. 2004) ............................................................... 49

*United States* v. *Gigante*, 979 F. Supp. 959 (S.D.N.Y. 1997) .................................................. 44

*United States* v. *Giordano*, 416 U.S. 505 (1977) ................................................................ passim

*United States* v. *Glover*, 736 F.3d 509 (D.C. Cir. 2013) .............................................. 35, 36, 38

*United States* v. *Gray*, 521 F.3d 514 (6th Cir. 2008) ..................................................... 34, 40, 41

*United States* v. *Halloran*, 821 F.3d 321 (2d Cir. 2016) ............................................... 15, 21, 22

*United States* v. *Henry*, 861 F. Supp. 1190 (S.D.N.Y. 1994) .................................................... 89

*United States* v. *Hernandez*, 980 F.2d 868 (2s Cir. 1992) ......................................................... 5

*United States* v. *Howard*, 400 F. Supp. 2d 457 (N.D.N.Y. 2005) ............................................ 22

*United States* v. *Ikoli*, 2017 WL 396681 (S.D.N.Y. Jan. 26, 2017) .......................................... 95

v

*United States* v. *Juarez,* 2013 WL 357570 (E.D.N.Y. Jan. 29, 2013) .................................................... 78

*United States* v. *Kahn*, 415 U.S. 143 (1974) ...................................................................................... 51

*United States* v. *Kazarian*, 2012 WL 1810214 (S.D.N.Y. May 18, 2012) ................................. 87, 88, 93

*United States* v. *Keen*, 676 F.3d 981 (11th Cir. 2012) ....................................................................... 8, 11

*United States* v. *Kilgore*, 524 F.2d 957 (5th Cir. 1975) ...................................................................... 69

*United States* v. *Labate*, 2001 U.S. Dist. LEXIS 6509 (S.D.N.Y. May 18, 2001) ................................ 44

*United States* v. *Lace*, 669 F.2d 46 (2d Cir. 1982) ............................................................................ 60, 66

*United States* v. *Leon*, 468 U.S. 897 (1984) ................................................................... 31, 57, 58, 83

*United States* v. *Leonelli*, 428 F. Supp. 880 (S.D.N.Y. 1977) ............................................................ 90, 93

*United States* v. *Lilla*, 699 F.2d 99 (2d Cir. 1983) ................................................................ 52, 54, 55, 56

*United States* v. *Lino,* 2001 WL 8356 ........................................................................................... 91

*United States* v. *Lomelei*, 676 F.3d 734 (8th Cir. 2012) ................................................................... 33, 41

*United States* v. *Lupton*, 620 F.3d 790 (7th Cir. 2010) ................................................................... 8, 12

*United States* v. *Lustyik,* 57 F. Supp. 3d 228 (S.D.N.Y. 2014) ................................................................ 81

*United States* v. *Magaddino*, 496 F.2d 455 (2d Cir. 1974) ...................................................................... 44

*United States* v. *Mahabub*, 2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014) ................................. 87, 89, 90

*United States* v. *Marmolejo*, 89 F.3d 1185 (5th Cir. 1996) .................................................................. 9

*United States* v. *Martino*, 664 F.2d 860 (2d Cir. 1981) ............................................................................ 54

*United States* v. *McHale*, 495 F.2d 15 (7th Cir. 1974) ......................................................................... 66

*United States* v. *Miller*, 116 F.3d 641 (2d Cir. 1997) ............................................................................ 52

*United States* v. *Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001) ........................................................... 90, 93

*United States* v. *Monserrate*, 2011 WL 3480957 (S.D.N.Y. Aug. 4, 2011) ....................................... 88, 93

*United States* v. *Moore*, 41 F.3d 370 (8th Cir. 1994) ............................................................................ 34

*United States* v. *Muse*, 2007 WL 391563 (S.D.N.Y. Jan. 30, 2007) ....................................................... 67

*United States* v. *Muyet*, 945 F. Supp. 586 (S.D.N.Y. 1996) .................................................................... 88

*United States* v. *Nachamie*, 91 F. Supp. 2d 565 (2000) ........................................................................... 92

*United States* v. *Nichols*, 912 F.2d 598 (2d Cir. 1990) ........................................................................... 75

*United States* v. *Nouri*, 711 F.3d 129 (2d Cir. 2013) ........................................................................ 18, 19

*United States* v. *Panza*, 750 F.2d 1141 (2d Cir. 1984) ............................................................................. 89

*United States* v. *Payden*, 613 F. Supp. 800 (S.D.N.Y. 1985) ............................................................. 87, 88

*United States* v. *Perez*, 940 F. Supp. 540 (S.D.N.Y. 1996) .................................................................. 96

*United States* v. *Person*, 17 Cr. 683 (LAP) .................................................................................. passim

*United States* v. *Plotkin*, 550 F.2d 693 (1st Cir. 1977) ............................................................................ 66

*United States* v. *R. Enterprises, Inc.*, 498 U.S. 292 (1991)...................................................................... 67

*United States* v. *Radcliff*, 331 F.3d 1153 (10th Cir. 2003)................................................................ 34, 38, 41

*United States* v. *Rajaratnam*, 719 F.3d 139 (2d Cir. 2013) ..................................................................... 59

*United States* v. *Reddy*, 190 F. Supp. 2d 558 (S.D.N.Y. 2002) ................................................................. 91

*United States* v. *Rice*, 478 F.3d 704 (6th Cir. 2007) ................................................................. 57

*United States* v. *Rigas*, 490 F.3d 208 (2d Cir. 2007) ................................................................. 86

*United States* v. *Rigas*, 258 F. Supp. 29 299 (S.D.N.Y. 2003) ............................................................. 87, 90

*United States* v. *Rittweger*, 259 F. Supp. 2d 275 (S.D.N.Y. 2003) ......................................................... 92

*United States* v. *Robinson*, 663 F.3d 265 (7th Cir. 2011) ................................................................. 9

*United States* v. *Rodriguez*, 1999 WL 820558 (S.D.N.Y. Oct. 13, 1999) ................................................. 92

*United States* v. *Rosa*, 626 F.3d 56 (2d Cir. 2010) ................................................................. 75

*United States* v. *Rosen*, 716 F.3d 691 (2d Cir. 2013) ................................................................. 15, 16, 17

*United States* v. *Rueb*, 2001 WL 96177 (S.D.N.Y. Feb. 5, 2001) ............................................................. 96

*United States* v. *Ruiz*, 536 U.S. 622 (2002) ................................................................. 97

*United States* v. *Ruggiero*, 824 F. Supp. 379 (S.D.N.Y. 1993) ................................................................. 43

*United States* v. *Ruggiero*, 726 F.2d 913 (2d Cir. 1984) ................................................................. 52

*United States v. Salas*, 2008 U.S. Dist. LEXIS 92560 (S.D.N.Y. Nov. 5, 2008) .................................... 44

*United States v. Samsonov*, 2009 WL 176721 (S.D.N.Y. Jan. 23, 2009) ........................ 87, 88, 90, 92, 94

*United States v. Savin*, 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ...................................................... 91

*United States v. Scala,* 388 F. Supp. 2d 396 (S.D.N.Y. 2005) ................................................................. 44

*United States v. Scasino,* 513 F.2d 47 (5th Cir. 1975) ................................................................. 65

*United States v. Scurry*, 821 F.3d 1 (D.C. Cir. 2017) ................................................ 28, 29, 35, 36, 37, 38

*United States* v. *Shi Yan Liu*, 239 F.3d 138 (2d Cir. 2000) ................................................................. 81

*United States* v. *Silberstein,* 2003 WL 21488024 (S.D.N.Y. June 27, 2003) ......................................... 87

*United States* v. *Singh*, 390 F.3d 168 (2d Cir. 2004) ................................................................. 75, 79

*United States* v. *Skilling*, 561 U.S. 358 (2010) ................................................................. 16, 18, 19, 21

*United States* v. *Smith*, 155 F.3d 1051 (9th Cir. 1998) ................................................................. 66

*United States v. Solomonyan*, 451 F. Supp. 2d 626 (S.D.N.Y. 2006) ...................................................... 93

*United States* v. *Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ................................................................. 5

*United States* v. *Steinberg*, 525 F.2d 1126 (2d Cir. 1975) ................................................................. 55

*United States* v. *Stringer*, 730 F.3d 120 (2d Cir. 2013) ................................................................. 5, 6

*United States* v. *Tane*, 329 F.2d 848 (2d Cir. 1964) ................................................................. 67, 68

*United States* v. *Taylor*, 707 F. Supp. 696 (S.D.N.Y. 1989) ................................................................. 87

*United States* v. *Thompson*, 2013 WL 6246489 (S.D.N.Y. Dec. 3, 2013) ............................................. 89

*United States* v. *Tomero*, 462 F. Supp. 2d 565 (S.D.N.Y. 2006) ................................................ 31, 57, 84

*United States* v. *Torres*, 901 F.2d 205 (2d Cir. 1990) ........................................ 51, 52, 86, 88, 93

*United States* v. *Townsend*, 630 F.3d 1003 (11th Cir. 2011) ................................................................. 9

*United States* v. *Traitz*, 871 F.2d 368 (3d Cir. 1989) ................................................................. 33, 40, 41

*United States* v. *Travisano*, 724 F.2d 341 (2d Cir. 1983) ................................................................. 79

*United States* v. *Triana-Mateus*, 2002 WL 562649 (S.D.N.Y. Apr. 15, 2002) ...................................... 87

*United States* v. *Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001) ..................................................... 88, 92, 96

*United States* v. *Ulbricht*, 2014 WL 5090039 (S.D.N.Y. Oct. 10, 2014) .................................. 77, 78, 80

*United States* v. *Urlacher*, 979 F.2d 935 (2d Cir. 1992) ...................................................... 17

*United States* v. *Viera*, 2015 WL 171848 (S.D.N.Y. Jan. 14, 2015) ...................................... 96

*United States* v. *Vilar*, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) ................................. 78, 82

*United States* v. *Vitillo*, 490 F.3d 314 (3d Cir. 2007) ........................................................ 13

*United States* v. *Wac*, 498 F.2d 1227 (6th Cir. 1974) ................................................ 65

*United States* v. *Wagner*, 989 F.2d 69 (2d Cir. 1993) ........................................... 43, 54, 75, 76

*United States* v. *Walters*, 997 F.2d 1219 (7th Cir. 1993) ................................................ 47

*United States* v. *Whitehorn*, 829 F.2d 1225 (2d Cir. 1987) ....................................... 60

*United States* v. *Whitfield*, 590 F.3d 325 (5th Cir. 2009) ................................................ 13, 14

*United States* v. *Williams*, 565 F. Supp. 353 (N.D. I11. 1983) ................................................ 22

*United States* v. *Williams*, 540 U.S. 36 (1992) ........................................................ 6

*United States* v. *Winn*, 79 F. Supp. 3d 904 (S.D. I11. 2015) ........................................... 80, 81

*United States* v. *Wright*, 524 F.2d 1100 (2d Cir. 1975) ........................................... 22

*United States* v. *Yannotti*, 541 F.3d 112 (2d Cir. 2008) ..................................... 5, 6, 42

*United States* v. *Young*, 822 F.2d 1234 (2d Cir. 1987) ................................................ 52, 54, 55

*United States* v. *Zemlyansky*, 945 F. Supp. 438 (S.D.N.Y. 2013) .................................... 88, 89

**Statutes**

18 U.S.C. § 371 ............................................................ 3, 4, 45

18 U.S.C. § 666 ........................................................... passim

18 U.S.C. § 1343............................................................ 3, 4, 45, 48

18 U.S.C. § 1346 ............................................................ 3, 4, 15, 19, 48

18 U.S.C. § 1349 ............................................................ 3, 4, 45

18 U.S.C. § 1952 ........................................................... 4, 21, 45

18 U.S.C. § 2510 ........................................................... 22

18 U.S.C. § 2515 ........................................................... 35

18 U.S.C. § 2516 ............................................................ 25, 40, 61

18 U.S.C. § 2518 ........................................................... passim

18 U.S.C. §§ 2510-18 ............................................................ 29

Federal Rule of Criminal Procedure 7 ............................................................ 5, 86

Federal Rule of Criminal Procedure 29 ............................................................ 6

Federal Rule of Criminal Procedure 41 ............................................................ 78

ix

**Other**

Restatement (Third) of Agency § 1.01 (2006) .......................................................................... 12

Senate Report Number 98-225 (1983) ................................................................................... 8

Senate Report Number 90-1097 (1968) ................................................................. 52, 59, 60

**PRELIMINARY STATEMENT**

The Government respectfully submits this opposition in response to pretrial motions (the "Motions") filed by Christian Dawkins and Merl Code (collectively, "the defendants").[1] The motions pending before the court are as follows:

1.  The defendants move to dismiss all counts of the Indictment on various grounds (Defs. MTD Mtn.[2]);

2.  The defendants move to suppress evidence from Title III wiretaps, and for additional information concerning the presentment of wiretap evidence to the grand jury (Defs. Wiretap Mtn.);

3.  The defendants move to suppress evidence obtained from the search of their cellphones (Defs. Phones Mtn;); and

4.  Defendants Dawkins and Code move for a bill of particulars, and additional discovery, including, early disclosure of any *Brady* and *Giglio* evidence. (Defs. Discovery Mtn.)

These motions are almost entirely a reiteration of arguments made and rejected in the related cases of *United States v. Person et al.*, 17 Cr. 683 (LAP), and *United States v. Gatto et al.*, 17 Cr. 686 (LAK). For the reasons explained below, the defendants' motions should be denied in their entirety.

---

[1] The motions by the other three defendants are moot. By letter dated January 29, 2019, defendant Lamont Evans has withdrawn his motions; and defendants Richardson and Bland have both pleaded guilty to Count One of the Indictment.

[2] "Defs. MTD Mtn." refers to the Defendants' Joint Motion to Dismiss the Indictment (Dkt. 132); "Defs. MTD Br." refers to the Defendants' Memorandum in support of the Dismiss Mtn. (Dkt. 133); "Defs. Wiretap Mtn." refers to the Defendants' Joint Motion to Suppress Wiretap Evidence (Dkt. 128); "Defs. Wiretap Br." refers to the Defendants' Memorandum in support of the Wiretap Mtn. (Dkt. 130); "Defs. Phones Mtn." refers to the Defendants' Joint to Suppress Evidence Obtained from the Search of Defendants' Cell Phones (Dkt. 124); "Defs. Phones Br." refers to the Defendants' Memorandum in support of the Phones Mtn. (Dkt. 126); "Defs. Discovery Mtn." refers to the Defendants' Joint Motions for a Limited Bill of Particulars, Outstanding Discovery, and Early *Brady/Giglio* Disclosure (Dkt. 125); and "Defs. Discovery Br." refers to the Defendants' Memorandum in support of the Discovery Mtn. (Dkt. 129).

## BACKGROUND

### A.  The Defendants' Bribery Scheme

This case resulted from a long-term investigation by the Federal Bureau of Investigation ("FBI") and the United States Attorney's Offices for the Southern District of New York of the criminal influence of money on coaches and student-athletes who participate in intercollegiate basketball governed by the NCAA.  In Indictment 17 Cr. 684 (ER), defendants Lamont Evans, Emanuel Richardson, a/k/a "Book," Anthony Bland, a/k/a "Tony," Christian Dawkins, and Merl Code (collectively, the "defendants") are charged in a scheme that involves the corrupt influence of bribes paid to men's college basketball coaches.  Specifically, the Indictment charges that corrupt athlete advisors and their associates, such as Dawkins and Code, paid bribes to men's basketball coaches employed by NCAA Division I universities, including Evans, Richards, and Bland, with the expectation that in return the coaches would use their influence to steer college players under their control to sign contracts with Dawkins, Code and other bribe payers upon entering the National Basketball Association ("NBA").  (Indictment ¶¶ 1, 5-8.)  As alleged in the Indictment, at relevant times, Evans was a coach at the University of South Carolina and later Oklahoma State University; Richardson was a coach at the University of Arizona; and Bland was a coach at the University of Southern California.  (*Id.* ¶¶ 10-12).  Each of these universities received more than $10,000 in federal funds each year.  (*Id.* ¶¶ 5-8).

The Indictment provides extensive detail about the bribery scheme described above, including regarding certain specific corrupt payments to coaches who received bribes in return for a promise to deliver players to the bribe payers, including Dawkins, assisted by Code, for whom securing a future NBA player as a client could prove extremely profitable.  As further alleged in the Indictment, these payments were in direct violation of the coaches obligations to

2

their employers (the universities), including their obligations to comply with NCAA rules. (*Id.* ¶¶ 4, 17-28.) In particular, those rules – and the coaches' employment contracts mandating compliance with those rules -- expressly precluded coaches from facilitating contact between student-athletes and agents or financial advisors and from receiving compensation directly or indirectly from outside sources with respect to any actions involving student-athletes. (*Id.* ¶ 23.) As a result, the defendants' bribery scheme violated not just the NCAA rules, but also the coaches' duties of honest services to their employers.

## B.  The Indictment

The 40-page indictment, and the 59-page complaint that preceded it, detail at considerable length the defendants' scheme and the ways in which their conduct violated federal criminal laws. The Indictment was filed on November 7, 2017, in nine counts. As relevant here,[3] Count One charged Dawkins and Code with participating in a conspiracy to commit federal funds bribery, in violation of 18 U.S.C. §§ 371, 666(a)(1)(B) and 666(a)(2); Count Four charged Dawkins and Code with payment of bribes to an agent of a federally funded organization, to wit, multiple NCAA men's college basketball coaches, in violation of 18 U.S.C. § 666(a)(2) and 2; Count Five charged Dawkins and Code with conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349; Count Six charged Dawkins with honest services fraud concerning bribes paid to Evans as coach at the University of South Carolina and Oklahoma State University, in violation of 18 U.S.C. §§ 1343, 1346, 1349, and 2; Count Seven charged Dawkins with honest services fraud concerning bribes paid to Richardson as coach at the

---

[3] Counts Two and Three charge Lamont Evans and Emanuel Richardson respectively with the substantive offense of soliciting bribes and gratuities in violation of Title 18, United States Code, Section 666(a)(1)(B) and 2. (Indictment ¶¶ 51-54). Given that Richardson pleaded guilty to Count One of the Indictment and Evans has withdrawn his motions, the defendants' arguments relating to those specific charges are now moot.

University of Arizona, in violation of 18 U.S.C. §§ 1343, 136, 1349, and 2; and Count Nine

charged Dawkins and Code with participating in a conspiracy to commit bribery in violation of

the Travel Act, in violation of 18 U.S.C. §§ 371, 1952(a)(1) and (a)(3).[4]

## THE MOTION TO DISMISS THE INDICTMENT

The defendants move to dismiss all of the counts in the Indictment.  Briefly, the

defendants contend that Counts One and Four, which charge federal funds bribery offenses under

18 U.S.C. § 666, must be dismissed because these counts fail to allege that the defendant coaches

were acting as agents of their respective universities during the course of the charged scheme

and, even if they are agents of their universities, were not acting within the scope of their agency

when they directed certain players to retain the services of Dawkins's firm.  With respect to

Counts Five through Seven, which charge honest services wire fraud offenses, the defendants

argue that these counts should be dismissed because the Indictment fails to allege that any of the

three coaches owed a fiduciary duty to their respective universities and because, even if the

coaches did owe such a duty, the Indictment fails to allege that they were acting within the scope

of that duty when they sought to steer student-athletes to Dawkins, Code, and others.  The

defendants also argue that the federal funds bribery statute, 18 U.S.C. § 666, and honest services

fraud statute, 18 U.S.C. § 1346, are unconstitutionally vague as applied to their conduct.  Finally,

with respect to Count Nine, which charges Travel Act conspiracy, the defendants state that

"[a]lthough [the coaches] may have violated private rules governing coaches and players, clearly

they were not involved in any organized crime or other criminal activity," (Defs. MTD Br., at

18), which the defendants assert constitutes grounds for dismissal.

---

[4] The Government hereby gives notice that it no longer intends to proceed against Defendants
Dawkins and Code on Count Eight, charging the defendants with participating in a wire fraud
conspiracy in violation of 18 U.S.C. § 1349.

4

For the reasons set forth below, the motion to dismiss should be denied in its entirety.

## I.    APPLICABLE LAW

The dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted). Indeed, it is well-settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956).

To be valid on its face, "[a]n indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also* Fed. R. Crim. P. 7(c). In general, to satisfy the pleading requirements of Federal Rule of Criminal Procedure 7(c), "an indictment need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (internal quotation marks omitted).[5]  When determining whether a count sufficiently alleges a violation, the indictment should be read "in its entirety," *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992), and "must be read to include facts which are necessarily implied by the specific allegations made," *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (internal quotation marks omitted).

---

[5] Although there are circumstances in which greater specificity is required to pass muster under Rule 7(c) and the constitutional provisions it implicates, *see Stringer*, 730 F.3d at 125-26 (discussing, for example, the special case of *Russell v. United States*, 369 U.S. 749 (1962)), defendants do not and could not contend such circumstances are present here.

Finally, it is well settled that a facially valid indictment is not subject to challenge based on the quality or quantity of evidence. *See United States v. Williams*, 540 U.S. 36, 54 (1992); *United States v. Elie*, No. 10 Cr. 336 (LAK), 2012 WL 383403, at \*1 (S.D.N.Y. Feb. 7, 2012) (same).  A defendant seeking to challenge the sufficiency of the evidence must wait until after the close of the Government's case-in-chief at trial or after the jury's verdict.  *See* Fed. R. Crim. P. 29; *see also, e.g.*, *United States v. Elson*, 968 F. Supp. 900, 905 (S.D.N.Y. 1997); *see also Elie*, 2012 WL 383403, at \*1 ("[T]here is no summary judgment in criminal cases"). Indeed, because a post-trial motion is the proper avenue for challenging the accuracy or sufficiency of the Government's factual allegations, on a pretrial motion to dismiss, the allegations as set forth in the Indictment must be taken as true.  *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952).

## II.    THE MOTION TO DISMISS SHOULD BE DENIED

As an initial matter, there can be no serious dispute that the 40-page Indictment returned in this case amply alleges each of the elements of the offenses charged and fairly informs the defendants of the charges against which they must defend. *See Stringer*, 730 F.3d at 124.  As detailed extensively above, the Indictment alleges the existence of a conspiracy in which Evans, Richardson and Bland, as coaches for the Division I men's basketball team at their respective universities, accepted bribes from Dawkins, Code, and others in exchange for using their influence over the players that they coached to pressure and direct those players and their families to retain the services of the bribe payers, including Dawkins's new management company, once those players turned professional.

Moreover, far beyond "track[ing] the language of the statute charged and stat[ing] the time and place" of the alleged crime, *Yannotti*, 541 F.3d at 127, this Indictment – which was

6

preceded by a detailed 59-page criminal complaint – sets forth in considerable detail the manner and method in which the crimes were carried out.  That alone warrants denial of a motion ostensibly challenging the validity of the Indictment.  Nonetheless, the Government responds to each of the defendants' core arguments below.

## A.  The Indictment Properly Alleges a Federal Funds Bribery Scheme

The defendants urge the Court to dismiss the federal funds bribery counts of the Indictment – Counts One and Four, which charge a bribery conspiracy and a substantive bribery charge, respectively – on the grounds that the bribery charges fail to allege (1) that the defendant coaches were acting as agents of their respective universities during the course of the charged scheme, or, in the alternative, (2) that, even if the Indictment does allege the defendant coaches were agents of their respective universities, it fails to allege that the coach defendants were acting within the scope of their agency when they directed certain players to retain the services of Dawkins's firm.  (*See* Defs. MTD Br., at 15-17).  Moreover, the defendants claim, the charged conduct – *i.e.*, the defendant coaches steering college basketball players to Dawkins's firm in exchange for cash – does not constitute a "business or transaction" of their employers, the relevant universities.  (*See* Defs. MTD Br., at 17-18).  None of these arguments has merit.

### 1.  *Applicable Law*

Title 18, United States Code, Section 666 makes it a crime either to corruptly solicit or accept anything of value or to corruptly give or offer anything of value with the intent to influence an agent of an organization or of a State, local or Indian tribal government "in connection with any business, transaction, or series of transactions of such organization, government, or agency [that receives a threshold amount of federal funding] involving any thing of value of $5,000 or more."  18 U.S.C. § 666(a)(1)(B), (a)(2).  Thus,

7

Section 666 criminalizes "a quid pro quo agreement—to wit, a government official's receipt of a benefit in exchange for an act he has performed, or promised to perform, in the exercise of his official authority." *United States v. Ganim*, 510 F.3d 134, 141 (2d Cir. 2007). As the Supreme Court has described, Section 666 was designed "generally to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery" after prior bribery statutes had proven inadequate. *Sabri v. United States*, 541 U.S. 600, 606 (2004); *see also Salinas v. United States*, 522 U.S. 52, 58 (1997) (noting that Section 666 "was designed to extend federal bribery prohibitions to bribes offered to state and local officials employed by agencies receiving federal funds").

Two elements of this statute are relevant to the defendants' motions. *First*, the term "agent" is expressly defined in Section 666 as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1). Congress declined to provide any "further explication." S. Rep. No. 98-225, at 370. Courts therefore broadly construe the term "agent" in this context. *See*, *e.g.*, *United States v. Fernandez*, 722 F.3d 1, 11 (1st Cir. 2013) ("Narrowing the scope of § 666(d)(1)'s definition of 'agent' would be 'inconsistent not only with the expansive, unqualified language that Congress has elected to use, but also with Congress' clear objective of ensuring the integrity of entities receiving substantial sums of federal funds.") (quoting *United States* v. *Keen*, 676 F.3d 981, 991 (11th Cir. 2012)); *United States* v. *Lupton*, 620 F.3d 790, 800-01 (7th Cir. 2010) ("Parties cannot contract around definitions provided in criminal statutes; even if Lupton could not be considered a common law agent under Equis's contract, it is nonetheless possible for him to be an 'agent' under the terms of 18 U.S.C. § 666(d)(1)."); *United States v. Brann*, 990 F.2d 98, 101 (3d Cir.

1993) ("The definition thus includes in the term 'agent' an employee of any level from the lowest clerk to the highest administrator.").

Second, the "quo" element of the statute is reflected in the criminalization of bribery "in connection with any business, transaction, or series of transactions of" an entity receiving a qualifying amount of federal funds.  Section 666 does not define the terms "business," "transaction," or "series of transactions," but the Supreme Court has cautioned courts to avoid "narrowing construction[s]"of the "business or transaction clause."  Salinas, 522 U.S. at 57 (and noting that "[t]he word 'any,' which prefaces the business or transaction clause, undercuts the attempt to impose [a] narrowing construction"); see also United States v. Ferrara, 990 F. Supp. 146, 151 (E.D.N.Y. 1998) ("Congress fashioned [§ 666] to avoid the type of accounting quagmires which defendant invites us to enter.").  Accordingly, courts have broadly construed the terms "business" and "transaction" in this context.  See, e.g., United States v. Robinson, 663 F.3d 265, 275 (7th Cir. 2011) (finding that "the language of the business or transaction clause in § 666(a) is broad enough to include bribes offered to influence the intangible business or transactions of a federally funded organization . . . ."); United States v. Marmolejo, 89 F.3d 1185, 1191-93 (5th Cir. 1996) (finding that the transactional element of the § 666(a) offense "cover[s] transactions involving intangibles, such as conjugal visits, that are difficult to value."); United States v. Townsend, 630 F.3d 1003, 1011 (11th Cir. 2011) (finding that intangibles are things of value under Section 666(a)(1)(B).

9

2. *Argument*

With respect to the defendants' first argument – *i.e.*, that the Indictment fails to allege that the defendant coaches were acting as agents of their respective universities during the course of the charged scheme – the argument is belied by the plain language of the Indictment itself. Indeed, the Indictment alleges as much in the very first paragraph and throughout the Indictment, (*e.g.,* Indictment ¶ 1, 10-12, 29-45), and, at this stage, nothing more is required. Indeed, for just this reason, among others, the Honorable Loretta A. Preska recently rejected an identical challenge to the related case pending before her. *See generally United States v. Person*, 17 Cr. 683 (LAP), Dkt. No. 104 (hereinafter, "*Person* MTD Opinion").

Notwithstanding the plain facial sufficiency of the Indictment, the defendants argue, first, that Evans, Richardson, and Bland were not agents of their respective universities because they "had no control over the federal funds that were distributed to the Universities." (*See* Defs. MTD Br., at 16.) The argument, which raises factual issues that could not possibly be resolved at the motion-to-dismiss stage, fails in any event because it misstates the law. As stated above, the term "agent" is expressly defined in Section 666 as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or *employee* and a partner, director, officer, manager, and representative." 18 U.S.C. Section 666(d)(1) (emphasis added). It is undisputed that Evans was an *employee* of the University of South Carolina and Oklahoma State University, and Richardson and Bland were *employees* of the University of Arizona and the University of Southern California, respectively, during the period of the charged conduct. (*See* Defs. MTD Br., at 4-5). As such, Evans, Richardson, and Bland were all "agents" of their respective universities within the meaning of the statute. *See United States* v. *Brann*, 990 F.2d 98, 101 (3d Cir. 1993) ("The definition thus

10

includes in the term 'agent' an employee of any level from the lowest clerk to the highest administrator.").

Judge Preska reached the same conclusion in *United States* v. *Person*. In *Person*, Chuck Connors Person, a former basketball coach for Auburn University's men's basketball team, and Rashan Michel, a suit maker, were charged with participating in a federal funds bribery conspiracy, among other things. The charges stemmed from their participation in a scheme in which Person took nearly $100,000 dollars from a financial advisor and business manager ("CW-1") in exchange for Person using his influence over Auburn's players to pressure and direct those players and their families to retain the services of CW-1 once those players turned professional. The defendants sought to dismiss the federal funds bribery charges for several reasons, including because Person "had no control over the federal funds that were distributed to Auburn." (*See United States v. Person*, 17 Cr. 683 (LAP), Dkt. No. 46 (hereinafter, "Person Br."), at 11-12). Judge Preska correctly rejected the defendants' argument, finding that under Section 666, "Person was an employee and therefore an agent." (*See Person* MTD Opinion, at 18.)

Indeed, courts have consistently rejected the argument that Section 666 requires that an agent be not simply any employee but one specifically authorized to act with respect to an entity's federal funds. *See, e.g.*, *United States v. Keen*, 676 F.3d 981, 989-90 (11th Cir. 2012) (rejecting the defendant's effort to add a requirement to the "agent" definition because "[n]owhere does the statutory text either mention or imply an additional qualifying requirement that the person be authorized to act specifically with respect to the entity's funds."); *United States v. Fernandez*, 722 F.3d 1, 10 (1st Cir. 2013) (rejecting defendants' argument that they did not qualify as "agents" for purposes of Section 666 because they lacked the "authority to control the expenditure of funds by any entity receiving federal funds").

11

Alternatively, the defendants claim that the Indictment fails to allege that the coach defendants were acting within the scope of their agency when they directed certain players on their respective teams to retain the services of Dawkins's firm because there is no allegation in the Indictment that "recommending financial advisers to players was part of their role as employees of their respective Universities." (*See* Defs. MTD Br., at 16, 17.). The argument misstates the requirements of Section 666 and mischaracterizes the allegations in the Indictment. With respect to the former, Section 666 imposes no requirement that the agents must be "acting within the scope of their agency," (*id.* at 16), to violate the statute. Instead, Section 666 requires, in relevant part, that an agent corruptly solicits or demands "anything of value" while "intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of" his organization. 18 U.S.C. § 666(a)(1)(B). The further requirement the defendants would impose – that the agent be acting within the scope of his agency – while derived from a common-law definition of agency, finds no basis in the statute. *Compare* 18 U.S.C. § 666(d)(1) ("a person authorized to act on behalf of another person or a government") *with* Restatement (Third) of Agency § 1.01 (2006) ("Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."). Judge Preska in *Person* agreed, rejecting this exact argument by finding that "Section 666's statutory definition of agency is broader than its common law meaning." (*See Person* MTD Opinion, at 18.) Indeed, courts explicitly eschew the common-law meaning in evaluating the term "agent" under Section 666. *See*, *e.g.*, *Lupton*, 620 F.3d at 800-01 ("[E]ven if Lupton could not be considered a common law agent under Equis's contract, it is nonetheless possible for him to be an 'agent' under the terms of 18 U.S.C. §

666(d)(1)."); *United States* v. *Vitillo*, 490 F.3d 314, 323 (3d Cir. 2007) ("There is nothing in the statute to suggest that we should consult extrinsic sources, such as the Restatement of Agency, in attempting to further define 'agent.'").

Moreover, the defendants' argument also mischaracterizes the Indictment, which alleges that the defendant coaches, as a part of their official job responsibilities, had a duty to run an NCAA-compliant basketball program for their respective universities, which included following and enforcing rules against accepting bribes from financial advisors or directing players those financial advisors or agents. (*See* Indictment ¶ 23.) Indeed, Judge Preska in *Person* recognized this duty, finding that "[a]ssistance in running an NCAA-compliant program was a purpose of defendant Person's employment with the University." (*See Person* MTD Opinion, at 20-21). The defendant coaches acted in derogation of this duty to their respective universities in engaging in the bribery scheme charged in the Indictment.

The defendants further argue that the conduct alleged in the Indictment – that the defendant coaches steered college basketball players to Dawkins's firm in exchange for cash – was outside the mission of the relevant universities and therefore did not involve the "business or transaction" of these universities. To support this argument, the defendants rely exclusively on a Fifth Circuit case, *United States* v. *Whitfield*, which involved two state judges who were convicted of accepting bribes from an attorney in exchange for favorable rulings in his cases. *See United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009). In *Whitfield*, the government argued that the judges were "agents" of the Administrative Office of the Courts ("AOC"), a Mississippi state agency that was "charged with assisting in the efficient administration of the *nonjudicial* business of the courts of the state." *Id*. at 344 (emphasis added) (citation omitted) (internal quotation marks omitted). The AOC handled the finances of the Mississippi court

13

system, including payroll, travel expenses, inventory, and budgeting. *Id.* The Fifth Circuit found that the judges' rulings were not made "in connection with" the business or transactions of the AOC, as they were made while the judges were performing purely *judicial* duties. *Id.* at 346-67.

Whatever the merits of *Whitfield*, they are not implicated here. Evans, Richardson, and Bland were employees and agents of their respective universities, and their agreement to steer players from their schools to Dawkins's firm in exchange for cash was in connection with a "business" or "transaction" of their respective universities. Although the relevant schools may not be "in the business of recommending financial advisers for basketball players," (Defs. MTD Br., at 18), they are certainly in the business of running an NCAA-compliant athletics program. Each of the relevant schools fields multiple varsity sports teams in NCAA Division I competition, including men's basketball, (Indictment ¶¶ 5-8), and to compete in NCAA competition, they each must comply with NCAA rules. To ensure that compliance, each schools' coaches and players must make annual certifications to the schools regarding their participation in and knowledge of NCAA violations. (*See* Indictment ¶¶ 24-26). Indeed, in *Person*, when Judge Preska was faced with the same argument in relation to Auburn University, she explicitly found that "running an NCAA-compliant program was a business of the University." (See *Person* MTD Opinion, at 21).

Moreover, and while beyond the scope of a motion to dismiss, at trial the Government expects to show that each of the defendant coaches' employment contract with their respective universities required them to comply with the NCAA rules and to ensure compliance with those rules by people under their supervision. The defendants owed a duty to their respective universities to follow the NCAA rules, and actions taken by the defendant coaches that violated these rules – *i.e.*, steering players to financial advisors in exchange for cash – involved the

14

"business" of their respective universities, as they affected those schools' ability to run a NCAA compliant program and subjected those schools to penalties by the NCAA. (*See* Indictment ¶ 28).

In sum, and consistent with the conclusions reached by Judge Preska in rejecting identical arguments in the *Person* case, the Court should deny the defendants' motion to dismiss Counts One and Four of the Indictment.

## B. The Federal Funds Bribery Statute and the Honest Services Fraud Statute are Not Unconstitutionally Vague As Applied

Next, the defendants assert that the federal funds bribery statute, 18 U.S.C. § 666, and honest services fraud statute, 18 U.S.C. § 1346, are unconstitutionally vague as applied to their conduct. This claim, which also parrots the arguments made by the defendants in the *Person* case, should be dismissed out of hand, as it was by Judge Preska. *See Person* MTD Opinion, at 28-30.

"The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016) (quotation marks omitted). "Although a law has to provide minimal guidelines in the form of explicit standards regarding what conduct is unlawful, it need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." *United States v. Rosen*, 716 F.3d 691, 699 (2d Cir. 2013) (internal quotation marks omitted). Even in the absence of sufficient standards, however, "a statute will survive an as-applied vagueness challenge if the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of

15

the statute." *United States v. Farhane*, 634 F.3d 127, 139-40 (2d Cir. 2011) (internal quotation marks omitted).

As an initial matter, the defendants' argument that the private honest services fraud and Section 666 claims must be "circumscribed" by an "official act" requirement, as articulated by the Supreme Court in *McDonnell v. United States*, 136 S. Ct. 2355 (2016) (Defs. MTD Br., at 24-25) is meritless. *See also Person* MTD Opinion, at 28-30. The Supreme Court has held that the private honest services fraud statute, as narrowed to the core of bribery and kickback schemes such as those charged in the Indictment, is constitutional. *See Skilling v. United States*, 561 U.S. 358 (2010), and the Second Circuit recently rejected the defendant's argument with respect to the federal funds bribery statute when it held that the *McDonnell* standard does not apply to Section 666 counts, *see United States v. Boyland*, 862 F.3d 279, 291 (2d Cir. 2017), *cert. denied*, —— U.S. ——, 138 S.Ct. 938, 200 L.Ed.2d 212 (2018).

The crux of the defendants' argument appears to be that the application of Section 666 and honest services fraud statute to their conduct would be unconstitutional because "the Indictment seems to suggest that any act of disloyalty by an employee is sufficient so long as harm to the employer was foreseeable, even if such harm is collateral to the offense." (*See* Defs. MTD Br., at 25.) As an initial matter, the argument raises a claim that cannot be resolved on a motion to dismiss because it turns on assertions about what the facts at trial will show. Second, and more important, this claim turns on circumstances and hypotheticals of no relevance to this case; whatever merit a claim that the defendants lacked fair notice that their conduct was prohibited might have on other facts, "'it has always been as plain as a pikestaff that bribes and kickbacks' are prohibited." *Rosen*, 716 F.3d at 700 (quoting *Skilling v. United States*, 561 U.S. at 412). Moreover, "the requirement that the Government prove [the] defendant's specific intent

to bribe eliminates the possibility that he will be prosecuted for bribery without fair notice." *Id.*

Accordingly, the defendants' vagueness challenges to the honest services fraud and Section 666

have no more merit than the claims that other courts have roundly rejected. *See, e.g., Rosen*, 716

F.3d at 700-01 (on appeal from conviction at trial, rejecting vagueness challenge to § 666);

*United States v. Brunshtein*, 344 F.3d 91, 98 (2d Cir. 2003) (same); *United States v. Urlacher*,

979 F.2d 935, 939 (2d Cir. 1992) (same); *United States v. Crozier*, 987 F.2d 893, 900 (2d Cir.

1993) (same).

### C.  The Indictment Properly Alleges a Scheme to Defraud the Universities of the Honest Services of Their Employees

The defendants next argue that the conspiracy and substantive honest services wire fraud

charges in counts Five through Seven should be dismissed because (1) the Indictment fails to

allege that any of the three coaches owed a fiduciary duty to their respective universities (Defs.

MTD Br., at 19-20); or, in the alternative, (2) that, even if the coaches owed a fiduciary duty to

their universities, the Indictment fails to allege that they were acting within the scope of that duty

(Defs. MTD Br., at 20).  These arguments, which ignore the plain language of the Indictment and

which were also made and swiftly rejected by Judge Preska in the *Person* case, are meritless.

The defendants fundamentally mischaracterize the allegations in the Indictment, which

detail a *quid pro quo* scheme whereby the three coaches accepted bribe payments in exchange

for agreeing to and exercising their position as coaches and employees of their respective

universities in order to influence the players that they coached and their families to retain the

services of those paying and facilitating the payments, including defendant Christian Dawkins

and, in certain instances, defendant Merl Code.  All of this conduct was in direct violation of the

terms of the coaches' employment contracts with their universities and the applicable NCAA

rules.  Schemes involving a *quid pro quo* like the one charged here whereby an employee owing

17

a fiduciary duty accepts bribes in exchange for taking actions adverse to the interests of his principal are the "solid core" of what the honest services fraud statute prohibits. *See United States v. Skilling*, 561 U.S. 358, 404 (2010) (describing the "doctrine's solid core" as involving "offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes"). As is alleged in the Indictment, it was "by virtue of their official positions as NCAA Division I men's basketball coaches" that Evans, Richardson and Bland "had the ability to provide sports agents, financial advisors, business managers and others with access to the student-athletes whom they coach" and wielded substantial influence over these student-athletes that they supervised. (*See* Indictment ¶ 2).

Specifically, in moving to dismiss Counts Five through Seven, the defendants argue that "it is far from clear that Mr. Evans, Mr. Richardson, and Mr. Bland were fiduciaries to their respective Universities." (Defs. MTD Br., at 19-20). This argument is frivolous and ignores both the allegations in the Indictment and well-settled case law. With respect to the former, the Indictment plainly alleges that Evans, Richardson, and Bland were employees of their respective universities (Indictment ¶ 10-12), employment positions the Indictment further alleges the defendant coaches abused as part of the scheme. (Indictment ¶ 2). Moreover, the Indictment specifically alleges the goal of the scheme participants "to deprive Evan's, Richardson's, and Bland's respective employers of their intangible right to their employees' honest services." (Indictment ¶ 59; *see also* Indictment ¶ 61, 63). That is sufficient, particularly at the motion to dismiss stage, to satisfy Rule 7.

With respect to the latter, it is "beyond dispute" that these coaches, as employees of their universities, owed a fiduciary duty to act in their university's interests. *See United States v. Nouri*, 711 F.3d 129, 137 n.1 (2d Cir. 2013) ("the 'existence of a fiduciary relationship' between

18

an employee and employer is 'beyond dispute,' and the violation of that duty through the employee's participation in a bribery or kickback scheme is within the core of actions criminalized by § 1346." (citing *Skilling*, 130 S.Ct. at 2930-31 & n.41).

The defendants argue in the alternative that even if the coaches did owe a duty to their universities, they were not "acting within the scope of that duty when they recommended financial advisors to players," as such conduct was "well outside the purpose of Mr. Evans, Mr. Richardson, and Mr. Bland's employment relationship with their respective universities." (Defs. MTD Br., at 20-21). According to the defendants, their duties were strictly limited to "things like running practices, developing team strategies, and instructing players in their skills and techniques and that whatever the coaches did with the student-athletes as part of the scheme alleged in the Indictment was "on their downtime." (Defs. MTD Br., at 20).

This argument, which is similar to the one advanced with respect to the bribery counts and described above, should be rejected for substantially the same reasons. In particular, as argued above, the Indictment alleges that the scope of the professional duties and responsibilities of Evans, Richardson and Bland, as coaches for Division I men's basketball programs, included compliance with the NCAA rules applicable to their universities. (*See, e.g.,* Indictment ¶ 23, 24, 26, 27). And as noted above – and not seriously disputed by the defendants -- the charged conduct blatantly violated those rules. (*See, e.g.,* Indictment ¶ 23). The fact that these coaches' compliance with NCAA rules was part of "the purpose of Mr. Evans, Mr. Richardson, and Mr. Bland's employment relationship with their respective universities" (Defs. MTD Br., at 20-21), is clear from the requirement that the coaches annually certify to their respective universities that

19

they had reported any knowledge of violations of NCAA rules involving the University

(Indictment ¶ 24).[6]

In denying the defendants' motion to dismiss in *United States v. Person*, 17 Cr. 683

(LAP), Judge Preska considered and rejected the exact argument advanced by the defendants that

the conduct alleged in the Indictment somehow falls outside of the scope of the coaches'

employment duties.  As Judge Preska concluded:

> The Government correctly points out that while it is true the University is not in the business of making professional service recommendations, "it is certainly in the business of running an NCAA compliant athletics program." (Gov. Br. at 16.)  Assistance in running an NCAA-compliant program was a purpose of defendant Person's employment with the University . . . . It is a factual question whether this duty to help run an NCAA-compliant athletics program was breached, and thus that issue is not an appropriate basis for dismissal.

---

[6] In addition, although the allegations in the Indictment in this regard are more than sufficient to defeat a motion to dismiss, at trial the Government intends to introduce the employment contracts of each of the coaches with their respective universities, which did not limit the coaches' duties in the artificial and narrow manner suggested by the defendants.  Rather, per the terms of the coaches' own contracts, they was required to ensure that the university complied with all NCAA rules.  For example, Lamont Evans' employment contract with Oklahoma State University stated under the "duties and responsibilities" section that Evans "agree[d] to abide by and comply with NCAA and other Government Athletic Rules [including NCAA rules] and University Rules relating to the conduct and administration of the Men's Basketball program" and further stated that Evans "recognize[d] an obligation personally to comply with, and to exercise due care that all personnel and student subject to Employee's direct control or authority comply with Governing Rules [including NCAA rules] relating to recruiting and furnishing unauthorized extra benefits to recruits and student-athletes." (OSU 490-91)  Furthermore, Evans' employment contract stated that "[i]n the event Employee has knowledge of, or has reasonable cause to believe, that violations of Governing Athletic Rules [including NCAA rules] may have taken place, Employee shall report the same immediately to the Head Men's Basketball Coach, Director of Intercollegiate Athletics, and Associate Athletic Director for Compliance."  (*Id.*).  Finally, Evans' employment contract also provided that "significant or repetitive violation of Governing Athletic Rules" would constitute grounds for the contract to be terminated for "just cause." (OSU 494).  The employment contracts of Richardson and Bland contained materially similar provisions.  There can be no dispute that the conduct of each of the three coaches was in direct violation of these duties, which the coaches each undertook at the time they executed employment contracts with their respective universities.

20

*Person* MTD Opinion, at 20-21.

Accordingly, because the Indictment alleges a straightforward bribery scheme – one within the "solid core" of honest services fraud identified by the *Skilling* Court – the defendants' motion to dismiss Counts Five through Seven should be denied.

### D.  The Indictment Properly Alleges A Travel Act Conspiracy

Finally, the defendants argue that Count Nine, which charges conspiracy to violate the Travel Act, should be dismissed because the purpose of the Travel Act was to "assist local law enforcement officials in combating interstate activities which violate state laws" and that "[a]lthough [the coaches] may have violated private rules governing coaches and players, clearly they were not involved in any organized crime or other criminal activity."  (Defs. MTD Br., at 18).

The argument is frivolous.  The Travel Act, which refers to "unlawful activity" – not "criminal activity" or organized crime – defines that term to include, among other things, "bribery . . . in violation of the laws of the State in which committed or of the United States." *Id.* § 1952(b).  Indeed, it is well-settled that "a Travel Act conviction based on bribery requires an underlying violation of a federal or state bribery statute." *Halloran*, 821 F.3d at 332.  Here, the Indictment plainly alleges that the payment of bribes by Dawkins, in certain instances as aided by Code, and the acceptance of bribes by the coaches, violated specific state commercial bribery statutes.  (*See* Indictment ¶ 70).

The defendants further contend that because, as they would have it, "the conduct alleged in Counts One through Four did not involve criminal activity," that Count Nine should also be dismissed.  This argument also fails because, for the reasons stated above, Counts One and Four should not be dismissed.  Moreover, even assuming those counts were to be dismissed, the

21

Travel Act count would nonetheless survive because it is additionally predicated on violations of state bribery statutes. (*See* Indictment ¶ 70) *Cf. Halloran*, 821 F.3d at 332 ("[A] Travel Act conviction based on bribery requires an underlying violation of a federal *or state* bribery statute.") (emphasis added). Accordingly, even if the defendants could demonstrate that Counts One and Four should be dismissed – which they cannot for the reasons stated above – this would not provide any basis for dismissal of the Travel Act conspiracy count.

## THE WIRETAP SUPPRESSION MOTION

Defendants Christian Dawkins and Merl Code jointly move to suppress all communications intercepted pursuant to the wiretap orders issued on April 7, 2017, May 5, 2017, June 19, 2017, July 19, 2017, August 7, 2017, August 22, 2017, August 30, 2017, and September 20, 2017. In particular, the defendants[7] move to suppress all communications intercepted pursuant to the April 7, 2017 Order, which authorized the interception of wire communications

---

[7] In the motion, Code asserts that he has standing to move to suppress based on the error in the April 7 Order. *See* (Defs. Wiretap Br., at 9 & n. 9). However, in *United States v. Gatto*, 17 Cr. 686 (LAK), Code acknowledged that he did not have standing to suppress the communications intercepted pursuant to the April 7 Order. *See United States v. Gatto*, 17 Cr. 686 (LAK), Dkt. No. 80, at 5 (acknowledging that "current case law does not explicitly provide standing for Mr. Code and Mr. Gatto to join" the motion to suppress the April 7 Order").

Code's prior concession was correct as a matter of law. Code was not intercepted pursuant to the April 7 Order, was not named as a target subject, and does not otherwise meet the definition of an "aggrieved person." *See* 18 U.S.C. § 2510(11). As such, he lacks standing to challenge the April 7 Order and similarly lacks standing to challenge any subsequent order of interception, including orders of interception regarding his own phone, on the basis of any alleged error in the April 7 Order. *See, e.g.*, *United States v. Fury*, 554 F.2d 522, 526 (2d Cir. 1977), *cert denied*, 433 U.S. 910 ("[A] defendant with standing cannot challenge a wiretap because of deficiencies in an earlier wiretap for which he had no standing. In other words, and adopting the government's characterization of this principle, there is no fruit of the poisonous tree.") (citing *United States v. Wright*, 524 F.2d 1100, 1102 (2d Cir. 1975); *United States v. Howard*, 400 F. Supp.2d 457, 474 n.7 (N.D.N.Y. 2005); *United States v. Williams*, 565 F. Supp. 353, 364–65 (N.D. Ill. 1983), *aff'd*, 737 F.2d 594 (7th Cir. 1984) ("[A] long line of cases have held that Title III does not confer standing to suppress one's own conversations when they are intercepted as fruits of a violation that one does not have standing to challenge") (citations omitted).

22

occurring over the a cellular telephone used by Munish Sood (the "April 7 Order") on three grounds.  *First,* the defendants argue that the April 7 Order contained a technical defect, namely the failure to fill in the name of the Deputy Assistant Attorney General who had approved the Government's application, an error which the defendants contend rendered the April 7 Order "facially insufficient" under Title 18, United States Code, Section 2518(10)(a)(ii) thus mandating suppression. (Defs. Wiretap Br., at 1).  *Second* the defendants alternatively argue that the April 7 Order "was not supported by probable cause to believe that any target was committing any of the target offenses." (Defs. Wiretap Br., at 17).  *Third*, the defendants argue that the affidavit in support of the April 7 Order did not comply with Title III's necessity requirement. (Defs. Wiretap Br., at 20-23).

The defendants further contend that, as a consequence, this Court should suppress not only any communication intercepted pursuant to the April 7 Order, but also the fruits of each subsequent wire application made during the investigation, which the defendants term "derivative evidence."  (Defs. Wiretap Br., at 3).

Finally, the defendants contend that they are entitled to the minutes of the grand jury to ensure that its deliberations were not "tainted" by the purportedly "illegal wiretap" evidence . (Defs. Wiretap Br., at 3).

For the reasons that follow, this motion should be denied in its entirety.

## I.     BACKGROUND

### A.  The April 7 Order and the Sood Phone

During the course of the investigation, the Government sought and obtained judicial authorization on more than a dozen different occasions to intercept communications occurring over various cellular telephones.  In each instance, the Government sought and obtained prior authorization from an appropriate official at the Department of Justice (an "authorizing official") before submitting the application, and apprised the reviewing judge of both the fact that authorization had been obtained, and the identity, including the name and title, of the authorizing official.

On April 7, 2017, the Hon. George B. Daniels approved the Government's application for an order to intercept wire communications occurring over a cellular telephone used by Munish Sood (the "April 7 Application, and "Sood Phone," respectively).  The April 7 Application included, among other things, a sworn affidavit from an FBI agent involved in the investigation, which set forth certain background information on the investigation as well as facts supporting a finding of probable cause to support the Government's application.  (April 7 Wiretap Application, Ex. 1 to Defs. Wire Br., hereinafter "April 7 Aff.").  The materials submitted to Judge Daniels also included an application by an attorney for the Government, which provided additional information, including, in relevant part, the fact that "Trevor N. McFadden, Deputy Assistant Attorney General, an appropriately designated official in the Criminal Division has approved this application."  (April 7 Aff. at SDNY_00007704.)  The attorney application also attached a memorandum and letter both signed by Deputy Assistant Attorney General Trevor McFadden, indicating his approval of the application (April 7 Aff. at SDNY_00007718-7722).

24

In addition, the Government submitted a proposed order of interception, *i.e.*, the April 7 Order, which, by its terms, made clear that it was being entered with "full consideration having been given to the matters set forth in the Application and supporting documents." (April 7 Wiretap Order, Ex. 2 to Defs. Wiretap Br., hereinafter "April 7 Order," at SDNY_00007804). However, in the section of the Order reciting Judge Daniels' findings based upon the "Application and supporting documents," the Order reads, in relevant part, as follows: "Pursuant to 18 U.S.C. § 2516(a), this Application has been authorized by [FILL IN], Acting Deputy Assistant Attorney General, an official of the United States Department of Justice specially designated by the Attorney General of the United States to authorize applications for the interception of wire communications." (April 7 Order, at SDNY_0007807). Judge Daniels signed the Order on April 7, 2017 and interception pursuant to the Order began shortly thereafter.

On May 5, 2017, the Government sought and obtained an extension order permitting it to intercept communications occurring over the Sood Phone for an additional 30 days. As detailed below, Dawkins was intercepted communicating with Sood pursuant to the April 7 Order and the May 5, 2017 extension of that order.

### B. The Subsequent Wiretaps

Interception over the Sood Phone ended on or about June 4, 2017. In the months that followed, the Government sought and obtained authorization to intercept communications occurring over phones associated with Dawkins, Code, and Richardson, as well as James Gatto (a defendant in the related case of *United States v. Gatto et al.*, 17 Cr. 686 (LAK)). While each application referred to the fact of the April 7 Order and summarized some of the communications intercepted over the Sood Phone, none of those subsequent applications relied exclusively (or

even in significant part) on those communications.  To the contrary, each of those applications

was based on substantial additional evidence, derived wholly independent of the April 7 Order.

For example, and as detailed further below, the June 19, 2017 initial application to

intercept wire communications occurring over a cellular telephone used by Christian Dawkins

(the "June 19 Application" and the "Dawkins Phone," respectively), detailed numerous

*consensually* recorded meetings with Dawkins, as well as consensual calls and text messages

with the Dawkins Phone, none of which, obviously came from interceptions of the Sood Phone.

(*E.g.*, June 19 Wiretap Application, Ex. 5 to Defs. Wiretap Br., hereinafter "June 19 Aff., " at

SDNY_00008102, SDNY_00008162, SDNY_00008166).  The same application made clear the

Government had been investigating Dawkins and his role in wire fraud and bribery schemes for

many months before the April 7 Order was entered.  For example, in one consensually recorded

meeting that occurred well before the April 7 Order, Dawkins, among other things, expressly

admitted that he had been making illicit payments to a college basketball coach, and openly

discussed his desire to continue bribing the coach so that he would direct players that he coached

to retain Dawkins.  (*Id.* at SDNY_00008105-06.)  Furthermore, the June 19 Application

described a consensually recorded call in May 2017 with the Dawkins Phone during which

Dawkins stated that he had talked to numerous college basketball coaches, including coaches at

the University of Louisville and the University of Arizona.  (*Id.* at SDNY_00008162).  The June

19 Application also included an analysis of Dawkins's toll or call records to indicate that he was

in contact with other individuals believed to be involved in the schemes under investigation.  (*Id.*

at  SDNY_00008172-8175.)  Subsequent extension orders for the Dawkins Phone relied

principally on calls intercepted over the Dawkins Phone, as well as consensually recorded

26

meetings and calls with Dawkins, and not on the April 7 order or extension which, by that point, had long since expired.

Furthermore, while the July 19, 2017 initial application[8] to intercept communications occurring over a cellular telephone used by Emanuel Richardson (the "July 19 Application" and "Richardson Phone," respectively) detailed one call with the Richardson Phone intercepted over the Sood Phone (*See* Wiretap Application, Ex. 7 to Defs. Wiretap Br., hereinafter "July 19 Aff., " at SDNY_00008349-50), the July 19 Application otherwise largely focused on a consensual meeting with Richardson during which he accepted $5,000 in exchange for agreeing to steer players that he coached to Dawkins and his new company (July 19 Aff., at SDNY_00008381-85), consensually recorded calls with Dawkins, and calls between Dawkins and Richardson intercepted over the Dawkins Phone, none of which came from interceptions of the Sood Phone. (*Id.* at SDNY_00008375-80, SDNY_00008391-95).  The July 19 Application also included an analysis of Richardson's toll or call records to indicate that he was in contact with other individuals relevant to the target offenses.  (*Id.* at SDNY_00008402-04).

On August 7, 2017, the Government sought authorization to begin intercepting communications occurring over a cellular telephone used by defendant Code (the "August 7 Application" and "Code Phone," respectively).  While the August 7 Application disclosed the April 7 Order and summarized certain communications intercepted over the Sood Phone in describing the background of the investigation, the portion of the application relevant to Code and the Code Phone did not rely in *any* part on the Sood Phone or the April 7 Order.  Indeed, one of the key phone conversations with Code relied upon by the Government was recorded consensually by an FBI undercover officer (the "UC") and not intercepted as a result of any

---

[8] This same application also sought an extension of the wiretap of the Dawkins Phone.

27

wiretap. (August 7 Wiretap Application, Ex. 9 to Defs. Wiretap Br., hereinafter "August 7 Aff.,"

at SDNY_00008643-48). During that call, Code requested that the UC and Sood provide a

payment to the family of Brian Bowen and generally explained the scheme to funnel money from

Adidas to the Bowen family in order to "secure a five star caliber kid" for the University of

Louisville. (*Id.*) Furthermore, the August 7 Application detailed an in-person meeting between

Code, Dawkins, the UC, CW-1, and others during which Code stated, in sum and substance, that

he could introduce the group to coaches interested in having an arrangement in which they would

direct certain of their players to retain the services of Dawkins' new company in exchange for

payments. (August 7 Aff., at SDNY_00008628). The August 7 Application further described

that Code accepted a $5,000 payment during this same meeting and provided the telephone

number for the Code Phone. (*Id.*). A subsequent extension order for the Code Phone relied

principally on calls intercepted over the Code Phone pursuant to the August 7 Order. (August 30

Wiretap Application, Ex. 13 to Defs. Wiretap Br., hereinafter "August 22 Aff.," at

SDNY_00009213-9235).

## II.    THE MOTION TO SUPPRESS COMMUNICATIONS INTERCEPTED PURSUANT TO THE APRIL 7 ORDER BASED ON A TECHNICAL ERROR IN THAT ORDER SHOULD BE DENIED

The defendants first argue that because the April 7 Order "did not identify the

Department of Justice official who had authorized the Government's request for a wiretap," the

Order was "facially insufficient" pursuant to Section 2518(10)(a)(ii) of the Wiretap Act and that

suppression of all communications intercepted pursuant to the April 7 Order is mandatory. (Defs.

Wiretap Br. at 1).

This component of the defendants' motion to suppress the wiretap communications,

which turns exclusively on a lone opinion from the D.C. Circuit in *United States v. Scurry*, 821

F.3d 1 (D.C. Cir. 2017), should be denied in its entirety. Leaving aside the fact that *Scurry* is not binding on this Court, as the *Scurry* court itself acknowledged, the D.C. Circuit stands alone in believing suppression is necessary on these facts, while every other court to address the issue – including the Supreme Court – has come to the contrary conclusion. Indeed, as discussed herein, the position the defendants advance here is in considerable tension, if not directly precluded by, the Supreme Court's conclusion in *United States v. Chavez*, 416 U.S. 562 (1974), that a failure to accurately identify the authorizing official in an order of interception does *not* warrant suppression, where, as here, there is no question that an appropriate official did, in fact, authorize the application. *Id.* at 569, 573.

For substantially those reasons, and as described in further detail below, the Honorable Lewis A. Kaplan rejected an identical motion in the related *Gatto* case with respect to the very same wiretap order based on the very same error, concluding that the technical defect in the April 7 Order did not warrant suppression of the communications intercepted pursuant to that Order. *See generally United States v. Gatto*, No. 17 Cr. 686 (LAK), 2018 WL 1801313 (S.D.N.Y. Mar. 26, 2018).

Because the error in the April 7 Order is a technical defect that does not undermine the Government's compliance with the core statutory requirements of Title III, this Court should find, consistent with the Supreme Court's holding in *Chavez* and the conclusions of virtually every other court to address these facts, including Judge Kaplan in *Gatto*, that the error here does not require suppression.

## A. Applicable Law

Title III provides for the manner and method in which all applications for the interception of wire, oral, or electronic communications must be made. *See* 18 U.S.C. §§ 2510-18. In

29

particular, Section 2518(1) sets forth the requirements for application for an order of interception, while Section 2518(4) provides that "[e]ach order authorizing or approving the interception of any wire, oral, or electronic communications . . . shall specify" among other things "the identity of the agency authorized to intercept the communications, and the person authorizing the application." *Id.* § 2518(4)(d). Title III also includes its own suppression remedy, providing that an "aggrieved person . . . may move to suppress" intercepted communications on three grounds: "(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a)(i-iii).

The statute does not further define the terms "unlawfully intercepted" for purposes of paragraph (i), or "insufficient on its face" for purposes of paragraph (ii). However, the Supreme Court, in three opinions on the suppression remedy under Title III, has repeatedly made clear that "'(not) every failure to comply fully with any requirement provided in Title III'" warrants suppression. *United States v. Donovan*, 429 U.S. 413, 433 (1977) (quoting *United States v. Chavez*, 416 U.S. 562, 574-75 (1974)) (alteration in original). "To the contrary, suppression is required only for a 'failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Id.* (quoting *United States v. Giordano*, 416 U.S. 505, 527 (1977)). And while *Donovan* and *Giordano* focused principally on Section 2518(a)(i), in *Chavez*, the Court rejected a motion also made pursuant to section 2518(a)(ii) – that is, a challenge to the facial sufficiency of an order of interception – where, as here, the Government obtained approval from an appropriate official at

30

the Justice Department but failed to correctly identify that official in the order of interception. *Chavez*, 416 U.S. at 574-75.

Moreover, even when an order can be deemed "insufficient on its face," courts have recognized that the "good-faith exception to the exclusionary rule" first identified by the Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984), "applies in Title III cases." *United States v. Tomero*, 462 F. Supp. 2d 565, 572 (S.D.N.Y. 2006) (Kaplan J.). Accordingly, "even if the order failed to comply with Title III's requirements," the motion to suppress should nonetheless be denied where "nothing in the record suggests the government implemented it in bad faith." *Id.* at 572; *see also United States v. Bellomo*, 954 F. Supp. 630, 638 (S.D.N.Y. 1997) (Kaplan, J.) (same).

### B. Argument

The Court should deny the motion to suppress communications intercepted pursuant to the April 7 Order based on the technical error in the April 7 Order. As Judge Kaplan recently found in *United States v. Gatto*, 17 Cr. 686 (LAK), with respect to the same error contained in the same wiretap application, suppression is improper because the April 7 Application and accompanying materials clearly identified the official authorizing the application, and the error in the April 7 Order was no more than a technical defect that did not frustrate any core Congressional concern in enacting Title III.

    *1.*   *The Error in the April 7 Order Does not Render the Order "Insufficient on its Face"*
        *or Require Suppression Pursuant to Section 2518(10)(a)(ii)*

There is no question that the April 7 Order failed to include the *name* of the "person authorizing the application." 18 U.S.C. § 2518(4)(d).  However, there is similarly no question that the Government's application and accompanying materials – materials the Order expressly referred to as a basis for its findings – *did* include such information.  Moreover, the Order included the fact that the necessary approval had been obtained, as well as the title of the person approving the order, *i.e.* an "Acting Deputy Assistant Attorney General . . . specially designated by the Attorney General . . . to authorize applications for the interception for wire or oral communications."  (April 7 Order at SDNY_00007807).  On these facts, the Order, while imperfect, was not insufficient, and therefore suppression is not appropriate.

The Supreme Court's decisions in *Chavez* and *Giordano* are instructive.  In *Chavez*, as here, the Government obtained the required approval from an appropriate official, namely the Attorney General himself, before submitting its application to the reviewing judge.  However, in both its application and order, the Government failed to correctly identify the authorizing official, stating instead that an Assistant Attorney General had authorized the application.  On those facts, the Court concluded that the error did not warrant suppression under 2518(10)(a)(ii), because the Court could and would look "behind the order despite the clear 'on its face' language of the statute" – a review that made clear that an appropriate official had, in fact, authorized the application.  *Id.* at 575-576.  By contrast, in *Giordano*, the Court concluded suppression was appropriate where the Government had *not* obtained the approval of an authorized official. Instead, the Attorney General's executive assistant had "authorized" the application.  On those facts, the Court found suppression appropriate because the application failed to satisfy a "core concern" of Congress in enacting Title III, that is a requirement "that directly and substantially

implement[ed] the congressional intention to limit the use of interception procedures clearly calling for the employment of this extraordinary device," *i.e.*, that an appropriate senior official at the Justice Department approve the application. *Giordano*, 416 U.S. at 527.

Critically, in contrasting the two cases, the *Chavez* court distinguished between the substantive "reviewing or approval functions" of the statute – *i.e.*, those requiring that an appropriate official review and approve the application – with the statute's "identification reporting" requirements – *i.e.*, those requiring that the appropriate official be correctly identified in the application and order. *Id.* at 575, 78. With respect to the former, the Court concluded that "misidentification" of the authorizing official "did not affect the fulfillment of any of the reviewing or approval functions required by Congress and is [therefore] not within the reach of" the suppression remedy in Section 2518(10)(a)(ii). With respect to the latter, the reporting requirements, the Court found nothing there "to suggest that they were meant, by themselves, to occupy a central, or even functional, role in guarding against unwarranted use of wiretapping evidence." *Id.* at 578.

Consistent with those principles, every court of appeals but the D.C. Circuit has concluded that where, as here, an appropriate official did, in fact, authorize the application, a failure to properly identify that official in the order of interception does not warrant suppression.[9]

---

[9] The Second Circuit does not appear to have addressed the standard applicable to a motion to suppress made pursuant to Section 2518(10)(a)(ii). Other circuits, while all concluding that a technical defect or minor error in an order of interception does not warrant suppression, have differed slightly in their application of the principles articulated in *Giordano* and *Chavez* to such a motion. For example, the Third, Seventh and Eighth Circuits have concluded that if the error in the order is technical and does not frustrate Title III's "core concerns," that the order is imperfect, but not "insufficient on its face," and thus, that suppression is not required. *See, e.g.*, *United States v. Traitz*, 871 F.2d 368 (3d Cir. 1989); *United States v. Fudge*, 325 F.3d 910 (7th Cir. 2003); *United States v. Lomelei*, 676 F.3d 734, 739 (8th Cir. 2012). By contrast, the Sixth, Ninth, and Tenth Circuits have all treated similar errors as "insufficiencies" but have then applied the "core concern" analysis to conclude that they were "*minor* insufficienc[ies] for which suppression is not the appropriate remedy." *United States v. Callum*, 410 F.3d 571, 576 (9th Cir.

*See, e.g.*, *United States v. Traitz*, 871 F.2d 368 (3d Cir. 1989); *United States v. Gray*, 521 F.3d 514 (6th Cir. 2008); *United States v. Fudge*, 325 F.3d 910 (7th Cir. 2003); *United States v. Callum*, 410 F.3d 571, 576 (9th Cir. 2005); *United States v. Radcliff*, 331 F.3d 1153, 1162 (10th Cir. 2003). [10]  Indeed, more generally, every other court confronted with "technical deficiencies" of a similar sort in an order of interception has concluded that such errors do not warrant suppression. *United States v. Moore*, 41 F.3d 370, 374 (8th Cir. 1994) (judge's failure to sign the order does not warrant suppression where it is clear judge reviewed and approved the application and order); *see also id* at 374-75 ("[E]very circuit to consider the question has held that 2518(10)(a)(ii) does not require suppression if the [error in] the wiretap order is no more than a technical defect.") (collecting cases); *United States v. Foy*, 641 F.3d 455, 463 (10th Cir. 2011) (reference in wiretap application to the incorrect source of authority for the Attorney General's delegation to the authorizing official immaterial because the official did have the

---

2005) (same); *see also United States v. Radcliff*, 331 F.3d 1153, 1162 (10th Cir. 2003) (same). The difference is in large part academic – whether an error is too minor to render the order "insufficient on its face" or too minor to warrant suppression on the grounds that the order is "insufficient on its face" within the meaning of the statute is of no moment given the consensus among these courts that such a minor error is insufficient to warrant suppression under Section 2518(10)(a)(ii). The Government here principally argues that, consistent with the approaches of the Third, Seventh and Eighth Circuits, this Court should focus on whether the error sufficiently frustrates a core concern of Title III so as to render the order "insufficient on its face."

[10] The defendants misleadingly cite to *United States v. Callum*, 410 F.3d 571, 576 (9th Cir. 2005) ostensibly for the proposition that a "wiretap order was 'facially insufficient' where order listed no one at all in place of [the] authorizing Justice Department official." (Defs. Wiretap Br. at 10). As noted above, however, the *Callum* court proceeded to hold that suppression was *not* appropriate on those facts because the error – which was identical to the error in this case – was a "minor insufficiency for which suppression is not the appropriate remedy." *Id.* at 576.  The defendant similarly distorts *United States v. Radcliff*, 331 F.3d 1153, 1162 (10th Cir. 2003), citing it for the proposition that "wiretap order was 'facially insufficient' where authorizing official was not identified by name." (Defs. Wiretap Br. at 11).  However, as with the *Callum* court, the *Radcliff* court proceeded to conclude that suppression was unnecessary because "the facial insufficiency here was a technical defect that did not disrupt the purposes of the wiretap statute or cause any prejudice to Defendant." *Radcliff*, 331 F.3d at 1163.  As noted above, no court outside of the D.C. Circuit has concluded that suppression is required on these facts.

requisite delegated authority and "[n]ot all deficiencies in wiretap applications . . . warrant suppression"). As noted, Judge Kaplan, reviewing an identical motion on these facts, similarly concluded that suppression was not required.  *Gatto*, 2018 WL 1801313, at *2-3.

Nevertheless, relying almost entirely on the D.C. Circuit's opinion in *Scurry*, the defendants argue that "the April 7 Wiretap Order is 'facially insufficient' because it fails to identify the Department of Justice official who authorized the Government's application, as required by Section 2518(4)(d) of Title III" and that "the April 7 Wiretap Order's failure to comply with Title III requires that all communications intercepted pursuant to the Order be suppressed." (Defs. Wiretap Br., at 11) (citing 18 U.S.C. § 2518(10)(a)(ii); 18 U.S.C. § 2515). Defendant Dawkins advanced these exact same arguments as to the same error in the same wiretap order in *United States v. Gatto*, *see United States v. Gatto,* 17 Cr. 686 (LAK), Dkt. No. 78, and invited Judge Kaplan to adopt the reasoning of *Scurry* and suppress the intercepted communications due to the error in the April 7 Order.  As is described in further detail below, Judge Kaplan denied that invitation and rejected the reasoning of *Scurry*.

The D.C. Circuit's opinion in *Scurry*, which followed its decision in *United States v. Glover*, 736 F.3d 509 (D.C. Cir. 2013), is not binding on this Court, and, more importantly, its reasoning does not withstand scrutiny, particularly in light of the cases described above.  In *Glover*, the D.C. Circuit considered a warrant signed by a judge in the District of Columbia but that purported to authorize installment of a roving bug in the District of Maryland.  In evaluating whether an order was "sufficient on its face" for purposes of Section 2518(10)(a)(ii), that court announced, based upon scant authority, that it would employ a "mechanical test; either the warrant is facially sufficient or it is not."  *Id.* at 513.[11]  The Court further concluded, citing no

---

[11] In concluding that Section 2518(10)(a)(ii) requires a "mechanical test" the D.C. Circuit cited solely to "*Giordano*, 416 U.S. at 527."  However, nothing on that page or any page of the

authority at all, that if an order was deemed facially insufficient, "suppression is the mandatory remedy. There is no room for judicial discretion." *Id*. at 513.

A year later, in *Scurry*, the D.C. Circuit considered the very facts present here, namely an application that included the full name and title of the authorizing official, but an order that stated that the application had been authorized by "******, Deputy Assistant Attorney General of the Criminal Division . . . pursuant to the power delegated to that official by . . . the Attorney General." *Scurry*, 821 F.3d at 8. The *Scurry* court, noting that it was bound by *Glover* to apply a "mechanical test" in evaluating the sufficiency of the order, declined to consider the fact that the application and accompanying materials properly identified the authorizing official, concluding that its inquiry "is limited to the four corners of the wiretap order." *Id.* at 9. The *Scurry* court further rejected the district court's finding that the error was a "technical defect that did not undermine the purposes" of Title III, noting that Congress had specifically mandated inclusion of the missing information in the order to further the Congressional interest in, among other things, promoting accountability on the part of the approving officials. *Id.* at 10. Finally, because the *Glover* court had further held that "suppression is the mandatory remedy" and "[t]here is no room for judicial discretion," the court suppressed the evidence. *Id.* at 13, 18.

Each component of the *Scurry* ruling is in considerable tension with, if not directly contrary to, controlling authority. First, the *Scurry* court's conclusion that it was bound by the "four corners of the wiretap order" is virtually impossible to reconcile with *Chavez*, where the Supreme Court expressly stated its willingness to look "behind the order." *Chavez*, 416 U.S. at 574. Indeed, the gravamen of the distinction drawn by the Supreme Court between *Chavez* and

---

*Giordano* opinion says anything of the sort. Nor could it – as discussed above, in *Chavez*, the companion case to *Giordano*, the Court did not engage in a "mechanical test" but instead engaged in a substantive inquiry into whether the Government had satisfied the core statutory requirements of Title III.

36

*Giordano* turned on the fact that in *Chavez*, an inquiry beyond the four corners of the order revealed that the Government had, in fact, complied with the core statutory requirement by obtaining the necessary approval, whereas in *Giordano*, the Government had not.

Second, and more fundamental, the D.C. Circuit's conclusion that the failure there to properly name the authorizing official in the order frustrated congressional intent is squarely at odds with the conclusion of the *Chavez* court that: "Failure to correctly report the identity of the person authorizing the application … when in fact [an appropriate person] has given the required preliminary approval to submit the application, *does not* represent a similar failure to follow Title III's precautions against the unwarranted use of wiretapping or electronic surveillance and *does not* warrant the suppression of evidence gathered pursuant to a court order resting upon the application." *Id.* at 572 (emphasis added); *cf. Giordano*, 516 U.S. at 528 (noting that "the provision for pre-application approval was intended to play a central role in the statutory scheme and that suppression must follow when it is shown that this statutory requirement has been ignored.").

For these reasons, no other court has concluded that it could not look beyond the order to determine whether the Government had, in fact, obtained the necessary approval.  No other court has suggested that, where the reviewing judge is provided with the name of the approval official in other components of the application, that a failure to properly name the authorizing official in an order of interception alone frustrates the Congressional concern in assuring that such authorization is obtained.  And no other court has concluded that suppression is warranted on these facts.  Indeed, no other Circuit has followed *Scurry*, and the only court to face a motion based on similar facts since *Scurry* was decided has ruled the other way.  *See United States v. Friend*, 2017 WL 6947861 at *3 (W.D. Mo. Dec. 8, 2017) (rejecting *Scurry* as "not persuasive"

37

and noting that "*Scurry* is an outlier among the circuits, all of which have followed the approach outlined in *Chavez* in finding that similar facts do not warrant suppression because the violation is nothing more than a technical defect") (collecting cases).

As noted, in *United States v. Gatto*, 17 Cr. 686 (LAK), Judge Kaplan recognized the fundamental flaws in the reasoning of *Scurry* and, consistent with the reasoning of the overwhelming majority of courts to address this issue, concluded that the error in the April 7 Order did not warrant suppression of the communications intercepted pursuant to that Order. In pertinent part, in denying the motion to suppress Judge Kaplan assumed without deciding that the April 7 Order was "'insufficient on its face' within the meaning of Title III," but nevertheless concluded that "even on that assumption . . . suppression is not warranted by this obvious clerical error." *Gatto*, 2018 WL 1801313, at *2. Judge Kaplan went on to note that Dawkins in seeking suppression of the wiretap communications was relying almost entirely on the D.C. Circuit's decision in *Scurry*, and that that court was "bound by *United States v. Glover,* which departed from several sister circuits and held that suppression was a mandatory remedy upon a finding of facial insufficiency." *Id.* at *2. Judge Kaplan denied the motion to suppress because he concluded that *Scurry* was against the weight of authority and had been wrongly decided:

> I respectfully consider *Scurry* to have been decided wrongly and decline to follow it. Indeed, the mandatory remedy prescribed in *Glover* and *Scurry* has not been adopted in this or any other circuit. Other circuits facing wiretap orders with similar infirmities uniformly have concluded that the facial insufficiency of the orders did not warrant suppression of the relevant communications because the insufficiency resulted from a mere technical error. *E.g.*, *United States v. Callum*, 410 F.3d 571, 576 (9th Cir. 2005); *United States v. Radcliff*, 331 F.3d 1153, 1160 (10th Cir. 2003).
>
> This approach is in line with the statutory scheme and with Supreme Court precedent. As the Ninth Circuit stated: "Reading *Giordano* and *Chavez* together, it is clear that the Supreme Court was far more concerned with the wiretap applications being authorized by an empowered DOJ official than with correct identification of that official in the wiretap applications and

38

> orders. The absence of valid authorization in *Giordano* and the presence of valid authorization in *Chavez* explain why suppression was ordered in the former case but not the latter." *Callum*, 410 F.3d at 575 (referring to *Chavez* and to *United States v. Giordano*, 416 U.S. 505 (1974)).

*Gatto*, 2018 WL 1801313, at *3.[12]

In addition to Judge Kaplan's decision in *Gatto*, the Seventh Circuit's opinion in *United States v. Fudge*, 325 F.3d 910 (7th Cir. 2003), is also instructive.  There, the court considered a motion to suppress based on the fact that the order of interception stated only that the application has been authorized "by a duly designated official of the Criminal Division."  *Id.* at 918.  Looking beyond the order itself, as *Chavez* invited the court to do, it noted that the Government had, in fact, obtained the requisite approval before concluding that the technical failure to provide the name of the approving official "does not warrant suppression."  *Id..*  Specifically, the court relied on *Chavez,* concluding that "under *Chavez,* the order's failure to identify the

---

[12] Subsequent to Judge Kaplan's ruling in *Gatto*, the Supreme Court issued its decision in *Dahda v. United States,* 138 S.Ct. 1491 (2018) on May 14, 2018.  In *Dahda*, the Court held that the "core concerns" test first articulated in *United States v. Giordano*, 416 U.S. 505, 525-26 (1974), with respect to a suppression motion made pursuant to 18 U.S.C. § 2518(10)(a)(i), does not apply where, as here, the motion is made pursuant to Section 2518(10)(a)(ii).  *See id.* at 1498. Instead, the Court held that with respect to subparagraph (ii), "[t]he statute means what it says. That is to say, subparagraph (ii) applies where an order is 'insufficient on its face.'" (*Id.*) (citing § 2518(10)(a)(ii)).  However, and notwithstanding that observation, the Court generally declined to expand on the meaning of the phrase "insufficient on its face," instead limiting itself to the orders at issue, orders which purported to authorize the Government to intercept communications in *any* jurisdiction (rather than only the authorizing jurisdiction). With respect to those orders, the Court concluded that, while they contained an error, they were not "insufficient on their face" because they were not "deficient or lacking in anything necessary or requisite." (*Id.* at 10). Instead, the Court deemed the error in those orders to be a "defect" and concluded, consistent with the findings of virtually every other court to address these issues, that "not every defect [in an order of interception] results in an insufficiency." (*Id.*).  The Government does not believe that *Dahda* in any way disturbs Judge Kaplan's opinion in the *Gatto* case.  The Government informed Judge Kaplan of the Supreme Court's decision in *Dahda* after he issued his March 26, 2018 opinion.  In response, Judge Kaplan did not issue any subsequent ruling altering in any way his March 26, 2018 opinion denying the motion to suppress the wiretap evidence.  The defendants apparently agree that *Dahda* is of no moment here and do not rely at all on *Dahda* in their moving brief.

individual who authorized the application did not violate any substantive requirement of Title III and consequently does not warrant suppression." *Id.*

The Third Circuit's opinion in *United States v. Traitz*, 871 F.2d 368 (3d Cir. 1989), is similarly on point. There, the court found suppression unnecessary when the order of interception signed by the judge inadvertently omitted an entire page, thereby cutting off the name (but not the title) of the approving official. *Id.* at 376. Noting that there was no question that an appropriate official had, in fact, authorized the application and that the Order in question included the fact that the "Assistant Attorney General, Criminal Division" had approved the application, the Court deemed omission of the name of that individual irrelevant, concluding that "[i]t makes little difference in law that the person authorizing an application for interception was identified by title rather than by name." *Id.* at 379. The Third Circuit thus declined to conclude that the Order in that case was "facially defective." *Id.* at 379.

Finally, in *United States v. Gray*, 521 F.3d 514 (6th Cir. 2008), the Sixth Circuit found that where the order omitted any reference at all to the name of the approving official or his title but a look "behind the order" made clear that such information was available to the reviewing judge, suppression was unnecessary. Noting that, as of that date, "every circuit to consider the question has held that § 2518(a)(ii) does not require suppression if" the error in the order "is no more than a technical defect," the Court concluded that the technical defect in that case did not warrant suppression because "[u]nder these circumstances, the underlying purpose of § 2516(1)" – *i.e.*, to ensure than an appropriate official approved the application – "was served." *Id. at* 527. *Cf. United States v. Byrnum*, 386 F. Supp. 449, 460 (S.D.N.Y. 1974) (observing that the purpose of the requirement was "to assure that" politically accountable officials were involved in

40

authorizing wiretap applications so that "the statutory wiretap authority conferred by Title III will be used with restraint and will not be routinely invoked").[13]

Here, of course, the same is true. While the April 7 Order itself did not contain the name of the approving official, it did accurately reflect the fact that the requisite approval had been obtained and identified the approving official by title. Moreover, when the Court looks "behind the order," *Chavez*, 416 U.S. at 574, as both the Supreme Court and the text of the Order itself invite the reader to do, the application and supporting documents clearly do identify the authorizing official by both name and title. (April 7 Aff. at SDNY_00007703-7722). As such, and was true in *Chavez*, the error here "did not affect the fulfillment of any of the reviewing or approval functions required by Congress and is [therefore] not within the reach of" Section 2518(10)(a)(ii). *Id.* at 575; *see also Traitz*, 871 F.2d at 379 (same); *Fudge*, 325 F.3d at 918 (same); *Gray*, 521 F.3d at 527 (same); *Radcliff*, 331 F.3d at 1162 (same); *Callum*, 410 F.3d at 576 (same); *Lomeli*, 676 F3d. at 741 (same). Indeed, at most, the error here impacted the

---

[13] In *United States v. Lomelei*, 676 F.3d 734, 739 (8th Cir. 2012), the Eighth Circuit found that a failure to identify the authorizing official in *any* of the materials presented to the reviewing judge, including the application, warranted suppression because the approving judge had "no way of knowing the name of the actual, statutorily designated official that had indeed authorized the application even though the application states as much in general terms—one of the core components of this legislation." *Id.* at 741. As such, the Court declined to term that failure "technical." Of some significance, while the *Lomelei* court made clear its willingness to look beyond the order and even the application, it noted that unlike in *Gray* and other cases:

> [T]he government offered no evidence (such as was received in other cases) that the judge indeed knew the identity of the appropriate authorizing official, or that the name of the statutorily designated official was otherwise disclosed. Such evidence would have demonstrated compliance with all the fundamental statutory safeguards that protect against unauthorized or unwarranted wiretap surveillance.

*Id.* at 742. As such, *Lomelei* is entirely consistent with the approach advocated here.

41

statute's "identification reporting" requirements which "by themselves" neither "occupy a central, or even function, role" in the statutory scheme, nor warrant suppression. *Id.* at 578.

In sum, this Court should conclude, as Judge Kaplan did in *Gatto* when considering an identical motion, that the error here is a "technical defect" that, consistent with *Chavez* and the holdings of every other Circuit to address the issue, does not warrant suppression.

## III.    THE MOTION TO SUPPRESS THE COMMUNICATIONS INTERCEPTED PURSUANT TO THE APRIL 7 ORDER ON PROBABLE CAUSE GROUNDS SHOULD BE DENIED

Alternatively, the defendants move to suppress all communications intercepted pursuant to the April 7 Order because that Order "was not supported by probable cause to believe that any target was committing any of the target offenses."[14]  (Defs. Wiretap Br., at 17.)  This claim is without merit.

### A.    Applicable Law

Title 18, United States Code, Section 2518(3) requires that to issue a wiretap, a reviewing judge must find probable cause that: (i) an individual is committing, has committed, or is about to commit an enumerated offense; (ii) particular communications concerning that offense will be obtained through the requested interception; and (iii) the facilities subject to interception are being used in connection with the offense.  18 U.S.C. § 2518(3); *see United States* v. *Yannotti*, 541 F.3d 112, 124 (2d Cir. 2008); *United States* v. *Diaz*, 176 F.3d 52, 110 (2d Cir. 1999).

---

[14] The defendants also move for the suppression of all communications intercepted pursuant to the subsequent wiretap orders under the theory that "[d]efficiencies in the original April 7 Wiretap Order taint all subsequent wiretap applications and order."  (Defs. Wiretap Br., at 17.) As is described further below, even if the Court did decide to suppress the communications intercepted pursuant to the April 7 Order – which it should not – the subsequent wiretap orders should not be suppressed because the Government had an "independent source" supporting each application to intercept those communications.

Probable cause requires that the totality of the circumstances reflect a fair probability of finding evidence of a crime. *Illinois* v. *Gates*, 462 U.S. 213, 238 (1983); *see also United States* v. *Diaz*, 176 F.3d 52, 110 (2d Cir. 1999) (probable cause standard for wiretap is same as probable cause standard for search warrant). The issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that . . . evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Probable cause "is not an especially demanding standard in this context. '[O]nly the probability, and not the prima facie showing, of criminal activity is the standard of probable cause.'" *United States* v. *Bellomo*, 954 F. Supp. 630, 636 (S.D.N.Y. 1997) (quoting *Gates*, 462 U.S. at 235). Probable cause "to issue a wiretap order exists when the facts made known to the issuing court are sufficient to warrant a prudent [person] in believing that evidence of a crime could be obtained through the use of electronic surveillance." *United States* v. *Ruggiero*, 824 F. Supp. 379, 398 (S.D.N.Y. 1993), *aff'd*, 44 F.3d 1102 (2d Cir. 1995) (quotation and footnote omitted).

In ruling on a motion to suppress wiretap evidence, the reviewing court must grant "considerable deference" to the issuing court's probable cause findings. *United States* v. *Concepcion*, 579 F.3d 214, 217 (2d Cir. 2009); *see also United States* v. *Gangi*, 33 F. Supp. 2d 303, 306 (S.D.N.Y. 1999) ("[T]he issuing judicial officer's decision to authorize wiretaps 'should be paid great deference by reviewing courts.'" (quoting *Spinelli* v. *United States*, 393 U.S. 410, 419 (1969))). The subsequent court's review is limited to whether the issuing judicial officer had a "substantial basis" for the finding of probable cause. *See, e.g.*, *Gates*, 462 U.S. at 236; *United States* v. *Wagner*, 989 F.2d 69, 72-74 (2d Cir. 1993). "[W]iretap orders are entitled to a presumption of validity." *United States* v. *Ambrosio*, 898 F. Supp. 177, 181 (S.D.N.Y.

43

1995) (citing *United States* v. *Fury*, 554 F.2d 522 (2d Cir. 1977)).  Accordingly, the defendants

bear the burden of proving that probable cause was lacking.  *See United States* v. *Magaddino*,

496 F.2d 455, 459-60 (2d Cir. 1974).  Any doubts as to the existence of probable cause should be

resolved in favor of upholding the authorization.  *See United States* v. *Labate*, No. 00 Cr. 632

(WHP), 2001 U.S. Dist. LEXIS 6509, at *50 (S.D.N.Y. May 18, 2001).  Although without "the

insights of adversarial scrutiny, the issuing judge may not readily perceive every question that

might legitimately be raised" regarding the requested wiretap, "so long as fundamental

constitutional rights are preserved, the issuing court's determination should not be subjected to

gratuitous 'Monday morning quarterbacking.'"  *United States* v. *Gigante*, 979 F. Supp. 959, 963

(S.D.N.Y. 1997).

In assessing probable cause, a reviewing court must read a wiretap affidavit as a whole

and in a common-sense manner.  Defendants may not "dissect each piece of information in the

[agent's] affidavit to show that each fact taken alone does not establish probable cause."  *Gangi*,

33 F. Supp. 2d at 306; *accord United States* v. *Salas*, No. 07 Cr. 557 (JGK), 2008 U.S. Dist.

LEXIS 92560, at *12 (S.D.N.Y. Nov. 5, 2008) (same).  Put another way, "a court must look at

the snowball, not the individual snowflakes."  *United States* v. *Scala*, 388 F. Supp. 2d 396, 402

(S.D.N.Y. 2005).

### B.    Argument

The defendants argue that the April 7 Application was deficient because it failed to

establish probable cause to believe that any defendant was involved in wire fraud and/or

conspiracy to commit the same, or had violated the Travel Act and/or conspired to commit the

same.  (*See* Defs. Wiretap Br. 17-20.)  The defendants are wrong.  As described below, the April

7 Application contained more than sufficient probable cause to support the April 7 Order.

To begin, the April 7 Application established probable cause to believe that Dawkins, Evans, Sood, Richardson, and others participated in the Target Offense of wire fraud, in violation of Title 18, United States Code, Section 1343, conspiracy to commit the same, in violation of Title 18, United States Code, Section 1349, interstate and foreign travel or transportation in aid of racketeering enterprises, in violation of Title 18, United States Code, Section 1952 (the Travel Act), and conspiracy to do the same, in violation of Title 18, United States Code, Section 371. The April 7 Application detailed the FBI's investigation into corruption in college basketball, including "payments by sports agents and athlete advisors to college coaches … in return for providing access to and influence over their student-athletes [] in direct violation of applicable NCAA rules and in breach of the college coaches' duties to their employer, the university," and the defendants' involvement in such schemes. (*See* Defs. Wiretap Br., Ex. 1 (SDNY_00007738)).  Further, the April 7 Application set forth that "[s]uch conduct by a coach can expose that coach's university to numerous harms," and that the "coaches are required under NCAA rules to annually certify that they have reported all known violations of NCAA rules to their universities."  (*See id.* at SDNY_00007738-7739).  The April 7 Application detailed that Evans had agreed with Dawkins and CW-1 to accept payments in exchange for Evans using his influence as a college basketball coach to direct certain college basketball players to retain the services of  Dawkins and CW-1.  (*See id.* at 00007748-7749).  In so doing, the affidavit described, among other things, recorded phone calls involving Dawkins and CW-1 discussing the scheme, and multiple meetings in which CW-1, at the direction of law enforcement, provided Evans with cash bribes.  (*Id.*) The April 7 Application also described a similar bribery scheme involving Richardson, Dawkins, Sood, and others (*See id.* at SDNY_00007750-783).

The April 7 Application then included over 30-pages of detailed allegations regarding, among other things, numerous phone calls between Sood and CW-1 in which they discussed Sood's plans to meet two coaches in Las Vegas, one of whom was later determined to be Richardson, to determine if they would be willing to accept bribes in exchange for directing certain players to retain the services of Sood, Dawkins, and CW-1.  (*Id*.)  The April 7 Application also made plain that there were numerous phone calls between Sood and Richardson around the time of the scheduled meeting.  (*See id.* at SDNY_00007765; SDNY_00007775).  The April 7 Application further explained that universities are responsible for compliance with the NCAA rules, including by their coaches and student-athletes, and these sorts of payments violated NCAA rules both by the coach and player and could render the student-athlete ineligible to play for the university.  (*See id.* at SDNY_00007744-00007746)).  Further, the April 7 Application explained that NCAA rules required that a coach's contract include a stipulation that a coach in violation of the rules "shall be subject to disciplinary or corrective action … including suspension without pay or termination of employment."  (*See id.* at SDNY_00007745).

Accordingly, the April 7 Application was more than sufficient to demonstrate probable cause to believe that the defendants were engaged in a scheme to defraud universities by soliciting and receiving bribes that violated Evan's and Richardson's duties to their respective universities, *i.e.*, private honest services fraud, and by causing false certifications to be made regarding compliance with NCAA rules.  Lastly, the April 7 Application also set forth sufficient probable cause showing that Sood used a cellular telephone to communicate with co-conspirators about the target offenses.  As a result, the defendants' contention that the April 7 Application failed to state probable cause must fail.

Nevertheless, the defendants contend that the April 7 Application was insufficient for several reasons.  First, they argue that the April 7 Application "did not establish probable cause" with respect to the wire fraud because "the theory of wire fraud in this case suffers from the same defects" as in *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993) in that the "potential gain" to Evans "did not depend upon Oklahoma State University (a victim alleged in the Indictment) suffering any deprivation of money or property, even if the University was harmed inadvertently."  (Defs. Wiretap Br., at 18.)  As an initial matter, the facts of this case, and more important, the facts set forth in the wiretap applications – which alleged a scheme by sports agents and advisors to *bribe* NCAA coaches with tens of thousands of dollars– is completely distinguishable from *Walters*, which involved a scheme by an agent to pay student-athletes directly.  Moreover, even assuming a factual similarity between the cases, the law of *Walters* is not the law of this Circuit.  As Judge Kaplan recently recognized in the *Gatto* case, it is well established in the Second Circuit that a defendant "does not need to literally obtain money or property to violate the mail and wire fraud statutes."  *United States v. Gatto*, 295 F. Supp. 3d 336, 344 (S.D.N.Y. 2018) (quoting *United States* v. *Finazzo*, 850 F. 3d 94, 106 (2d Cir. 2017) (internal quotations omitted).

Consistent with the law of this Circuit, the April 7 Application sufficiently established that there was probable cause to believe that the scheme participants depended on (1) false statements being made to the Oklahoma State University, and with respect to Richardson, because, in order for the scheme to succeed, Evans and Richardson would have to falsely certify compliance with NCAA rules, in violation of their contracts, and (2) that as a consequence, the relevant universities would be subjected to the risk of numerous financial harms in the form of, among other things, fines and potential penalties.  Furthermore, the April 7 Application

47

established probable cause that the defendants were engaging in honest services wire fraud, *i.e.* a scheme to deprive Oklahoma State University and the University of Arizona, respectively, of the intangible property right to the honest services of their employees through bribes.[15]

Even assuming there was any merit to the defendants' argument with respect to lack of probable cause as to the first predicate target offense of wire fraud – which there is not – there can be no reasonable dispute that, with respect to the second listed predicate offense, the Travel Act, the April 7 Application was more than amply supported by probable cause.  Nevertheless, the defendants argue that the April 7 Application "was not supported by probable cause" because, as the defendants would have it, Evans's acceptance of bribe payments from CW-1 was "entirely unconnected to his duties as a basketball coach and Oklahoma State University's business, generally" and "[n]othing in the wiretap applications suggest that Mr. Evans was paid with the specific intent that he act contrary to his duties to Oklahoma State University."  (Defs. Wiretap Br., at 19.)  The defendants further contend this alleged failure is fatal because they claim that the state commercial bribery statutes underlying the Travel Act charge in the application, require that the bribe payment "be made for the purpose of inducing the employee to act contrary to the interest of, and inconsistently with, his duties to his current employer."  (*See* Defs. Wiretap Br., at 19.) (quoting *United States v. Geibel*, 369 F.3d 682, 699 (2d Cir. 2004)).

---

[15] The defendants argue that in the April 7 Application "the Government did not even allege honest services wire fraud, 18 U.S.C. § 1346, as a target offense, which further lends credence to Defendants' position that the conduct charged does not constitute a federal crime." (Defs. Wiretap Br., at 3 n.3).  This is wrong.  The April 7 Application listed wire fraud under 18 U.S.C. § 1343 as a Target Offense. (April 7 Aff., at SDNY_00007727).  18 U.S.C. § 1346 is not a standalone statute.  To the contrary, it provides a definition of the term "scheme or artifice to defraud" that is incorporated into the meaning of the wire fraud statute, 18 U.S.C. § 1343. Section 1346 states in pertinent part that a scheme or artifice to defraud "includes a scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. § 1346. Accordingly, when the Government listed 18 U.S.C. § 1343 as one of the Target Offenses, it necessarily included in the meaning of scheme or artifice to defraud the definition set forth in Section 1346.

However, as argued extensively above with respect to the defendants' motion to dismiss, the Government's allegations – as amply set forth in the April 7 Application – *do* allege a bribery scheme whose goal was to cause Evans and the other defendant coaches to act contrary to the interest of, and in abrogation of duties owed to, their employer.  Specifically, the April 7 Application makes plain that the bribe payments Evans received were given in violation of NCAA rules and his employment contract, and to ensure he abused his position to direct players he coached to retain the services of Dawkins and CW-1, all actions clearly "contrary to the interest of . . . his [then] current employer," *Geibel*, 369 F.3d at 699.[16]

As such, the defendants' claim that the April 7 Order "was not supported by probable cause," (Defs. Wiretap Br., at 17), is without merit and should be rejected.

## IV.    THE MOTION TO SUPPRESS THE COMMUNICATIONS INTERCEPTED PURSUANT TO THE APRIL 7 ORDER ON NECESSITY GROUNDS SHOULD BE DENIED

The defendants further move to suppress all communications intercepted pursuant to the April 7, Order claiming that the wiretap was unnecessary.  (Defs. Wiretap Br. at 20-23). Specifically, the defendants argue that the April 7 Application failed to explain "in any meaningful way" why normal investigative procedures were inadequate to investigate the alleged scheme, but instead, merely claimed that the wiretap was necessary to "capture *potentially*

---

[16] The defendants' reliance on *United States v. Geibel*, 369 F.3d 682 (2d Cir. 2004) is doubly misplaced.  As an initial matter, that case involved the New York – rather than Oklahoma – bribery statute which is not relevant to the instant case.  Second, on its facts, *Geibel* concerned two defendants one of whom was paid bribes intended to induce him to leave his current employer and return to a previous employer for the purpose of misappropriating information from that employer.  *Geibel*, 369 F.3d at 699.  In interpreting New York's commercial bribery statutes, the Court found that "it is not commercial bribery merely to pay a person to leave his current employer; rather, the payment must be made for the purpose of inducing the employee to act contrary to the interest of, and inconsistently with, his duties to his current employer."  Here, as noted above, the allegations amount to just that, *i.e.*, bribes paid "for the purpose of inducing the employee to act contrary to the interest of, and inconsistently with, his duties to his current employer."

*criminal* conversations with Mr. Dawkins." (*Id*. at 22.)  Moreover, the defendants contend that a wiretap was clearly unnecessary because the Government had the ability to record conversations of the defendants through its cooperating witness ("CW-1").  (*Id*. at 20-23.)  As explained in more detail below, these arguments lack merit and should be rejected.

### A.    Relevant Background

During the course of the investigation, the Government sought and obtained judicial authorization on several occasions to intercept communications occurring over cellular telephones associated with one or more of the defendants.  The Government's initial application for an order of interception for a phone associated with Munish Sood was approved by the Honorable George B. Daniels on April 7, 2017.  Subsequent applications followed, all of which referenced the April 7 Application, resulting in the approval of eight orders of interception by *six* different District Court judges.[17]  The April 7 Application included, among other things, a sworn affidavit from an FBI agent involved in the investigation that detailed the background of the investigation then to date, the objectives of the interception and an analysis of over a dozen alternative investigative methods that had either failed to achieve the goals of the investigation or were not likely to be effective.  In particular, with respect to the other investigative methods, the affidavit discussed the use of, or inability to use, undercover officers, cooperating witnesses, physical surveillance, geolocation information, telephone records and pen registers, the grand jury process, search warrants, arrests, witness interviews, trash searches, the results of prior

---

[17] The orders of interception the Government is referring to are only those orders authorizing the interception of communications occurring over cellular phones belonging to the defendants charged in the instant case, as well as James Gatto and Sood.  As the Court is likely aware, there were additional orders of interception issued to capture communications occurring over cellular phones belonging to defendants not charged in this case in *United States* v. *Person et al*, S1 17 Cr. 684 (LAP).

interceptions, pole cameras, and parallel and related investigations.  (April 7 Aff. at

SDNY_00007783-00007797).  To the extent the agent believed that the use of a particular

investigative method would be futile, not feasible, or insufficient to accomplish the goals of the

investigation, the agent's reasoning was also explained in detail in the April 7 Application.

### B.    Applicable Law

Title 18, United States Code, Section 2518(1)(c) requires that an application for the

interception of telephonic communications include "a full and complete statement as to whether

or not other investigative procedures have been tried and failed or why they reasonably appear to

be unlikely to succeed if tried or to be too dangerous."  Section 2518(3)(c) requires the judge

reviewing a wiretap application to determine, as a condition of authorizing the wiretap, that

"normal investigative procedures have been tried and have failed or reasonably appear to be

unlikely to succeed if tried or to be too dangerous."

These requirements ensure that "wiretapping is not resorted to in situations where

traditional investigative techniques would suffice to expose the crime."  *United States* v. *Kahn*,

415 U.S. 143, 153 n.12 (1974).  As the Second Circuit has explained:

> [T]he purpose of the statutory requirements of § 2518 is not to preclude the
> Government's resort to wiretapping until after all other possible means of
> investigation have been exhausted by investigative agents; rather, the statute
> only requires that the agents inform the authorizing judicial officer of the
> nature and progress of the investigation and of the difficulties inherent in
> the use of normal law enforcement methods.

*United States* v. *Diaz*, 176 F.3d 52, 111 (2d Cir. 1999) (citing *United States* v. *Torres*, 901 F.2d

205, 231 (2d Cir. 1990)).  Thus, the statute's "alternative investigative techniques" provisions do

not establish a requirement "'that any particular investigative procedure [must] be exhausted

before a wiretap may be authorized.'" *United States* v. *Miller*, 116 F.3d 641, 663 (2d Cir. 1997)

51

(*quoting United States* v. *Young*, 822 F.2d 1234, 1237 (2d Cir. 1987)).  Rather, the Government's application must only "provide some basis for concluding that less intrusive investigative procedures are not feasible."  *United States* v. *Lilla*, 699 F.2d 99, 103 (2d Cir. 1983).

The legislative history of the statute further makes clear that Section 2518(1)(c) is not designed to force the Government to exhaust all "other investigative techniques."  As the Senate Report concerning the statute explained:

Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely.  What the provision envisions is that the showing be tested in a practical and commonsense fashion.  S. Rep. No. 1097, 90th Cong., 2d Sess., *reprinted* in 1968 U.S.C.C.A.N. 2190 (citations omitted); *see also Torres*, 901 F.2d at 231-32 (quoting legislative history); *United States* v. *Ruggiero*, 726 F.2d 913, 924 (2d Cir. 1984) (explaining that affidavits in support of wiretap applications are viewed in common sense and realistic fashion); *see also United States* v. *Torres*, 901 F.2d at 231-232 (quoting legislative history).

In reviewing a wiretap application, significant deference is owed to the issuing court by any reviewing court.  *See*, *e.g.*, *United States* v. *Ruggiero*, 726 F.2d 913, 924 (2d Cir. 1984) (noting the "deference properly accorded to the issuing judge") *see also United States* v. *Concepcion*, 579 F.3d 214, 217 (2d Cir. 2009) (noting that "considerable deference" should be granted to the district court's decision whether to allow a wiretap, "ensuring only that the facts set forth in the application were minimally adequate to support the determination that was made").  (Internal citations and quotations omitted).

## C.    Argument

The defendants claim that the April 7 Application seeking to intercept communications occurring over Munish Sood's cellular phone failed to explain "in any meaningful way" why

52

normal investigative procedures were inadequate to investigate "the alleged scheme to pay money to Mr. Evans in exchange for referring players." (Defs. Wiretap Br. at 22.) They contend that the "only justification provided" in the application for the use of a wiretap was that it was necessary to "capture *potentially criminal* conversations with Mr. Dawkins." (*Id.* at 22). That claim is false.

In over 13 pages, the April 7 Application set forth in exacting detail why a wiretap was necessary to advance multiple, related investigations into coach bribery and wire fraud involving Sood, and why over a dozen typical methods of investigation would either be futile, not feasible, or insufficient to fully investigate the alleged schemes. (*See id.* at SDNY_00007783-7797). For example, the application explained how physical surveillance is of limited utility without wire and electronic communication to assist in understanding the purpose of various meetings, (*see id.* at SDNY_00007787-7790), how geolocation information without contemporaneous wire and electronic communications is not helpful in differentiating between criminal and non-criminal movement, (*see id.* at SDNY_00007790-7791), and how even with the use of telephone records and pen registers, it is only possible to determine the identities of the participants in the scheme and the role that various participants in the scheme play in the scheme through the use of electronic or wire surveillance, and other investigative techniques. (*See id.* at SDNY_00007791). The application's detailed explanation as to why a wiretap was necessary, and why other investigative methods were insufficient, provided more than enough support for Judge Daniels's decision to issue the order of interception. *See, e.g.*, *United States* v. *Diaz*, 176 F.3d 52, 111 (2d Cir. 1999);("[T]he statute only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods."); *United States* v. *Lilla*, 699 F.2d at 103

(application only must "provide some basis for concluding that less intrusive investigative procedures are not feasible'). That is particularly true when viewed through the deferential standard of review afforded a judicially approved wiretap application.

Indeed, the Second Circuit has routinely rejected challenges to wiretap applications on necessity grounds where the applications clearly set forth the difficulties in employing normal investigative techniques, as the application unquestionably did here. *See United States* v. *Young*, 822 F.2d at 1237 (approving wiretap because surveillance would have been impractical and telephone toll records would not have uncovered target's partners in crime); *United States* v. *Martino*, 664 F.2d 860, 868 (2d Cir. 1981) (rejecting challenge to wiretap because, among other things, "telephone toll records and use of pen registers . . . do not identify the participants to a telephone conversation, and hence would be unlikely to uncover [defendant's] partners in crime"); *see also United States* v. *Wagner*, 989 F.2d 69, 74 (2d Cir. 1993) (upholding the issuance of a wiretap where the supporting affidavit cited the difficulty of conducting surveillance and infiltrating the criminal organization).

The defendants argue that a wiretap was unnecessary because the Government had the ability to record conversations relating to the charged conspiracy through its cooperating witness, CW-1. (*See* Defs. Wiretap Br. at 22). However, as set forth in the application itself, CW-1 could not record conversations to which he was not a party, and a wire was needed to capture Sood's criminal conversations with others that did not involve CW-1. (*See* April 7 Aff., at SDNY_00007786-87). That was particularly appropriate given the nature of the crimes being investigated, *i.e.*, a wide-ranging conspiracy that the investigation had already made clear was unfolding over the phone, due in no small part to the fact that the defendants lived in different states. *See United States* v. *Steinberg*, 525 F.2d 1126, 1130 (2d Cir. 1975) ("[W]iretapping is

54

particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation"); *United States* v. *Young*, 822 F.2d at 1237 (same). *Cf. United States* v. *Feola*, 651 F. Supp. 1068, 1105 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989) ("the clandestine nature of alleged conspiracies makes them relatively less susceptible to normal investigative techniques.").

That asserted need was, of course, entirely born out through the wire itself, which resulted in the interception of Sood communicating with numerous other co-conspirators, including Richardson and Dawkins, with each call occurring in furtherance of the charged schemes but none including CW-1 as a participant. (*See* Dkt. No. 1 ("Compl.") ¶ 77, 80, 85).

Finally, the April 7 Application stands in stark contrast to the facts in *United States* v. *Lilla*, 699 F.2d 99 (2d Cir. 1983), on which the defendants rely. In *Lilla*, an undercover officer worked with a confidential informant to buy one pound of marijuana. *Lilla*, 699 F.2d at 100-101. After buying the marijuana, the undercover officer discussed purchasing cocaine from the defendant. *Id*. at 101. The defendant told the undercover officer that his brother was out-of-state, making arrangements to deliver a shipment of cocaine and marijuana, and that the drugs should be available in a week or two. *Id*. Despite these successes, the affidavit for a wiretap offered only general statements as to why further investigation would fail. *Id*. "[T]he affidavit merely asserted that 'no other investigative method exists to determine the identity' of individuals who might have been involved with Lilla." *Id*. at 104. The affidavit did not specify the facts upon which that conclusion was based, did not indicate why simple surveillance of the defendant's home would not have been useful, and did not explain why the instant narcotics case presented problems different from any other "small-time narcotics case." *Id*. The Second

Circuit concluded that the facts actually demonstrated that "the normal investigative procedures that were used were successful." *Id*.

Here, by contrast, and as set forth above, the April 7 Application devoted more than 13 pages to a detailed explanation of why over a dozen typical investigative methods would be inadequate in advancing the goals of the investigation. Moreover, unlike in *Lilla*, the April 7 Application was not for a "small-time narcotics case," but for a complex white-collar investigation of corruption in the billion-dollar industry of college athletics perpetrated by sophisticated and publicly known figures. The defendants make no argument as to how or why the Government's investigative goals here could have been accomplished by simply performing a stakeout or with the assistance of a lone cooperating witness. Moreover, contrary to the defendants' contention, the April 7 Application did not describe a "fully successful law enforcement operation." (Defs. Wiretap Br., at 23.) At the time the April 7 Application was approved, the investigation was still in its beginning stages, Code had yet to facilitate any meetings between college basketball coaches and the scheme participants, and defendant coaches Richardson and Bland had yet to take any bribes from their co-conspirators. As such, the need for a wiretap in the instant matter was drastically different than the need described in the *Lilla* affidavit. Accordingly, as the April 7 Application was more than "minimally adequate" to support the issuance of the wiretap warrant, and the defendants' suppression motion on necessity grounds should be denied.

## V.    THE GOVERNMENT WAS ENTITLED TO RELY IN GOOD FAITH ON THE APRIL 7 ORDER

Even assuming *arguendo* that the defendants' arguments to suppress the wire communications intercepted pursuant to the April 7 Order had any merit – which they do not for

the reasons set forth above – because agents acted in good faith in relying on the April 7 Order

and the subsequent wiretap orders that followed, suppression would be improper.

The "good-faith exception to the exclusionary rule . . . applies in Title III cases." *United*

*States v. Tomero*, 462 F. Supp. 2d 565, 572 (S.D.N.Y. 2006).  As such, "even if the order failed

to comply with Title III's requirements," the motion to suppress should nonetheless be denied

where "nothing in the record suggests the government implemented it in bad faith."  *Id.* at 572;

*see also Bellomo*, 954 F. Supp. at 638 (noting that "[a]lthough *Leon* does not directly address

electronic surveillance, numerous courts have extended its holding to such evidence" and

concluding "that *Leon* applies in these circumstances") (collecting cases); *see generally United*

*States v. Bianco*, 998 F.2d 1112, 1125-26 (2d Cir. 1993) (extending judicially crafted exception

to the Fourth Amendment exclusion rule apply recognized in *Franks v. Delaware*, 438 U.S. 154

(1978) to the Title III suppression remedy).[18]

Accordingly, an order of interception later deemed to be insufficient will be suppressed

only if "(1) the issuing judge abandoned his detached, neutral role; (2) the agent was dishonest or

reckless in preparing the supporting affidavit for the wiretap order; or (3) the agents' reliance on

the warrant was not reasonable."  *Bellomo*, 954 F. Supp. at 638 (citing *Leon*, 638 U.S. at 922-

925).

Here, the defendants do not assert any of these conditions are met, nor could they

credibly do so.  With respect to the technical error in the April 7 Order, there is no suggestion

---

[18] Not every court to address the issue has found that the good faith exception applies to Title III's suppression remedy.  *See United States v. Rice*, 478 F.3d 704 (6th Cir. 2007) (good-faith exception to exclusionary rule is not applicable to an improperly obtained warrant for a wiretap). However, as Judge Kaplan noted in *Bellomo*, the weight of authority has reached the opposite conclusion, leading Judge Kaplan to conclude that there was "no principled basis for distinguishing electronic surveillance from other searches and seizures in this respect and therefore agree[ing] that *Leon* applies in these circumstances."  *Bellomo*, 954 F. Supp. at 638.

that the Government engaged in misconduct or was in anyway "dishonest" or "reckless" in its application to Judge Daniels.  To the contrary, while the error was unfortunate, it was not intentional – there certainly was no intention to mislead or deceive the reviewing judge – and, as detailed above, the Government took seriously and satisfied what the Supreme Court has found to be the core concern behind Title III's approval and reporting requirement by obtaining the necessary approval and accurately informing the reviewing judge of the fact of that approval. *See Chavez*, 416 U.S. at 575.  Indeed, even had agents identified the error in the April 7 Order at the time, it would not have been unreasonable for them to continue to rely upon it, given that both common sense and the overwhelming weight of authority dictate that such an error in an order of interception is "minor" or "technical" and thus does not warrant suppression.

With respect to the purported lack of probable cause supporting the April 7 Order and the purported failure to meet the necessity requirement, the defendants do not make any suggestion that the Court abandoned its neutral role, and the defendants have not argued the Agents made any dishonest or reckless statements in their affidavits, or that the FBI's reliance on the April 7 Order was "not reasonable."  To the contrary, the agents were entitled to rely on the fact that a judge had reviewed the Government's application, which met every requirement of Title III, and had approved the April 7 Order based on that application.

Accordingly, the good faith exception counsels against suppression of any evidence gathered as a result of the April 7 Order and the subsequent wiretap orders that followed, and the defendants' motions to suppress any evidence obtained from those wiretaps should be denied on this additional ground.

VI.    **EVEN IF THE APRIL 7 ORDER IS SUPPRESSED, THE COMMUNICATIONS INTERCEPTED PURSUANT TO THE ENSUING ORDERS SHOULD NOT BE SUPPRESSED BECAUSE THOSE ORDERS ARE BASED ON INDEPENDENT SOURCES**

58

Even if the Court were to rule that suppression of all communications intercepted pursuant to the April 7 Order was necessary – which it should not for all of the reasons stated above – it does not follow that each subsequent order of interception must similarly be suppressed.  To the contrary, with regard to those communications intercepted pursuant to subsequent applications that complied fully with the requirements of Title III, because the Government had an "independent source" supporting each application to intercept those communications, no suppression of any communications occurring over these subsequent wiretaps is required.

### A.  Applicable Law

As the defendants acknowledge, the Title III suppression remedy encompasses the "fruits of the poisonous tree doctrine," (Defs. Wire Br. at 23), one that permits the Government to avoid suppression where it can demonstrate that evidence was derived from an "independent source." *See generally Wong Sun v. United States*, 371 U.S. 471, 487 (1963) ("[T]he exclusionary rule has no application" where "the Government learned of the evidence 'from an independent source.'"); *United States v. Rajaratnam*, 719 F.3d 139, 152 (2d Cir. 2013) (quoting S. Rep. No. 90-1097, at 96 (1968), *reprinted in* 1968 U.S.CC.A.N. 2112, 2185 ("When Title III was enacted, it was not intended 'generally to press the scope of the suppression role beyond [then current] search and seizure law."); *Giordano*, 416 U.S. at 558-59 (Powell, J., dissenting in part) (noting that Title III "largely reflects existing law" and that "[t]here [was] . . . no intention to change the attenuation rule") (citing *Nardone v. United States*, 303 U.S. 338 (1939), *Wong Sun*, 371 U.S. 471 (1963); S. Rep. No. 90-1097, at 96).

Because the exclusionary rule does not extend to evidence derived from an "independent source," where the Government can demonstrate that subsequent applications are based on

evidence derived independent of the "tainted" material, further suppression is not required. *See generally Murray v. United States*, 487 U.S. 533, 537 (1988) ("When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.") (citation omitted); *United States v. Whitehorn*, 829 F.2d 1225, 1231 (2d Cir. 1987) (where court can conclude from affidavit that probable cause for search existed without reference to tainted information, search remains valid).

In the context of a challenge to a wiretap application, the "independent source" analysis requires the reviewing judge to "put[] aside all [the] tainted allegations" in the wiretap application and ask whether the remaining "independent and lawful information stated in the affidavit suffices to show probable cause." *United States* v. *Lace*, 669 F.2d 46, 49 (2d Cir. 1982) (quoting *Giordano*, 416 U.S. at 555) (Powell, J. dissenting in part); *see also Whitehorn*, 829 F.2d at 1231 (where court can conclude from affidavit that probable cause for search existed without reference to tainted information, search remains valid).[19]

## B. Argument

Here, and in succession, the Government sought and obtained subsequent orders of interception for the Dawkins Phone, the Richardson Phone, and the Code Phone. Focusing first on the Dawkins Phone and the initial June 19 Application, there can be no serious dispute that,

---

[19] While Courts sometimes also engage in "attenuation" analysis where the tainted material is alleged to be the "but for" cause of the discovery of additional evidence, no such allegation is made here. Indeed, as detailed herein, Dawkins was already a subject of the investigation *prior to* the April 7 Order, his phone number was already known to law enforcement *prior to* the April 7 Order, and Dawkins had already been recorded using the Dawkins Phone to discuss the schemes under investigation *prior to* the April 7 Order. As such, there can be no serious suggestion that the fruits of the April 7 Order were the "but for" cause of the agents discovery of Dawkins or his cell phone. *Segura v. United States*, 468 U.S. 796, 814 (1984) (fruit of the poisonous tree doctrine does not extend to information "known to the agents well before" the improper conduct).

after removing any interceptions obtained over the Sood Phone pursuant to the April 7 Order,[20] there still remains substantial "independent" evidence to support a finding of probable cause that Dawkins "[was] committing, had committed, or [was] about to commit a particular offense enumerated in section 2516," "particular communications concerning that offense [would] be obtained through such interception"; and that "the facilities from which . . . the wire, oral, or electronic communications are to be intercepted [were] being used, or [were] about to be used, in connection with the commission of such offense." 18 U.S.C. § 2518(3).

Indeed, much of the Government's evidence of probable cause regarding Dawkins and the Dawkins Phone substantially *predates* the April 7 Order.[21]  As detailed in the June 19 Application – *i.e.*, the Government's first application to intercept Dawkins' phone – a cooperating witness ("CW-1") working with the Government first met Dawkins in the Spring of 2015 and discussed with Dawkins, at that time, Dawkins's plan to pay bribes to college basketball coaches as part of his illicit effort to recruit student-athletes to retain his services. (June 19 Aff. at SDNY_00008101-02.)  In December 2015 and January 2016, CW-1, at the direction of law enforcement, had several phone calls with Dawkins about the same subjects. (*Id.* at SDNY_00008102.)  CW-1 subsequently met with Dawkins and recorded Dawkins detailing his extensive involvement in bribery schemes involving college basketball coaches as part of his illicit attempts to recruit the student-athletes under their control.  (*Id*., at SDNY_00008105-06.)  The June 19 Application further details the contents of several

---

[20] As discussed below, because the Government concedes that if this Court suppresses interceptions occurring as a result of the April 7 Order then it must also suppress any communications intercepted by virtue of any "extension" of that order, the Government uses the term "April 7 Order" in this section to refer to the April 7 Order and the May 5 extension of that order.

[21] It bears noting that the Government first obtained a pen register for the Dawkins Phone on or about November 7, 2016.

consensually recorded calls between CW-1 and Sood in which they discuss Dawkins's

involvement in the schemes under investigation, and additional consensually recorded meetings

in May and June 2017 involving Dawkins in which Dawkins boasts of how he is "able to

influence kids where they're going to college." (*Id*., at SDNY_00008158.)

With respect to the Dawkins Phone in particular, and in addition to the consensually

recorded calls between Dawkins and CW-1 described above, the application details a May 24,

2017 call involving Dawkins, UC-1 and Sood that was recorded by UC-1, in which Dawkins,

using the Dawkins Cellphone, bragged about his access to college basketball coaches and how he

could use that access in furtherance of the fraud and bribery schemes then under investigation.

(*Id.* at SDNY_00008162).  The application also detailed a series of consensually obtained text

messages from Dawkins and the Dawkins Phone in early June 2017 in which Dawkins listed his

"main guys" – *i.e.*, college coaches he worked with as part of the schemes (*id*., at

SDNY_00008166) – and coordinated with the UC to schedule meetings with some of those

coaches (*id.*, at SDNY_00008170-71.)  Indeed, the June 19 Application, which spanned nearly

120 pages, included mention of only six calls intercepted over the Sood Phone pursuant to the

April 7 Order, only three of which involved Dawkins and the Dawkins Phone.  Finally, the June

19 Application included an analysis of Dawkins's toll or call records to indicate that he was in

contact with other individuals believed to be involved in the schemes under investigation (*Id*., at

SDNY_00008172-75.)  Removing any mention of the few calls intercepted over the Sood Phone,

the June 19 Application was clearly sufficient to establish probable cause and otherwise satisfy

the requirements of Section 2518(3).[22]  The same is true of each of the extension orders for the

---

[22] Under Section 2518(3), the Government must also show that "normal investigative procedures [had] been tried and [had] failed or reasonably appear[ed] to be unlikely to succeed if tried" and in that section, the Government discussed its interceptions over the Sood Phone. (June 19 Aff. at SDNY_00008185-87.)  However, striking those references only makes the Government's

Dawkins Phone, each of which focused principally on calls intercepted over the Dawkins Phone, not the Sood Phone.[23]

In addition, with respect to the Richardson Phone, the July 19 Application referenced solely one call between Sood and Richardson that had been intercepted pursuant to the April 7 Order.  After removing reference to this single call from the July 19 Application, there still remains substantial "independent" evidence to support a finding of probable cause as to the wiretap of the Richardson Phone, including a consensual meeting with Richardson during which he accepted $5,000 in exchange for agreeing to steer players that he coached to Dawkins and his new company (July 19 Aff., at SDNY_00008381-85), and calls between Dawkins and Richardson intercepted over the Dawkins Phone.  (*Id.* at SDNY_00008375-80, SDNY_00008391-95).

---

showing of necessity *stronger*, since the Government was required to demonstrate why the interceptions over the Sood Phone had been insufficient to meet the investigation's goals.

[23] For example, the application in support of the July 19, 2017 extension order for the Dawkins Phone, the Government relied principally on calls intercepted pursuant to the June 19 Order, as well as several additional consensual recordings (July 19 Aff., at SDNY_00008375-8402).  In the August 22, 2017 extension order for the Dawkins Phone, the Government similarly focused on calls intercepted pursuant to the June 19 Order and July 19 extension order, as well as consensually recorded meetings that occurred in July and August 2017 (August 22 Wiretap Application, Ex. 11 to Defs. Wiretap Br., hereinafter "August 22 Aff.," at SDNY_00008926; SDNY_00008930-32).

Similarly, the application in support of the September 20 extension order for the Dawkins Phone, in addition to referencing certain of the consensual meets/calls intercepted pursuant to the July 19 and August 22 extension orders, a consensually recorded meeting with defendant Anthony Bland, a coach at the University of Southern California (September 20 Wiretap Application, Ex. 15 to Defs. Wiretap Br., hereinafter "September 20 Aff.," at SDNY_00009549-50); a consensually recorded meeting with the uncle of a current University of Southern California basketball player (*Id.* at SDNY_00009550); a September 7, 2017 call between Dawkins and Gatto intercepted over the Gatto Phone (*Id.* at SDNY_00009557-58); and a September 7, 2017 call between Dawkins and Code intercepted over the Code Phone (*Id.* at SDNY_00009559-9562).

And the same is similarly true for the Government's applications with respect to the Code Phone. As noted above, communications intercepted over the Sood Phone formed an immaterial component of the August 7 Application for the Code Phone which focused, instead, on a series of consensually recorded calls and meetings involving Code and the Code Phone, including a July 10 consensually recorded call involving the Code Phone during which he set out in significant detail the scheme to funnel funds from Adidas to the Bowen family (August 7 Aff., at SDNY_00008643-48); calls between Code and Dawkins intercepted over the Dawkins Phone (*id.* at SDNY_00008629-30, SDNY_00008650-52); and toll records for the Code Phone demonstrating his ongoing communications with other participants in the schemes under investigation (*id.* at SDNY_00008652-55). Indeed, while the application disclosed the fact of the April 7 Order and summarized some of the communications thereby intercepted in describing the background of the investigation, it made no mention of that Order or those communications in the sections focused on Code or the Code Phone. (*Id.* at SDNY_00008629-8652). As such, removing any mention of communications intercepted over the Sood Phone, has no effect on the probable cause determination for the Government's application to intercept communications over the Code Phone, and the remaining material plainly satisfies the requirements of Section 2518(3).

In seeking to broadly suppress all of these additional communications, the defendants make no specific argument about any of the subsequent wiretap applications. Instead, and in sole reliance on *Giordano*, they assert that the court should mechanically suppress each subsequent application because they "detail[] at considerable length" calls intercepted pursuant to the April 7 Order and are therefore "tainted by the use of unlawfully intercepted

64

communications." (Defs. Wiretap Br. at 24) (quoting *Giordano*, 416 U.S. at 511 n.2).  This argument significantly distorts both *Giordano* and the Government's subsequent applications.

With respect to the former, in *Giordano* the Supreme Court drew a clear distinction between an "original" application and order, and "extension orders" which "do not stand on the same footing as original authorizations but are provided for separately."  *Giordano*, 416 U.S. at 530. With respect to extension orders alone, which was all that was at issue in *Giordano*, the *Giordano* court found that the "independent source" doctrine did not apply because "whether or not the application, without the facts obtained from monitoring [the original phone], would independently support original wiretap authority" was not relevant because "the Act itself forbids extensions of prior authorizations without consideration of the results meanwhile obtained."  *Id.* at 533 (citing 18 U.S.C. § 2518(f)).  Indeed, as the dissent in *Giordano* noted, as a result of the majority's holding, the independent source doctrine "while fully applicable to original wiretap orders, is wholly inapplicable to extension orders."  *Id.* at 560 n. 7 (Powell, J., dissenting in part). *Giordano*'s discussion of the suppression of subsequent extension orders, thus, is of no import where, as here, the wiretaps at-issue are *original,* not extension, wiretap orders.[24]  *See United States v. Scasino*, 513 F.2d 47, 49 n.2 (5th Cir. 1975) ("*Giordano* involved the extension of the original wiretap . . . . We are not confronted with an extension order . . . but rather with two separate wiretaps, months apart, at two separate, independent gambling operations and different telephone numbers."); *United States v. Wac*, 498 F.2d 1227, 1231-32 (6th Cir. 1974) ("Not being an application for an extension, . . . the present case differs from *Giordano* and it cannot be said

---

[24] The lone exception to this would be the May 5 extension order for the Sood Phone, which the Government would concede must be suppressed if the Court concludes that suppression of the fruits of the April 7 Order is also mandated.

that the results of the conversations overheard pursuant to the first order were 'essential in law' to issuance of the second order.").[25]

But second, and more important, the suggestion that each subsequent wiretap application is "tainted" because it included discussion of the April 7 Order and certain calls intercepted over the Sood Phone is, at best, an unduly simplistic characterization of the independent source doctrine, and an unsupported and inaccurate assessment of that doctrine as applied to these facts. As detailed extensively above, each of the subsequent wire applications, starting with the June 19 Application for the Dawkins Phone, contained substantial, additional evidence supporting probable cause, all obtained independent of the April 7 Order. Because that independent, lawfully obtained information is sufficient to support each subsequent order, the inclusion of calls intercepted over the April 7 Order does not require suppression of the interceptions pursuant to those subsequent orders. *See, e.g., Lace*, 669 F.2d at 49 (inquiry rests on "not whether the underlying affidavit contained allegations based on illegally obtained evidence, but whether, putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause.").

Accordingly, even if the Court concludes that suppression of the fruits of the April 7 Order is appropriate, because the Government has a lawfully obtained independent source to support its subsequent applications to intercept communications over the Dawkins Phone, the

---

[25] *See also United States v. Kilgore*, 524 F.2d 957, 959 (5th Cir. 1975) ("We agree with Justice Powell's characterization of the majority opinion [in *Giordano*] where he states that it casts no doubt on the proposition that the independent source rule is fully applicable to original orders.") (citing *Giordano*, 416 U.S. at n.7) (Powell, J., dissenting in part, concurring in part); *United States v. Caruso,* 415 F. Supp. 847, 851 (S.D.N.Y. 1976) (Pollack, J.), *aff'd* 553 F.2d 94 (2d Cir. 1977); *United States v. Plotkin*, 550 F.2d 693, 695-98 (1st Cir. 1977), *cert. denied*, 434 U.S. 820 (1977); *United States v. Smith*, 155 F.3d 1051, 1059-1063 (9th Cir. 1998), *cert. denied*, 525 U.S. 1071 (1999); *United States v. McHale*, 495 F.2d 15, 17 (7th Cir. 1974)

Richardson Phone, and the Code Phone, no further suppression of any of those interceptions is appropriate.

## VII.  THE DEFENDANTS' REQUEST FOR THE GRAND JURY MINUTES SHOULD BE DENIED

Finally, the defendants contend that they are entitled to review grand jury minutes because the Indictment may be based upon communications obtained pursuant to the April 7 Order and the subsequent wiretap orders.  (Defs.' Wiretap Br. at 25).  The argument is without merit.

As an initial matter, it is well established that grand jury proceedings are "accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process."  *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991).  As such, "[m]ere speculation that the grand jury may have heard insufficient evidence . . . falls far short of the showing to overcome the presumption of secrecy."  *United States v. Forde*, 740 F. Supp. 2d 406, 414 (S.D.N.Y. 2010); *see also United States v. Muse*, No. 06 Cr. 600 (DLC), 2007 WL 391563, at *10 (S.D.N.Y. Jan. 30, 2007) ("Review of a facially valid indictment is extremely circumscribed and does not include a challenge based on the contention that unreliable evidence was presented to the Grand Jury.").

Here, the defendants – relying primarily on *United States v. Tane*, 329 F.2d 848, 854 (2d Cr. 1964) – assert that they are entitled to review the grand jury transcripts because the Indictment may have been based "almost exclusively" upon the intercepted communications they now seek to suppress.  (Defs. Wiretap Br., at 25).  As an initial matter, and as detailed extensively above, the defendants are not entitled to the drastic remedy they seek, and denial of the motion to suppress, even in part, would moot this component of the motion as well.  Moreover, the defendants' reliance on *Tane* is doubly misplaced.

First, the Government's investigation included numerous investigative steps separate and apart from Title III wiretaps, including consensually recorded meetings, conversations and phone calls.  Both the complaint and indictment similarly detail evidence not obtained pursuant to an order of interception.  (*E.g.*, Compl. ¶¶ 45, 46, 48-54, 56-58, 60, 65, 68, 81-84, 87, 90, 91, 93, 94, 96, 97, 99, 100, 104, 106, 107, 109, 111; Indictment ¶¶ 32, 33, 36-39, 41, 43-45).  As such, even assuming this Court were to suppress every intercepted communication, the defendants would remain unable to demonstrate that the Indictment against them was based "almost exclusively" on the suppressed communications.  Indeed, the Second Circuit in *Tane* itself stated, "[a]s long as there is some competent evidence to sustain the charge issued by the Grand Jury, an indictment should not be dismissed."  *See Tane*, 329 F.2d at 853-54.

Second, and more important, *Tane* says nothing about access to grand jury minutes. There, the district court dismissed the indictment because the Government had "concede[d] that the indictment rested almost exclusively on" testimony and evidence that could "not be used." *Id.* at 854.  Here, the Government has made no such concession.

Accordingly, this final component of the defendants' wiretap suppression motion should also be denied.

### THE MOTION TO SUPPRESS THE CELLPHONE EVIDENCE

Defendants Code and Dawkins further move to suppress all evidence obtained from cell phones seized from each of them incident to their arrests and searched pursuant to judicially authorized search warrants (collectively, the "Cell Phones"). The defendants contend that the search warrants were not supported by probable cause and were overbroad.  The defendants' motion is simply a reiteration of their prior, unsuccessful motion to suppress evidence from these very same phones obtained pursuant to the very same warrants in the *Gatto* case. That motion

was denied by Judge Kaplan who found the warrants were properly issued and not overbroad. *See generally United States v. Gatto*, 313 F. Supp. 3d 551 (S.D.N.Y. 2018).

This motion should be denied for the same reasons it was denied by Judge Kaplan.  In particular, and as the reviewing magistrate judges properly concluded when issuing these warrants, the search warrant applications articulated probable cause to believe that evidence of specific crimes would be found on the Cell Phones, and each warrant clearly and specifically described the items to be seized.  Moreover, even assuming a subsequent court were to disagree with the approving magistrate's determination, suppression would not be warranted because law enforcement agents executing the warrants acted in good faith reliance on those warrants, and the defendants do not and cannot allege otherwise.

## I.    FACTS RELEVANT TO THE SEARCHES OF THE CELL PHONES

### A.  Defendants' Arrests

On September 25, 2017, defendant Dawkins were charged in *U.S. v. Evans, et al.*, 17 Mag. 7119, with conspiracy to commit bribery, substantive bribery, conspiracy to commit honest services fraud, substantive honest services fraud, conspiracy to commit wire fraud, and conspiracy to violate the Travel Act (the "*Evans* Complaint").  The *Evans* Complaint – which, of course, preceded the instant Indictment – also detailed Code's facilitation of bribes paid to Anthony Bland, a men's basketball coach at the University of Southern California.  These complaints collectively detailed a lengthy wiretap investigation that uncovered long-running criminal schemes that extensively utilized cellular phones, as well as fake documents, wire transfers, and other electronic activity by the defendants in furtherance of the charged offenses. Defendants Dawkins and Code were also charged in a separate criminal complaint in *U.S. v. Gatto, et al.,* 17 Mag. 7120, with conspiracy to commit wire fraud, and money laundering (the "*Gatto* Complaint").

69

Dawkins was arrested on the same day the complaints were filed, and Code was arrested on the following day.  At the time of the arrests, Dawkins and Code each had two cellular phones on his person.  At the time of his arrest, Dawkins was believed by law enforcement to have been en route to a meeting with an FBI undercover agent to discuss the crimes charged in the complaints.  Law enforcement personnel seized both cellular phones (*i.e.*, the Cell Phones) from each defendant incident to the arrests.

### B.  The Search Warrant Applications

The Government subsequently sought judicial authorization to search the Cell Phones.  In particular, on October 6, 2017, and November 3, 2017, the Government applied for warrants to each the seized cell phones.  Each application provided a detailed basis for probable cause to believe that the defendants engaged in the crimes charged in the *Evans* Complaint and the *Gatto* Complaint (the "Subject Offenses"), and attached and incorporated by reference both complaints, and the applications also provided a detailed basis for probable cause to believe that the seized cellular phones contained evidence of the Subject Offenses.  The application to search Code's phones also noted that although Code was not initially charged in the *Evans* Complaint, there was probable cause to believe that he committed those offenses, and the Government planned to seek an indictment of Code for those additional offenses as well.  (*See* Exhibit 1 to Phones Mtn., at MC_00000006 n.2).

In support of the application to search the two Dawkins cell phones, the Government submitted an affidavit by an FBI Special Agent ("Agent-1") (the "Dawkins Affidavit," attached as Exhibit 2 to Phones Mtn.).  Agent-1 there stated that one cell phone recovered from Dawkins had been subject to an FBI wiretap and that Dawkins had been recorded using that phone for several calls and at least one text message as a part and in furtherance of the schemes with which he had been charged. (Dawkins Affidavit at 5-6).  The agent stated also that he was aware that

70

Dawkins had used other cell phones in connection with the Subject Offenses. As the second cell phone was recovered from Dawkins' person when he was believed to be en route to a meeting related to the alleged schemes, Agent-1 attested that he believed it likely that Dawkins had used the second cell phone to "communicate with co-conspirators in furtherance of the Subject Offenses." (Dawkins Affidavit at 6).

In support of the application to search the two Code cellphones, the Government submitted an affidavit by another FBI Special Agent ("Agent-2") (the "Code Affidavit," attached as Exhibit 1 to the Phones Mtn). Agent-2 there stated that the first cell phone recovered from Code also had been subject to an FBI wiretap. During the period from June through September 2017, Code repeatedly was recorded using that phone to communicate regarding and in furtherance of the Subject Offenses, including several calls with defendant Dawkins to discuss the prospective payment of bribes to certain coaches, as well as references to a text message Dawkins planned to send to Code regarding those payments. (Code Affidavit at 7-11, 14). Agent-2 stated that the second Code cell phone had been used by Code in a conversation with Dawkins that was intercepted over a wiretap of Dawkins' cell phone. During that conversation, Code and Dawkins discussed payments in furtherance of the Subject Offenses. On the basis of that conversation and the fact that Code was carrying this second phone with him on the day of his arrest, Agent-2 stated that he believed it likely that Code had used that phone on other occasions to communicate with his alleged co-conspirators in furtherance of the Subject Offenses. (Code Affidavit at 12). He stated also that:

> [B]ased on [his] training and experience, [he was] aware that cellphones like the Subject Devices that ha[d] been used to communicate with others about fraud schemes, often contain[ed] records of that activity, including call logs, voicemail messages, text messages, email correspondence, contact information and other identifying data regarding coconspirators, notes about calls and meetings relevant to the Subject Offenses, and the like. Indeed, individuals engaged in such criminal

71

activity often store[d] such records in order to, among other things, keep track of coconspirators [*sic*] contact information and to keep a record of requests for payments along with details regarding the manner and method in which those payments were made.

(Code Affidavit at 12-13).

Both Agent-1 and Agent-2 stated that law enforcement personnel would review the electronically stored information ("ESI") on the subject cell phones for information responsive to the warrant. They listed several search techniques and stated that while "[l]aw enforcement personnel [would] make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant," "[d]epending on the circumstances, ... law enforcement [might] need to conduct a complete review of all the ESI from the Subject Devices to locate all data responsive to the warrant."  (Dawkins Affidavit at 7; Code Affidavit at 14).

### C.  The Search Warrants

The Government's search warrant applications were granted, and search warrants were issued in respect of the Dawkins and Code cell phones on October 6, 2017, by Magistrate Judge Gabriel Gorenstein, and on November 3, 2017, by Magistrate Judge Barbara C. Moses, respectively. (Dawkins Search Warrant, attached as Exhibit 4 to the Suppress Motion; Code Search Warrant, attached as Exhibit 3 to the Suppress Motion). Each warrant authorized law enforcement personnel to "review the ESI contained on the Subject Devices for evidence, fruits, and instrumentalities" of the charged schemes—namely, (1) in the case of Dawkins, evidence of schemes to "(i) pay NCAA coaches in exchange for those coaches using their influence with NCAA players to convince those players and/or their families to retain certain agents, financial advisors, and others; and (ii) pay high school and NCAA players and conceal those payments from universities, thereby defrauding those universities of scholarship money and of the right to control their assets" (Dawkins Search Warrant at 3) and, (2) in the case of

72

Code, evidence of "schemes to make payments from the universities attended or intended to be attended by the players, thereby defrauding those universities of scholarship money and of the right to control their assets." (Code Search Warrant at 3).   In each case, the warrant specified the categories of evidence responsive to the warrant.  (Dawkins Search Warrant at 3-4; Code Search Warrant at 3-4).

Both warrants tracked the language in the applications with respect to the procedures for finding such evidence. Each listed various targeted search techniques, but stated also that "[d]epending on the circumstances, a complete review of the seized ESI may require examination of all of the seized data to evaluate its contents and determine whether the data is responsive to the warrant."  (Dawkins Search Warrant at 4; Code Search Warrant at 4).

### D.  Execution of the Searches

In response to the defendants' previous suppression motion in the *Gatto* case, the Government submitted an affidavit of an FBI Special Agent involved in the review of content obtained from the Cell Phones ("Agent-3"), who detailed how the Government performed the searches.  (*U.S. v. Gatto*, 17 Cr. 686 (LAK), Dkt. 132, Ex. 1, and referred to herein as the "Search Affidavit").  Agent-3 stated that although the search warrants had permitted a broad review of the ESI from the seized cell phones, no such "complete review" of all of the seized data actually occurred.  (Search Affidavit at 5, 7).  For each of the cell phones (except a Blackberry recovered from defendant Code), the law enforcement agents reviewing the data extracted a copy of the contents of the phones using a program called "Cellebrite."  The Cellebrite program automatically divided the content of each of the cell phones by category of data, such as "SMS Messages," Emails, "Voicemails," etc., and then facilitated law enforcement agents' search of the relevant categories of data by providing a "user-friendly interface to search

73

a Cellebrite Extraction of a phone using common search terms and methodologies." (*Id.* at 4). With respect to these cell phones, Agent-3 stated that he and "other law enforcement agents focused on data categories such as MMS Messages, SMS Messages, Chats, Contacts, Call Logs, and Voice Messages, all of which [they] believed were most likely to contain communications or related information regarding or in furtherance of the criminal scheme charged" in *United States v. Gatto, et al.* and, where applicable, in *United States v. Evans, et al.* (*Id.* at 5). In those data categories, the agents generally conducted their review using search terms, but on occasion executed individual review without using search terms. For the remaining categories of data, such as "Device Location," "Device Notifications," "Web History," and "Images," the agents conducted only "a cursory review sufficient to satisfy [them] selves that nothing in that category of data was likely to constitute Identified Material." (*Id.* at 6). With respect to "Images" specifically, Agent-3 stated that if the Images category consisted primarily of photographs, he did not review particular photographs. But if the images "contained documents or spreadsheets, [he] did review at least some of those items to determine whether they were within the scope of the Search Warrants." (*Id.*)

Defendant Code's Blackberry, on the other hand, was not compatible with the Cellebrite program and thus had to be reviewed manually. (*Id.* at 7). Agent-3 personally conducted that review and focused on the text messages contained on the phone, the contacts, and certain documents and/or spreadsheets saved on the phone. Aside from those categories of data, he reviewed no other area of the Blackberry. (*Id.*).

## II. THE SEARCH WARRANTS WERE PROPERLY ISSUED AND RELIED UPON IN GOOD FAITH

### A. Applicable Law

The Fourth Amendment provides that a search warrant "describe with particularity the

place to be searched and the persons or things to be seized." *United States* v. *Rosa*, 626 F.3d 56, 61 (2d Cir. 2010) (quoting *Maryland* v. *Garrison*, 480 U.S. 79, 84 (1987)).  In considering a request for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois* v. *Gates*, 462 U.S. 213, 238 (1983).  It is, of course, well established that "probable cause is a flexible, common-sense standard." *Texas* v. *Brown*, 460 U.S. 730, 742 (1983).  Moreover, probable cause requires "'only [a] probability, and not a prima facie showing, of criminal activity'" *United States* v. *Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 235), and it is entirely appropriate for the reviewing judge to rely upon "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act,'" *Walczyk* v. *Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Gates*, 462 U.S. at 231).  Thus, a sufficient nexus between the alleged criminal activities and the place to be searched "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (internal quotation marks and citations omitted).

Moreover, once a search warrant has issued, "the finding of an issuing judicial officer that probable cause exists" must be "accord[ed] substantial deference." *Wagner*, 989 F.2d at 72 (internal citations omitted); *see also United States* v. *Nichols*, 912 F.2d 598, 602 (2d Cir. 1990) (same); *Bellomo*, 964 F. Supp. at 636 (same).  Provided there is a "substantial basis for finding probable cause," *Wagner*, 989 F.2d at 72 (internal citations omitted), the issuing judge's determination cannot be disturbed.  Moreover, "any doubt about the existence of probable cause will be resolved against the challenge to [the issuing judicial officer's] determination." *Bellomo*,

75

964 F. Supp. at 636 (citing *Illinois* v. *Gates*, 462 U.S. 213, 237 n.10 (1983)).

## B. The Search Warrants Were Supported by Probable Cause

The defendants argue that probable cause to search the entirety of defendants' cell phones did not follow from the fact that the defendants used their cell phones to make calls in furtherance of the Subject Offenses. This argument does not withstand even basic scrutiny, and was appropriately rejected by Judge Kaplan in *Gatto*. As detailed above, the applications for each warrant, which attached detailed criminal complaints specifically alleging each defendant's involvement in the charged crimes and use of their cellular phones as a part and in furtherance of those offenses, specifically identified calls and text messages relevant to the charged crimes and made using one or more of the Cell Phones. Those facts alone defeat the instant motion as they establish a "fair probability that contraband or evidence of a crime" would be found in the defendants' cell phones. *Gates*, 462 U.S. at 238. Indeed, the fact that the defendants used their phones to make and receive calls and text messages in furtherance of the Subject Offenses amply supports a finding that the contents of those phones would include other forms of relevant evidence, including call logs reflecting the fact of the calls; saved contacts, including the names and phone numbers of the co-conspirators with whom the defendant spoke on each occasion; and other communications between that defendant and those co-conspirators, including voice messages, text messages, and e-mails, relevant to the same subjects, *i.e.*, the charged schemes.

Indeed, for substantially these reasons, Judge Kaplan correctly:

conclude[d], in the case of each of the warrants at issue, that the magistrate judge was entitled to infer from the fact that the defendant used a cell phone to make calls and send text messages related to the alleged scheme that other communications and evidence pertaining to that scheme also would have been made on that cell phone. This conclusion reasonably reaches not just other forms of communication, but other forms of data that may be related to or embedded in such communications—in other words, contacts and call logs as well as documents or

images that may have been embedded in or otherwise related to a communication made using the cell phone.

*Gatto*, 313 F.3d at 558-59.  The defendants make no new argument that would warrant disturbing that finding, which the Government would respectfully urge this Court to adopt.

### C.  The Search Warrants Were Not Overbroad

Alternatively, the defendants assert that the search warrants were overbroad because they permitted law enforcement agents, depending on the circumstances, to review the full contents of the phones.  They argue that "[t]o the extent that this Court concludes that the Warrants established probable cause to seize and search Defendants' phones in any manner, the search of those phones should have been limited to the locations on the phones where, according to the Applications, there was probable cause to conclude evidence of criminality would be found." (Defs. Phones Br., at 13).

As an initial matter, the defendants' argument ignores the extensive body of law establishing that "[i]t has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has issued based on probable cause, for specific evidence as enumerated in the warrant, which is then to be seized."  *United States* v. *Ulbricht*, No. 14 Cr. 68 (KBF), 2014 WL 5090039, at *14 (S.D.N.Y. Oct. 10, 2014), *aff'd*, 858 F.3d 71 (2d Cir. 2017) (approving search of entire computer for material specified in the search warrant).  "Thus a broad warrant allowing the government to search [a defendant's] laptop for potentially extensive evidence of those crimes does not offend the Fourth Amendment, as long as that warrant meets the three particularity criteria...."  *Ulbricht*, 858 F.3d at 102-03.  To be sufficiently particularized, a warrant must, (1) "identify the specific offense for which the police have established probable cause," (2) "describe the place to be searched," and (3) "specify the items to be seized by their relation to designated crimes."  *Id.*  at 99.  This general rule applies with equal force to searches

of cell phones and other electronic media.[26]  *See, e.g., United States* v. *Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041, at \*38 (S.D.N.Y. Apr. 4, 2007) (noting it "should not be surprising that a person who uses a computer, or any electronic device, as an instrumentality of crime might discover that a magistrate judge would find probable cause to search that computer, just as it should not shock the user of a telephone that a judge would approve interceptions of calls over that telephone or the home owner that a judge would approve a search throughout a house believed to contain evidence of a crime"); *United States* v. *Juarez*, No. 12-CR-59 (RRM), 2013 WL 357570, at \*6 (E.D.N.Y. Jan. 29, 2013) (concluding that cell phone warrant satisfies the particularity requirement when it constrains agents to search for evidence related to the specific criminal activity being investigated).

Indeed, in reliance on that well established law, Judge Kaplan appropriately concluded that the Search Warrants  "met all three particularity requirements. The warrants each listed the criminal offenses with which defendants had been charged in the relevant criminal complaints. Each warrant described also the places—i.e., the specific cell phones—to be searched. And each specified exactly the types of content that fell within the scope of the warrant." *Gatto*, 313

---

[26] Indeed, the procedure employed here – reviewing the full contents of the phone – was not only fully disclosed to the issuing judge, but is expressly permitted by Rule 41(e)(2)(B), which provides that agents should seize or copy the "electronic storage media" to be searched such that review of that media can occur at a later date. *See* Fed. R. Crim. P. 41(e)(2)(B); *see also United States* v. *Ganias*, 824 F.3d. 199, 213 (2d Cir. 2016) (en banc) ("[I]n assessing the reasonableness, for Fourth Amendment purposes, of the search and seizure of digital evidence, we must be attuned to the technological features unique to digital media as a whole and to those relevant in a particular case—features that simply do not exist in the context of paper files.").

While the Government believes that the use of such a technique would often be appropriate and is thus properly included in both the Search Warrants and underlying applications, in this case no such "complete review" of "all of the seized data" actually occurred.  Instead, as detailed in the Search Affidavit, law enforcement agents used more focused and targeted search techniques identified in the Search Warrants in an effort to pinpoint material likely to be relevant and within the scope of the Search Warrants.

F.Supp.3d at 560.  Judge Kaplan therefore found that the Search Warrants were not overbroad and denied the defendants' motion.  *Id.* at 561.

Furthermore, the issuing judges' determinations were particularly appropriate here given that the Code and Dawkins Affidavits and attachments provided specific information to support a conclusion that the Cell Phones were being extensively used in furtherance of the charged schemes.  As noted above, this wiretap investigation revealed that the defendants regularly used the Cell Phones in furtherance of the charged crimes for extended periods of time, placing dozens of calls to co-conspirators, necessarily implying that the Cell Phones would contain, among other things, call logs, contact lists, information about the identities of and numbers used by co-conspirators, and strongly suggesting more than "a fair probability" that the phones would contain other communications with co-conspirators, including text messages, voice mails, and other types of communicative data.  The existence of numerous calls in furtherance of the charged schemes made over the Cell Phones certainly supports the "practical, commonsense decision" that phones could contain evidence of those crimes, including in mediums beyond records of the phone calls and text messages themselves.  *See, e.g.*, *Gates*, 462 U.S. at 238; *United States* v. *Travisano*, 724 F.2d 341, 345 (2d Cir. 1983) (issuing judge need only find "probable cause to believe that evidence of such crime is located [in the place to be searched]."); *United States* v. *Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (noting that the nexus between the items sought and the particular place to be searched "may be based on 'reasonable inference' from the facts presented based on both common sense and experience.") (internal citations and quotation marks omitted).

The fact that the search, as a result, caused an invasion of privacy, as the defendant note, does not suggest that the warrants were overbroad.  As the Second Circuit has previously

recognized, "[s]uch an invasion of a criminal defendant's privacy is inevitable, however, in almost any warranted search because in searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." *Gatto*, 313 F. Supp.3d at 561 (quoting *Ulbricht*, 858 F.3d at 103) (internal quotation marks and citation omitted). And, as Judge Kaplan appropriately determined, "[h]ere, in particular, it would have been difficult for the search warrants to specify *ex ante* those areas of data in which law enforcement was likely to find evidence responsive to the warrants because, among other reasons, it was not clear in advance whether the government would be able to sort through the various data categories in some automatic or mechanical way." *Gatto*, 313 F. Supp.3d at 561.[27]

The two out-of-district, non-binding cases principally relied upon by the defendants are no different. (Defs. Phones Br., at 11-13). In *United States* v. *Winn*, 79 F. Supp. 3d 904 (S.D. Ill. 2015) the defendant, who was charged with public indecency based upon a complaint that he had used his cell phone to photograph young girls without their permission, *id.* at 909, challenged the search warrant itself on the ground that it permitted agents to search the entire phone for "any and all files" relating generally to the crime of public indecency. The Court, noting that the charged conduct was a "misdemeanor" for which it was "difficult to fathom why the police would ever need" to search the entire phone, found that the application in that case focused squarely on photos and videos, and "did not offer any basis – *such as facts learned during the*

---

[27] As Judge Kaplan recognized, "not all of the phones were compatible with the Cellebrite program. And in the cases of those that were so compatible, the data categories were not perfectly separable. For example, certain messages were able to 'include or "attach" various forms of multimedia, such as images and videos.' Moreover, the Cellebrite program combined photographs and documents in the broad category of 'Images.'" *Gatto*, 313 F. Supp.3d at 561 (citing Search Affidavit at 4 n.1, 6).

*investigation or [the affiant's] training and expertise* – to believe that" the rest of the phone was "connected with [the defendant's] act of public indecency." *Id.* at 919-20 (emphasis added).

Here, by contrast, the crime was not an isolated incident charged as a misdemeanor but a long running felony fraud scheme, one in which the Dawkins and Code Affidavits alleged, with specificity, the Cell Phones' extensive use over a substantial period of time, up to the date of the defendants' arrests. In particular, the Affidavits here *do* allege "facts learned during the investigation," namely, numerous recorded communications occurring over the Cell Phones regarding the charged schemes, all of which informed the affiant's view, based on his "training and expertise," that the phones were likely to contain additional categories of evidence. Moreover, here, unlike in *Winn*, the warrant itself did not simply cite a statute and authorize the seizure of anything arguably related to it, but instead described with particularity the type of content on the phone that was within the scope of the warrant. As such, the facts here are readily distinguishable from those in *Winn* in every material respect. *Cf. United States* v. *Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (reasoning that warrant is "sufficiently specific" if "permit[s] the rational exercise of judgment by the executing officers in selecting what items to seize") (brackets and internal quotation marks omitted); *Lustyik*, 57 F. Supp. 3d at 228 (finding that the inclusion in a warrant of an illustrative "list providing examples of the items to be seized, albeit a list modified by the phrase 'including, but not limited to,' offers sufficient guidance to law enforcement officers to pass constitutional muster.").

In *In re Nextel Cellular Telephone*, No. 14 MJ 8005, 2014 WL 2898262, at *1-2 (D. Kan. June 26, 2014), the other case relied on by defendants, a magistrate judge concluded that the Government's search warrant for various digital media lacked "particularity" principally because it failed to specify the methodology the Government would use to review the contents of media.

81

*See id.* at \*11-12 (noting the application failed to specify "*how* the government intends" to review the data and "whether or not [the Government's search] procedures are 'computer-assisted,'" and "what kinds of third party software are used and how they are used to search for particular types of data"). But there is no requirement in the Second Circuit for setting out such a search protocol to meet the particularity requirement under the Fourth Amendment. *See, e.g.*, *United States v. Galpin*, 720 F.3d 436, 451 (2d Cir. 2013) ("Unlike the Ninth Circuit, we have not required specific search protocols or minimization undertakings as basic predicates for upholding digital search warrants, and we do not impose any rigid requirements in that regard at this juncture."); *Vilar*, 2007 WL 1075041, at \*38 ("[W]hile the warrant must state with particularity the materials to be seized from a computer, the warrant need not specify *how* the computers will be searched. This is the view of the vast majority of courts to have considered the question."). Moreover, the Search Warrants did identify some of the methods that law enforcement might use to search the defendants' cell phones, which is "far more than the Constitution require[s]," and thus sufficient to uphold the Search Warrants. *Vilar*, 2007 WL 1075041, at \*38.

Accordingly, the defendants' claim that the Search Warrants were overbroad is without merit.

### D. Law Enforcement Agents Relied in Good Faith on the Warrant

Finally, even assuming that the Search Warrants could be deemed overbroad or unsupported by probable cause, suppression would still be improper because the agents relied upon them in good faith. *See generally Leon*, 468 U.S. at 922 (holding that where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant," the Fourth Amendment exclusionary rule does not apply). Accordingly, and as detailed above, the

82

fruits of a search warrant later deemed to be insufficient will be suppressed only if "(1) the issuing judge abandoned his detached, neutral role; (2) the agent was dishonest or reckless in preparing the supporting affidavit for the wiretap order; or (3) the agents' reliance on the warrant was not reasonable." *Bellomo*, 954 F. Supp. at 638 (citing *Leon*, 638 U.S. at 922-925). By contrast, if "a reasonably trained officer would" not "have known that the search was illegal despite the magistrate's authorization," *Leon*, 468 U.S. at 922 n.23, then suppression is improper. *See also Herring* v. *United States*, 555 U.S. 135, 144 (2009) (finding that to trigger the exclusionary rule, law enforcement "conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system").

Here, there is no serious suggestion that the agents lacked a good faith belief that the warrants they sought were proper and could be relied upon to execute searches of the Cell Phones. Nor could there be. First, there is no suggestion that the agents misled any of the issuing judges in any respect. Nor is there any suggestion that the issuing judge "wholly abandoned [her] judicial role." Finally, and for substantially the same reasons, there is no basis to conclude that the warrants here "so lacked probable cause" that the agents' "reliance upon them was unreasonable." As noted, the Code and Dawkins Affidavits and attachments in question were not only thorough and accurate, but they were approved by a magistrate judge and have been subsequently upheld by Judge Kaplan in the *Gatto* case, all facts that belie the notion that it was "unreasonable" for the agents to conclude the warrants were lawfully issued and could be lawfully executed.[28]

---

[28] Indeed, the reasonableness of that belief is only bolstered by the fact that the agent further knew that the Government had sought and obtained judicial authorization to intercept calls occurring over each of the defendants' Cell Phones, applications which themselves required additional and substantial probable cause findings.

As such, even assuming this Court were to find fault with the Search Warrants, there is no basis to conclude that the agents behaved in a deliberately unlawful manner or lacked a good faith belief in the validity of the search warrants, and thus no reason to suppress the fruits of those searches.  *Gatto*, 313 F.Supp.3d at 562; *Tomero*, 462 F. Supp. 2d at 572.

## THE MOTION FOR A BILL OF PARTICULARS, ADDITIONAL DISCOVERY, AND EARLY *BRADY* AND *GIGLIO* DISCLOSURES

Finally, the defendants move for an order requiring the Government to provide "certain particulars concerning the charged offenses," what the defendants describe as "relevant discovery," and early *Brady* and *Giglio* disclosures.  This motion should also be denied.

84

### I.   THE DEFENDANTS' MOTION FOR A BILL OF A PARTICULARS SHOULD BE DENIED

The defendants claim that they are entitled to "certain particulars without which they will be 'unable to prepare adequately for trial'" in light of the Government's purportedly "unique theory of liability." (Defs. Discovery Br., at 2).  But as is described extensively above in the Government's opposition to the defendants' other pending motions, there is nothing particularly unique about the charges here, which, at bottom, allege a straightforward bribery scheme that happens to take place within the context of college basketball.  Moreover, and as described throughout, through the lengthy, detailed complaint and Indictment, as well as the voluminous discovery produced by the Government, the defendants have more than sufficient information to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam).  The motion should, therefore, be denied.

#### A.  The Defendants' Requests

In their motion, the defendants request the following particulars:

1.   "[A]dditional details concerning the 'financial aid the universities continued to award to the relevant student-athletes under false pretenses,'" (Defs. Discovery Br., at 3) (quoting Indictment ¶ 3), including "the dates and amounts of these financial awards, and the names of each student who received an award under false pretenses." (*Id.*). (hereinafter, "Request 1").

2.   The "names of the 'others' from whom Lamont Evans is alleged to have 'solicited and accepted . . . bribes,' in addition to CW-1." (Defs. Discovery Br., at 3) (quoting Indictment ¶ 29). (hereinafter, "Request 2").

85

3.  "[T]he date in July 2017 wherein Emanuel Richardson is alleged to have 'solicited an additional $15,000 bribe from Christian Dawkins . . . CC1, and UC1.'" (Defs. Discovery Br., at 3) (quoting Indictment ¶ 38). (hereinafter, "Request 3").

4.  "[T]o the extent possible . . . the 'others known and unknown' who are alleged to have conspired with the defendants from 2016 up to and including September 2017. (Indictment ¶¶ 47, 66). (hereinafter, "Request 4").

The defendants further describe their requests as "in essence. . . seek[ing] the identities and roles of the defendants' alleged accomplices and unindicted coconspirators, as well as details concerning the additional bribes and financial details which underpin the government's theories of prosecution." (Defs. Discovery Br., at 3).

### B.  Applicable Law

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to move for a bill of particulars "before or within 14 days after arraignment or at a later time if the court permits." Fed. R. Crim. P. 7(f).  Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars where necessary to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *Bortnovsky*, 820 F.2d at 574; *see also United States v. Rigas*, 490 F.3d 208, 237 (2d Cir. 2007).  Thus, "'[a] bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" *United States v. Berganza*, No. 03 Cr. 987 (DAB), 2005 WL 372045, at *5 (S.D.N.Y. Feb. 16, 2005) (quoting *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990)).  If the information the defendant seeks "is provided in the indictment or in some acceptable alternate

form," such as discovery, no bill of particulars is required. *Bortnovsky*, 820 F.2d at 574; *see also United States v. Spy Factory*, 960 F. Supp. 684, 690-91 (S.D.N.Y. 1997).

A bill of particulars "is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." *United States v. Kazarian*, No. 10 Cr. 895, 2012 WL 1810214, at \*24-\*26 (S.D.N.Y. May 18, 2012). "It is not enough that the information would be useful to the defendant; if the defendant has been given adequate notice of the charges against him, the government is not required to disclose additional details about its case." *United States v. Payden*, 613 F. Supp. 800, 816 (S.D.N.Y. 1985); *see also United States v. Silberstein*, No. 02 Cr. 800 (SWK), 2003 WL 21488024, at \*6 (S.D.N.Y. June 27, 2003) (quoting *United States v. Facciolo*, 753 F. Supp. 449, 451 (S.D.N.Y. 1990)). A bill of particulars should not be employed in an attempt to "lock the government into its proof." *United States v. Rigas,* 258 F. Supp. 2d 299, 304 (S.D.N.Y. 2003); *see also United States v. Mahabub*, No. 13 Cr. 908, 2014 WL 4243657, \*2 (S.D.N.Y. Aug. 26, 2014) ("The government's presentation of evidence at trial is limited to the particulars contained in the bill, so care must be taken not to overly restrict the government's proof while still protecting the defendant from unfair surprise"); *United States v. Samsonov*, 07 Cr. 1198, 2009 WL 176721, at \*2-\*4 (S.D.N.Y. Jan. 23, 2009) (bill of particulars should not be "misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches"). Nor is the function of a bill of particulars "to allow defendants to preview the evidence or theory of the Government's case." *United States v. Taylor*, 707 F. Supp. 696, 699 (S.D.N.Y. 1989) (citations omitted). The Government is not required to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed." *United States v. Triana-Mateus*, No. 98 CR.

87

958(SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002); *United States v. Zemlyansky*, 945

F. Supp. 2d 438, 484-85 (S.D.N.Y. 2013) ("It is improper to use a bill of particulars to compel

the Government to disclose the manner in which it will prove the charges or preview its evidence

or legal theory." (internal citation and alteration omitted)).

The ultimate test is whether the information sought is *necessary*, not whether it is helpful.

*See United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001); *Payden*, 613 F. Supp. at

816 ("It is not enough that the information would be useful to the defendant; if the defendant has

been given adequate notice of the charges against him, the government is not required to disclose

additional details about its case."). Under the relevant legal standard, the Government is not

required to: (a) "particularize all of its evidence," *United States v. Cephas*, 937 F.2d 816, 823 (2d

Cir. 1991); (b) disclose the precise manner in which the crimes charged in the indictment were

committed, *see Torres*, 901 F.2d at 233-34; or (c) provide the defendant with a preview of the

Government's case or legal theory, *see United States v. Muyet*, 945 F. Supp. 586, 598-599

(S.D.N.Y. 1996).

Where, as here, the information sought by a defendant is provided in the charging

instrument or through some other means, such as in discovery, a bill of particulars is not

necessary. *See Kazarian,* 2012 WL 1810214, at *25 (noting the "enormous amount of discovery

material," which "provide[s the defendant] with much of the information sought in the request

for a bill of particulars"); *see also, e.g.*, *United States v. Monserrate*, No. 10 Cr. 965 (CM), 2011

WL 3480957, at *4 (S.D.N.Y. Aug. 4, 2011) (denying request for bill of particulars where

discovery materials and indictment were "sufficient to apprise the defendant of the charge

against him" and to allow him to prepare for trial); *Samsonov*, 2009 WL 176721, at *4 (denying

88

bill of particulars request where indictment, discovery letters, and discovery materials gave defendant adequate information to prepare for trial).

Because a bill of particulars "confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case." *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987); *see also Mahabub*, 2014 WL 4243657, at *2. Moreover, the Government's provision of particulars tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor [his] testimony to explain away the Government's case." *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) (citing *United States v. Cimino*, 31 F.R.D. 277, 279 (S.D.N.Y. 1962)). These concerns animate the rule that "if the defendant has been given adequate notice of the charges against [him] and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case." *Henry*, 861 F. Supp. at 1197.

Whether to order the Government to file a bill of particulars lies "within the sound discretion of the district court." *Zemlyansky*, 945 F. Supp. 2d at 485 (quoting *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984)). "When exercising this discretion, a court must consider the totality of the information available to the defendant—through the indictment, affirmations, and general pre-trial discovery—to determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." *United States v. Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489, at *7 (S.D.N.Y. Dec. 3, 2013) (internal quotation marks omitted).

Applying these principles, courts in this District routinely deny motions for bills of particulars that are, at bottom, demands for additional details about either the manner in which the offense was committed or how the Government intends to prove its case at trial. *See, e.g.*,

89

*United States* v. *Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (noting that Government may

not be compelled to provide bill of particulars disclosing manner in which it will prove charges,

manner in which defendant committed the crime charged, or a preview of Government's

evidence or legal theories); *United States* v. *Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977)

(rejecting request for bill of particulars regarding the names, dates and places for the entire case

as "an attempt to discover the minutia of the Government's case").

### C. Argument

There is no basis for a bill of particulars in this case.  The charges against the defendants

are set forth in far more detail in the Complaint and the Indictment than is required.  In addition,

Rule 16 discovery has provided the defendants with an even more detailed understanding of the

Government's evidence than the charging instruments.  The defendants cannot plausibly claim—

as they must, in order to be entitled to a bill of particulars—that the Complaint and Indictment

lack sufficient detail to allow them to plead double jeopardy against a subsequent prosecution for

the same acts, or to understand the criminal conduct of which they stand accused.

Instead, what the defendants seek by their own admission is additional "details" about the

Government's case.  (Defs. Discovery Br., at 3).  But it is precisely these sorts of additional

details that defendants cannot obtain through a bill of particulars.  *See, e.g., Rigas,* 258 F. Supp.

2d at 304  (bill of particulars should not be employed in an attempt to "lock the government into

its proof."); *see also Mahabub*, 2014 WL 4243657, at \*2; *Samsonov*, 2009 WL 176721, at \*2-\*4

(bill of particulars should not be "misused to compel disclosure of how much the Government

can prove, nor to foreclose the Government from using proof it may develop as the trial

approaches").

With respect to Request 4 – which seeks the identities of unindicted co-conspirators – while the defendants assert that "[c]ourts routinely order such disclosure" (Defs. Discovery Br., at 3), the case law does not support that claim.  In evaluating such requests, courts have considered, among other factors, the number of co-conspirators, the duration and breadth of the alleged conspiracy, whether the Government has otherwise provided adequate notice of the particulars, the volume of pretrial discovery, the potential danger to co-conspirators and the nature of the alleged criminal conduct, and the harm to the Government investigation. *See United States v. Reddy*, 190 F. Supp. 2d 558, 570 (S.D.N.Y. 2002) (collecting cases).

Here, many of these factors weigh against requiring the Government to disclose the identities of co-conspirators in advance of trial.  The duration of the conspiracy alleged is relatively modest and spans less than two years from in or about 2016 through in or about September 2017 (Indictment ¶ 47). *See United States v. Savin,* No. 00 Cr. 45, 2001 WL 243533, at *5 (S.D.N.Y. Mar.7, 2001) (bill of particulars granted where number of co-conspirators "quite large" and conspiracy may have spanned six years).  The breadth of the types of crimes alleged to have been part of the conspiracy is also narrow, and relates to the payment of bribes to college coaches in order for those coaches to steer student-athletes to the bribe payers in return.  This is not a case involving a conspiracy spanning a broad range of different types of criminal acts. *See Lino,* 2001 WL 8356, at *13(bill of particulars granted where conspiracy involved large number of defendants, was wide-ranging in terms of the nature of the acts and the commerce affected and defendants were likely to be surprised by the identity of the other co-conspirators).

Furthermore, due to the detailed Indictment and discovery material – including hours and hours and of the defendants' own phone calls – there is little risk of surprise to the defendants, which also weighs against granting the bill of particulars. *See United States v. Nachamie*, 91

91

F.Supp.2d 565, 572–73 (2000) (bill of particulars identifying coconspirators appropriate in case where defendant "is more likely to be surprised by the identity of other co-conspirators whom he may never have met"); *United States v. Amendolara*, No. 01 Cr. 694 (DAB), 2002 WL 31368279, at *5-6 (S.D.N.Y. Oct. 21, 2002) (denying a request for the identities of all unindicted co-conspirators because "the Indictment and discovery material already provided to Defendant Anello by the Government sufficiently facilitate his ability to avoid surprise and prepare for trial"); *Trippe*, 171 F. Supp. 2d at 240 (denying a bill of particulars seeking names of all co-conspirators and aiders and/or abettors in securities and mail fraud case in light of sufficiency of information contained in the Indictment and through discovery); *United States v. Rodriguez*, No. 99 Cr. 367 (DLC), 1999 WL 820558, at *2 (S.D.N.Y. Oct. 13, 1999) (denying motion for a bill of particulars identifying known co-conspirators where the Indictment coupled with discovery allowed a defendant "both to prepare his defense and to avoid prejudicial surprise at trial").

The defendants provide no specific argument as to why this case presents compelling circumstances requiring the Government to provide the identities of unindicted co-conspirators. Courts routinely deny blanket requests for the identities of all co-conspirators, and this Court should do the same here. *See, e.g., United States* v. *Rittweger*, 259 F. Supp. 2d 275, 292 (S.D.N.Y. 2003) (concluding, in thirteen-count securities fraud case that , the indictment and discovery were sufficient and "[t]here is no need to provide a list of all unindicted co-conspirators"); *Samsonov*, 2009 WL 176721, at *4 (noting that demand for particulars identifying co-conspirators was "a veiled attempt to discern who is cooperating with the Government"); *United States v. Solomonyan*, 451 F. Supp. 2d 626, 642 (S.D.N.Y. 2006) ("While knowing the identity of unindicted coconspirators might be useful to the defense, [ ] the question is not whether the information would be useful to the defense, but rather whether it is necessary. .

92

. Here, such information is not necessary and defendants' request is therefore denied.") (quotations and citations omitted); *cf. Torres*, 901 F.2d at 233-234 (upholding district court's denial of a bill of particulars where the defendant had requested "the identity of other persons 'known and unknown' as alleged in … the indictment").

With respect to Requests 1, 2 and 3 – which seeks the dates and amounts of financial awards, and the names of each student who received an award under false pretenses; the names of the 'others' from whom Lamont Evans is alleged to have 'solicited and accepted . . . bribes;'" and the "date in July 2017 wherein Emanuel Richardson is alleged to have solicited an additional $15,000 bribe from Christian Dawkins . . . CC1, and UC1," respectively – these Requests should be denied because they are exactly the sort of request that is forbidden under the case law. Indeed, the details the defendants seek in these Requests, including specific dates, amounts, and names, are exactly the type of "minutiae" of the Government's case to which they are not entitled through a bill of particulars. *See United States v. Leonelli,* 428 F. Supp. 880, 882 (S.D.N.Y. 1977) (rejecting request for bill of particulars regarding the names, dates and places for the entire case as "an attempt to discover the minutia of the Government's case"); *see also United States v. Mitlof,* 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (noting that Government may not be compelled to provide bill of particulars disclosing manner in which it will prove charges, manner in which defendant committed the crime charged, or a preview of Government's evidence or legal theories).  These Requests are particularly meritless in light of the extensive discovery, and the detailed allegations in the Indictment.  *See Kazarian*, 2012 WL 1810214 (noting the "enormous amount of discovery material," which "provide[s the defendant] with much of the information sought in the request for a bill of particulars"); *Monserrate*, 2011 WL 3480957, at *4 (denying request for bill of particulars where discovery materials and indictment

93

were "sufficient to apprise the defendant of the charge against him" and to allow him to prepare for trial); *Samsonov*, 2009 WL 176721, at \*4 (denying bill of particulars request where indictment, discovery letters, and discovery materials gave defendant adequate information to prepare for trial).

In sum, the Requests should be denied because the defendants have made no showing whatsoever that the information they seek is in fact necessary to allow them to plead double jeopardy against a subsequent prosecution for the same acts, or to understand the criminal conduct of which they stand accused.

## II.   THE DEFENDANTS' MOTION FOR ADDITIONAL DISCOVERY AND EARLY *BRADY* AND *GIGLIO* DISCLOSURES SHOULD BE DENIED

The defendants make two motions related to the Government's productions and disclosures to date.  First, the defendants ask this Court to order the production of wiretap warrants, affidavits, applications and periodic reports, along with the accompanying interceptions, that pertain to interceptions over two cellular phones that were utilized by Rashan Michel and Chuck Person, who are defendants in the separate case of *U.S. v. Person and Michel*, 17 Cr. 683 (S.D.N.Y.) (LAP) (Defs. Discovery Br., at 4-5).  Second, the defendants seek immediate disclosure of all *Brady/Giglio* material.  For the reasons set forth below, both requests should be denied.

### A. Defendants' Requests for Person and Michel Wiretaps

The defendants have requested five separate wiretap warrants, affidavits, applications, periodic reports, along with the accompanying interceptions, for cellular phones that were utilized by Michel and Person.  (Defs. Discovery Br. at 4-5).

The defendants assert – without any explanation whatsoever – that these materials are both "relevant to the preparation of our defense, but may also prove key in examining the

94

legality of the extensive wiretapping which occurred in this case." (Defs. Discovery Br., at 4).

However, they simultaneously acknowledge the obvious – that this is but a thinly veiled fishing

expedition.  (*Id.* at 4-5 ("Obviously, without reviewing these items first, we could not say either

with certainty.")).  The Government notes, based on its review of these materials, that it appears

that there was no content from either defendant Dawkins or Code intercepted over any of these

five wiretaps.[29]  The defendants make no argument, thus, as to how this material is discoverable

under Rule 16, nor is the Government aware of any.[30]

As such, the Court should deny this request.

### B.  Defendants' Request for Immediate *Brady/Giglio* Disclosure

Additionally, the defendants request immediate disclosure of *Brady* and *Giglio* material

to "preserve the eventuality of effective plea bargaining." (Defs. Discovery Br., at 7).  However,

as the defendants also acknowledge, the law of this Circuit is that "the Government need only

turn over constitutionally required exculpatory and impeachment information in time for

defendants to use it effectively at trial – not immediately on demand or any sooner."  (*Id.* at 6).

As to *Brady* material, an order is unnecessary.  The Government recognizes its

obligations under *Brady* and has acknowledged its *Brady* obligations in correspondence with

defense counsel.  Indeed, courts routinely hold that there is no need for a Court order directing

the Government to take action when the Government has already represented that it recognizes

and intends to comply fully with all of its obligations. *See, e.g., United States v. Gatto*, 316 F.

---

[29] There were two contacts between one of Code's phones and Michel – one phone call and one text message – but the phone call does not contain any intercepted audio content, and the text message does not appear on any line sheet.

[30] To the extent any of the material the defendants seek constitutes 3500 material for any of the Government's witnesses, the Government will produce such material at the appropriate time in advance of trial.

Supp.3d 654, 657-58 (S.D.N.Y. 2018) (denying defendant's motion to compel where "the Government represented it has and will continue to comply with its obligations under *Brady* as well as *Giglio*"); *United States v. Ikoli*, No. 16 Cr. 148 (AJN), 2017 WL 396681, at *3 (S.D.N.Y. Jan. 26, 2017) (denying motion to compel where "the Government represents that it recognizes its obligations under *Brady*, and that while the Government is not aware of any *Brady* material, should the Government become aware of any, it will produce it promptly" (internal quotation marks and alterations omitted)); *United States v. Gallo*, No. 98 Cr. 338 (JGK), 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying defendant's motion to compel production of *Brady* material based on Government's representations that "it is aware of its obligations under *Brady* . . . and will produce any *Brady* material to the defense well before trial"). The Government's representation in this case is entirely consistent with its productions to date which has included not only voluminous Rule 16 material, but multiple additional disclosures of information and witness statements clearly reflective of the Government's intention and good faith efforts to take seriously and comply fully with its *Brady* obligations.  And while the Government is not presently aware of any undisclosed *Brady* material, should the Government become aware of any, the Government will produce it promptly. As a result, the defendants' request for an order compelling the immediate production *Brady* material should be denied. *See, e.g., Gatto*, 316 F. Supp.3d at 657-58; *Gallo*, N1999 WL 9848, at *8; *accord United States v. Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996).

        As to *Giglio* material, there is no need for "immediate" disclosure of *Giglio* material in this case. In accordance with common practice in this District – and the well-established law of the Second Circuit, *see, e.g.*, *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001), -- the Government intends to provide the defense with *Giglio* material approximately 30 days prior to

96

the start of trial.  That timeline is more than sufficient, particularly given that the defendants have long had access to *Giglio* material for two of the Government's anticipated cooperating witnesses. [31] *See, e.g., Viera*, 2015 WL 171848, at \*6 (denying request for immediate disclosure of *Giglio* material when government indicated it intended to produce a witness list and *Giglio* material one week before trial and Jenks Act material on the Friday before trial); *United States v. Canter*, 338 F. Supp. 2d 460, 461-62 (S.D.N.Y. 2004) (denying request for disclosure of *Brady*, *Giglio* and Jencks Act material 30 days prior to trial); *United States v. Trippe*, 171 F. Supp. 2d 230, 237 (S.D.N.Y. 2001) ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as Jencks Act material, that is, at least one day before the Government witness is called to testify"); *United States v. Rueb*, 00 Cr. 91 (RWS), 2001 WL 96177, at \*6-7 (S.D.N.Y. Feb. 5, 2001) (Government directed to provide *Giglio* material at least one day before calling the relevant witness to testify).  Further, as the Supreme Court has recognized, due process "does not require the Government to disclose material impeachment evidence prior to entering a plea agreement."  *United States v. Ruiz*, 536 U.S. 622, 632-33 (2002).

Accordingly, this motion should also be denied.

---

[31] In particular, the identity of two of the Government's most significant witnesses, and much of the *Giglio* material pertaining to at least of one of them, was produced to the defendants in advance of the *Gatto* trial, and one of those witnesses testified against these defendants at that trial.

## **CONCLUSION**

For the reasons set forth above, the defendants' motions should be denied in their entirety.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney


By: _____/s/_____
Robert L. Boone /Noah Solowiejczyk
Eli J. Mark
Assistant United States Attorneys
(212) 637-2294/2473/2431